1   GARRICK A. HOLLANDER – State Bar No. 166316
    ghollander@wghlawyers.com
2   **WINTHROP GOLUBOW HOLLANDER, LLP**
    1301 Dove Street, Suite 500
3   Newport Beach, CA 92660
    Telephone: (949) 720-4100
4   Facsimile: (949) 720-4111

5
    General Insolvency Counsel for Global Premier Regency
6   Palms Oxnard, L.P., Debtor and Debtor-in-Possession

7

8                **UNITED STATES BANKRUPTCY COURT**

9         **CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION**

10

11  | In re: | Case No. 9:22-bk-10626-RC |
12  | | Chapter 11 Proceeding |
    GLOBAL PREMIER REGENCY PALMS
13  OXNARD, L.P., a California limited      **DEBTOR'S NOTICE OF MOTION AND**
    partnership,                           **MOTION FOR ORDER: (1) APPROVING**
14                                         **COMPROMISE OF CONTROVERSY WITH**
                Debtor and                 **JKO GROUP, INC. AND (2) DISMISSING**
15              Debtor-in-Possession       **CHAPTER 11 CASE; MEMORANDUM OF**
                                           **POINTS AND AUTHORITIES; AND**
16                                         **SUPPORTING DECLARATION OF**
                                           **CHRISTINE HANNA IN SUPPORT**
17                                         **THEREOF**

18                                         DATE:      August 8, 2023
                                           TIME:      2:00 p.m.
19                                         PLACE:[1]  Courtroom 201
20                                                    1415 State Street
                                                      Santa Barbara, CA  91301
21

22

23

24

25

26

27

28  ───────────────────
    [1] The hearing on the Motion is scheduled to be heard via Zoom.  Please check the Court's calendar just prior to the
    hearing to confirm. http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/.

# **TABLE OF CONTENTS**

MEMORANDUM OF POINTS AND AUTHORITIES ........................................................ 5

I.    INTRODUCTION ................................................................................. 5

II.   STATEMENT OF FACTS ....................................................................... 5
      A.    Background of the Debtor............................................................. 5
      B.    Events Precipitating Chapter 11 Filing.......................................... 6
      C.    Assets  ................................................................................... 7
      D.    Liabilities ............................................................................... 8
      E.    The Compromise....................................................................... 9
      F.    Proposed Disposition of Case ...................................................... 13

III.  THE COMPROMISE IS REASONABLE, FAIR AND EQUITABLE AND
      IS IN THE BEST INTERESTS OF THE ESTATE ................................... 14

      A.    The Probability of Success on the Merits ....................................... 16
      B.    Difficulty in Collection............................................................... 16
      C.    The Complexity, Expense and Inconvenience of Litigation.............. 16
      D.    The Interest of the Debtor's Creditors ........................................... 16

IV.   THE COURT SHOULD DESIGNATE CHRISTINE HANNA AS THE
      PERSON IN CONTROL OF THE DEBTOR PURSUANT TO 11 U.S.C. § 1107(a)
      AND F.R.B.P. 9001(5) .......................................................................... 17

V.    THE DEBTOR SHOULD BE AUTHORIZED TO PAY ITS CREDITORS ........... 19

VI.   THE BANKRUPTCY COURT SHALL DISMISS THIS BANKRUPTCY
      BASED ON THE EXISTENCE OF GOOD CAUSE  ................................. 20

      A.    The Court Has Authority, and Based on the Existence of Good Cause, Must
            Dismiss this Bankruptcy ............................................................. 20
      B.    Dismissal is in the Best Interests of the Debtor's Creditors and Estate
            Because Dismissal Represents the Best Option for Recovery to Creditors... 22
      C.    Creditors Will Not Suffer Any Legal Prejudice ............................. 22

VII.  ALL ORDERS OF THE COURT IN THIS CHAPTER 11 PROCEEDING
      SHOULD SURVIVE DISMISSAL..................................................... 23

VIII. CONCLUSION.................................................................................. 23

# TABLE OF AUTHORITIES

## <u>Cases</u>

<u>In re A & C Props.</u>
784 F.2d at 1380-82; In re Walsh Const., 669 F.2d at 1328 ............................................15, 16, 18

<u>In re Continuum Care Services, Inc.,</u>
375 B.R. 692, 694 (Bankr.S.D.Fla. 2007) ......................................................................19

<u>Czyzewski v. Jevic Holding Corp</u>.
137 S. Ct. 973, 197 L. Ed. 2d 398 (2017) .......................................................................21

<u>In re Derivium Capital, LLC</u>
2010 WL 11719990, at *3 (Bankr.D.S.C. 2010) ...............................................................19

<u>In re Ditter,</u>
13 F. App'x 686, 687, 2001 WL 791733 (9th Cir. 2001)....................................................22

<u>In re Eastman,</u>
188 B.R. 621, 624 (9th Cir. BAP 1995) ..........................................................................24

<u>In re Geller,</u>
74 B.R. 685, 688-89 (Bankr. E.D. Pa. 1987) ...................................................................23

<u>In re Hall,</u>
15 B.R. 913, 719 (B.A.P. 9th Cir. 1981) .........................................................................23

<u>In re Hickman,</u>
384 B.R. 832, 840 (B.A.P. 9th Cir. 2008).......................................................................22

<u>In re Integrated Knowledge Mktg., Inc.,</u>
2007 WL 7540949, at *6 (B.A.P. 9th Cir. Nov. 6, 2007),
   aff'd, 433 F. App'x 566 (9th Cir. 2011) ......................................................................23

<u>In re Iorizzo,</u>
35 B.R. 465, 467 (Bankr.E.D.N.Y. 1983)........................................................................19

<u>In re Kimball,</u>
19 B.R. 300, 302 (Bankr. D. Me. 1982)..........................................................................23

<u>In re Kimble,</u>
96 B.R. 305, 307-308 (Bankr. D. Mont. 1988)..............................................................23, 24

<u>Lambert v. Flight Transp. Corp.</u> (In re Flight Transp. Corp. Sec. Litigs.)
730 F.2d 1128, 1135 (8th Cir. 1984), cert. denied, 469 U.S. 1207 (1985).....................................16

<u>In re Leach,</u>
130 B.R. 855, 857 (B.A.P. 9th Cir. 1991)........................................................................23

265080

In re Lee Way Holding Co.,
120 B.R. 881, 891 (Bankr. S.D. Ohio 1990) (citation omitted)........................................14

In re Martin-Trigona,
35 B.R. 596, 598-99 (Bankr. S.D.N.Y. 1983)................................................................24

Martin v. Kane (In re A & C Props.),
784 F.2d 1377, 1380-81 (9th Cir. 1986) (citation omitted)
cert. denied, Martin v. Robinson, 479 U.S. 854 (1986)...............................................14

Matter of Gaslight Club, Inc.,
782 F.2d 767, 771 fn. 6 (7th Cir. 1986) ......................................................................20

Matter of Inter. Airport Inn P'ship,
517 F.2d 510, 512 (9th Cir. 1975). .............................................................................22

Newman v. Stein,
464 F.2d 689, 698 (2nd Cir. 1972), cert. denied, 409 U.S. 1039 (1972) ...................15

In re Mazzocone,
183 B.R. 402 (Bankr. E.D. Pa. 1995) aff'd, 200 B.R. 568 (E.D. Pa. 1996)................23

In re Mercado-Jimenez,
193 B.R. 112, 117 (D.P.R. 1996)................................................................................23

In re Milden,
111 F.3d 138, 1997 WL 189302, at *3 (9th Cir. 1997) ..............................................16

In re Northwest Associates, Inc.,
245 B.R. 183, 186 (Bankr.E.D.N.Y. 1999)..................................................................20

In re Pine Lake Vill. Apartment Co.,
16 B.R. 750, 753 (Bankr. S.D. N.Y.1982)..................................................................24

In re RAI Marketing Services, Inc.
20 B.R. 943, 945-46 (Bankr. D. Kansas 1982) ...........................................................24

In re Richmond Unified School Dist.
133 B.R. 221, 224 (Bankr. N.D. Cal. 1991) ...............................................................23

In re Stevenson
2011 WL 2413172 (Bankr. D. Ariz. June 9, 2011)......................................................23

In re Walsh Const.
669 F.2d at 1328-29 (citations omitted).......................................................................15

United States v. Alaska Nat'l Bank (In re Walsh Const., Inc.)
669 F.2d 1325, 1328 (9th Cir. 1982) .........................................................................15

265080

<u>In re Woodson</u>,
    839 F.2d 610, 620 (9th Cir. 1999) ................................................................................15

<u>Woodson v. Fireman's Fund Ins. Co. (In re Woodson)</u>
    839 F.2d 610, 620 (9th Cir. 1988) ................................................................................16

**<u>Statutes</u>**
11 U.S.C. § 305(a) ...........................................................................................................20
11 U.S.C. § 305(a)(1) .......................................................................................................19
11 U.S.C. § 1107(a) .................................................................................................15, 17

**<u>Other Authorities</u>**
10 Collier on Bankruptcy ¶ 9001.06 (16th 2023) ............................................................16
<u>Collier on Bankruptcy</u>, Rule 9001(5) ..............................................................................16
Bankr. Proc. Manual § 9001:1 (2023 ed.) ........................................................................16
Chou, <u>Corporate Governance in Chapter 11</u>, 65 Am. Bankr. L.J. 559, 577 (1991) .......16
<u>H.R. Rep. No. 95-595</u>, 95th Cong., 1st Sess. 325 (1977). ..............................................20

**<u>Rules</u>**
Fed. R. Bankr. P. 9001(5) ......................................................................................15, 16, 17
Fed. R. Bankr. P. 9019(a). ...............................................................................................12
Fed.R.Bankr.P. 1017(a) ...................................................................................................19
Local Bankruptcy Rule 9013-1 ...........................................................................................1

265080

**TO THE HONORABLE RONALD CLIFFORD, UNITED STATES
BANKRUPTCY JUDGE, THE OFFICE OF THE UNITED STATES TRUSTEE,
CREDITORS AND PARTIES-IN-INTEREST:**

**PLEASE TAKE NOTICE** that a hearing will be held on August 8 at 2:00 p.m. on the

within Motion for Order: (1) Approving Compromise of Controversy with JKO Group, Inc., and

(2) Dismissing Chapter 11 Case ("Motion") filed by Global Premier Regency Palms, L.P., debtor

and debtor-in-possession (the "Debtor").  By the Motion, the Debtor seeks entry of an order:

1.      Granting the Motion pursuant to an order containing findings and in a form

substantially similar to the one attached hereto as **Exhibit 1**;

2.      Approving the compromise of controversy as set forth in the Stipulation Resolving

Claims and Disputes Between the Debtor and JKO Group, Inc. (the "Compromise") attached

hereto as **Exhibit 2**;

3.      Designating Christine Hanna as the person in control of the Debtor with authority to

act on behalf of the Debtor, pursuant to 11 U.S.C. § 1107(a) and F.R.B.P. 9001(5), and in

particular, authorizing Christine Hanna to enter into the Compromise on behalf of the Debtor and

to execute any and all such additional documents, including the Deed in Lieu attached hereto as

**Exhibit 5** and incorporated herein by this reference, as may be necessary to effectuate the

Compromise, and take all actions necessary to effectuate the Compromise;

4.      Authorizing and compelling the Debtor to pay all administrative claims, as

described herein, subject to the terms of the Compromise and an order approving the fees of

professionals, the applications for which will be heard concurrently with the Motion;

5.      Authorizing the Debtor to continue operating its business and pay its creditors in the

ordinary course of business, as projected in the Budget attached as **Exhibit 6** to the Hanna

Declaration, to the extent funds exist to pay such creditors, and such payment is consistent with the

terms of the Compromise;

6.      Dismissing the chapter 11 case pursuant to the terms contained herein, effective

upon the later of the: (a) approval of debtor in possession financing necessary to consummate the

Compromise; (b) consummation of the Compromise; (c) payment of all unpaid administrative expenses incurred in this case; and (d) entry of the order granting this Motion;

7.    Maintaining the effectiveness of all prior orders and judgments entered in this case, and that the Compromise and the Bankruptcy Court's order approving the Compromise shall remain effective and binding on the parties to the Compromise;

8.    Retaining jurisdiction by the Court over any entered order or agreement approved by this Court in this case and any and all disputes that arise or relates thereto; and

9.    Such other and further relief as the Court deems appropriate.

This Motion is based upon the Memorandum of Points and Authorities set forth hereinbelow, the Declaration of Christine Hanna ("Hanna Declaration") appended hereto, all pleadings, papers and records on file with the Court and such other evidence, oral or documentary, as may be presented to the Court at the time of the hearing on the within Motion.

**IF YOU DO NOT OPPOSE THE MOTION, YOU NEED NOT TAKE ANY FURTHER ACTION.  HOWEVER, IF YOU DO OPPOSE THE MOTION, PURSUANT TO LOCAL BANKRUPTCY RULE 9013-1, ANY OPPOSITION TO THE MOTION MUST BE FILED WITH THE COURT NO LATER THAN FOURTEEN (14) DAYS PRIOR TO THE HEARING ON THE MOTION.  YOU MUST FILE ANY SUCH OPPOSITION WITH THE CLERK OF THE UNITED STATES BANKRUPTCY COURT, LOCATED AT 1415 STATE STREET, SUITE 233, SANTA BARBARA, CA 93101.  YOU MUST ALSO SERVE A COPY OF ANY SUCH OPPOSITION UPON COUNSEL FOR THE DEBTOR AT THE MAILING ADDRESS STATED IN THE UPPER LEFT CORNER OF THE FIRST PAGE OF THIS NOTICE AND UPON THE OFFICE OF THE UNITED STATES TRUSTEE LOCATED AT 1415 STATE STREET, SUITE 148, SANTA BARBARA, CA 93101.**

**PLEASE TAKE FURTHER NOTICE THAT IF YOU ASSERT AN ADMINISTRATIVE CLAIM (A CLAIM FOR GOODS OR SERVICES PROVIDED POST-PETITION TO THE DEBTOR – NOT ITS SUBSIDIARY), THEN YOU MUST, WITHIN FOURTEEN (14) DAYS PRIOR TO THE HEARING ON THE MOTION, FILE WITH THE UNITED STATES BANKRUPTCY COURT AND SERVE UPON THE**

265080

**DEBTOR AND ITS COUNSEL A REQUEST FOR THE ALLOWANCE OF AN ADMINISTRATIVE CLAIM, INCLUDING EVIDENCE IN SUPPORT OF SUCH CLAIM.**

**FAILURE TO TIMELY FILE AND SERVE AN OPPOSITION TO THE MOTION OR REQUEST FOR ALLOWANCE OF ADMINISTRATIVE CLAIM MAY RESULT IN ANY SUCH OPPOSITION OR REQUEST BEING WAIVED, AND THE COURT MAY ENTER AN ORDER GRANTING THE MOTION WITHOUT FURTHER NOTICE. MOREOVER, SHOULD YOU FAIL TO ATTEND THE HEARING ON THE MOTION, THE COURT IS AUTHORIZED TO ENTER YOUR DEFAULT AND TO GRANT THE RELIEF REQUESTED BY THE DEBTOR IN THE MOTION.**

DATED:  July 14, 2023                    **WINTHROP GOLUBOW HOLLANDER, LLP**


By:____/s/ *Garrick A. Hollander*_____
        Garrick A. Hollander
General Insolvency Counsel for Debtor and Debtor-
in-Possession

265080

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## INTRODUCTION

The Debtor commenced this case to stay the foreclosure of the Debtor's real property and nursing facility and restructure the debt of JKO Group, LLC ("JKO"), its senior secured creditor. The Debtor has reached an agreement to restructure its debt to JKO, thereby providing a path to pay its creditors. The resolution of JKO's claim eliminates the Debtor's need to remain in bankruptcy, and paves the way for a prompt dismissal.

Approving the Compromise resolves the issues with the Debtor's senior secured creditor, who holds the majority of the claims in this case. Meanwhile, dismissing the case is not only a required condition of the Compromise, but it also relieves the Debtor of the administrative expense of pursuing a plan process and the risk associated with plan confirmation. Based on the foregoing, the Debtor submits that it is in the best interests of creditors to approve the Compromise, authorize the dismissal of the case, and approve all other relief requested herein.

## II.

## STATEMENT OF FACTS

### A.    Background of the Debtor

The Debtor was formed in 2014 to purchase land and develop and operate an assisted living/memory care facility in Oxnard, California. Global Premier America #3, LLC ("GP") is the general partner of, and has complete decision making control over, the Debtor.[2] Pursuant to the GP's Operating Agreement and amendments thereto, the Managers of the GP, which are defined as Christine Hanna and Andrew Hanna, together or *separately*, each have full authority to manage and operate the GP.[3] Accordingly, Christine Hanna has authority to manage and operate the GP, and thus, manage and operate the Debtor. Accordingly, Christine Hanna had authority to

---

[2] See, e.g., Section 10(a) of the Debtor's limited partnership agreement, which is attached as **Exhibit 3** to the Hanna Declaration (General Partner shall be solely responsible for the day-to-day operations of the Partnership business and shall have all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith, or in connection with accomplishing the purposes of the Partnership as set forth in Section 3).

[3] See, for example, sections 1.7 and 2(e) of the First Amendment to Operating Agreement of Global Premier America #3, LLC, a true and correct copy of the GP's Operating Agreement and amendment thereto are attached collectively as **Exhibit 4** to the Hanna Declaration.

265080

1   file, on behalf of the Debtor, a petition for relief under Chapter 11 of the Bankruptcy Code, enter

2   into the Compromise, and file this Motion.

3          The Debtor was initially funded with $12 million of investment from foreign investors,

4   who invested in the Debtor pursuant to a program of the United States government to allow

5   foreign investors to make investments in the United States in order to obtain residency status.

6   This program is designed to stimulate the U.S. economy through job creation and capital

7   investment.  The Debtor's successful completion and operation of this project preserves jobs,

8   protects the investment of these foreign investors, and ensures their continued residency in the

9   United States.

10         The Debtor owns and since January 2021, with its wholly owned non-debtor subsidiary,

11  Global Regency Oxnard Senior Care Services LLC, dba Regency Palms Senior Living, a

12  California limited liability company, operates an assisted living/memory care facility located on

13  the Property. Regency Senior Living provides housing and a full spectrum of care and services to

14  fragile seniors in need of a moderate level of medical assistance, including specialized memory

15  care for seniors who suffer from Alzheimer's Disease and other forms of dementia.  The Debtor's

16  subsidiary employ approximately 60 persons.  The Debtor's sole revenue source is the rental

17  income and distributions, if any, from its sole tenant, Regency Senior Living.

18         **B.**     **Events Precipitating Chapter 11 Filing**

19         Similar to many other companies, in 2020, the Debtor experienced significant financial

20  and operational challenges as a result of the COVID-19 pandemic.  In the course of building its

21  assisted living/memory care facility, the outbreak of COVID-19, and the subsequent shutdown

22  and imposition of restrictions, caused construction delays and cost overruns for the Debtor's

23  project.  A Certificate of Occupancy was ultimately issued on June 17, 2020, and thereafter a

24  license was issued by the Department of Social Services.  It was only at this time when the Debtor

25  was first authorized to begin to accept residents into its facility.

26         While the facility opened in January of 2021, the COVID-19 pandemic continued to

27  negatively impact nursing homes and senior care facilities like the Debtor's business by restricting

28  the Debtor's ability to accept residents into its facility. These restrictions caused unexpected

265080

delays in the Debtor's ability to receive residents in the assisted living facility during 2021 and into 2022.

Pursuant to its loan obligations, the Debtor was required to make monthly interest payments in the amount of $129,202.  The interest payments were set up in the loan through an account called an "interest reserve."  When the loan was originally funded, $1,196,000 of the loan amount was placed in this interest reserve account.  Every month, monthly interest payments would be paid from that interest reserve account.

In October of 2021, the Debtor entered into discussions with its bank for a COVID-19 forbearance agreement, which would have prevented the loan from going into default at that time. The discussions were unsuccessful.

On or about April 22, 2022, the Debtor was informed that its bank sold the Debtor's loan to JKO.  On April 25, 2022, the Debtor received a Notice of Default and Election to Sell Under Deed of Trust recorded in the Official Records, County of Ventura, Doc No. 2022000005980. Pursuant to this notice, the Trustee Sale was scheduled for May 17, 2022.

On May 6, 2022, the Debtor commenced a lawsuit against JKO seeking, among other things, a temporary restraining order, preliminary injunction, and permanent injunction, to enjoin the JKO from proceeding with the Trustee Sale.  On May 10, 2022, the state court granted the Debtor's *ex parte* application for a temporary restraining order.  The state court, however, ultimately denied the Debtor's request for injunctive relief.  The temporary restraining order issued on May 10, 2022 was dissolved.  The Trustee Sale was rescheduled and continued from time to time until August 18, 2022, prior to which the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

C.    **Assets**

The Debtor's primary assets are the Property and its 100% interest in Regency Senior Living.  The Debtor also owns 100% interests in the following subsidiaries, Global Food, Global Health, and Global Senior Care; however, none of these entities have or ever had any assets or business operations.  For more details on the Debtor's assets, see the Debtor's bankruptcy schedules [Docket No. 17].  In an appraisal dated April 7, 2022, the Property was estimated to

265080

have an "as-is" value of $40,600,000 as of November 15, 2021, and prospective value at stabilization of $42,700,000 for the date December 1, 2022.

### D.    Liabilities

The following is a summary of the Debtor's pre-petition and post-petition liabilities:

***General Unsecured Claims***:  The Debtor owes $4,678,782 to pre-petition creditors holding general unsecured claims.  Approximately $4,262,349 of these claims are held by insiders or affiliates of insiders of the Debtor.

***Secured Debt***: On June 27, 2018, the Debtor obtained a loan from Nano Banc in the amount of $15.5 million to purchase the Property and build and operate an assisted living/memory care facility at the Property.  The Nano Banc loan was evidenced by, among other things, a Construction Loan Agreement and Promissory Note.  In connection with the loan, the Debtor provided a Deed of Trust in favor of Nano Banc.  Nano Banc also filed a UCC-1 financing statement dated August 30, 2018 with the California Secretary of State.

On March 23, 2020, executed a new promissory note in the amount of $23 million.  The Debtor also executed a Commercial Security Agreement, pursuant to which the Debtor granted a security interest in collateral, including inventory, accounts (including but not limited to all health-care-insurance receivables), and cash.  On November 19, 2020, the parties executed a change in terms agreement to increase the loan from $23 million to $25.5 million, and assign a deposit account in the amount of $500,000 held at Nano Banc as additional security to make the interest payments in the event the interest reserve was depleted.

On or about April 22, 2022, Nano sold and assigned to JKO 100% of Nano's interests in its claims against the Debtor.  As of the Petition Date, JKO asserts a secured claim against the Debtor's Assets in the amount of approximately $28 million.  As of the Petition Date, the Debtor had $64.31 in cash and $7,317.87 in accounts receivable from Regency Senior Living. Based on the terms of the Compromise, JKO's claim is $30,489,629 as of June 30, 2023.

Top Tier Painting and ArtMex Artistic Design, Inc. also assert secured claims against the Property in the amounts of $87,147 and $22,660, respectively. These asserted secured claims are based on alleged mechanics lien rights arising from contracting services provided to the Debtor.

265080

***Administrative Claims***.  The Debtor owes approximately $750,000 to its professionals (general insolvency counsel and financial advisor).  The Debtor is not aware of any additional administrative claims held or asserted against the Debtor's estate.

**E.    The Compromise**

The Debtor and JKO have been working diligently throughout this case toward resolution of its disputes over claim amount and restructuring of its debt.  The Debtor and JKO have resolved their disputes over the rights to, and claims arising from, the loan, which resolution paves the way for emergence from chapter 11.  To that end, the Debtor and JKO have entered into the Compromise resolving claims and re-defining the parties' rights and obligations.  The Debtor and JKO now seek approval of the Compromise and authority to enter into the Compromise.  The following is a summary of the material terms of the Compromise[4]:

1.  <u>PACE Loan</u>.  The Debtor shall obtain a PACE loan in the amount of approximately $12,800,000. The Debtor shall not execute the PACE Loan documents until they have been reviewed and approved by JKO in writing in its sole discretion. The PACE Loan may include a contractual assessment on the Property that would be recorded with the local tax authority, with delinquent assessments subject to the same process and penalties as property taxes.[5]

2.  <u>PACE Loan Proceeds</u>. JKO will receive all proceeds of the PACE Loan, subject to the following exceptions: (a) PACE Loan Capitalized Interest estimated at $2,170,000, which shall be held in reserve for the PACE loan and in an account inaccessible to the Debtor, Andrew Hanna, Christine Hanna, or any Debtor Related Party without JKO's written consent; (b) PACE loan expenses estimated at $386,471; (c) Chapter 11 administrative expenses capped at $750,000; (d) working capital reserve of $150,000 ("Working Capital") for Debtor; and (e) $102,581.72 for past due property taxes.  JKO shall withhold from the PACE Loan proceeds $1,068,000 to be used as a reserve for Monthly Payments then apply the remaining PACE Loan proceeds in accordance with the Loan Documents.

3.  <u>Closing</u>. The closing (the "Closing") and funding of the transaction shall be the later of: (i) two (2) business days after the date of funding and closing of the PACE Loan; (ii) two (2) business days after entry of an order granting the Motion; or (iii) August 15, 2023.

4.  <u>Disposition of Bankruptcy Case</u>. Debtor's bankruptcy case shall be dismissed upon Closing or as soon as practicable thereafter, with the Bankruptcy Court retaining jurisdiction over disputes arising from this agreement.

---

[4] To the extent there is an inconsistency between this summary and the Compromise, the Compromise shall govern.
[5] Consistent with this obligation, the Debtor will be filing on shortened time a Motion for Order Authorizing Debtor to Enter into Assessment Contract and Obtain Debtor in Possession Post-Petition Financing Secured Against Real Property, which will need to be, and thus, expected to be, heard concurrently with this Motion.

265080

5. <u>Monthly Payments</u>. Debtor shall re-commence paying monthly payments under the Promissory Note in the amount of $89,000 per month.  Monthly principal and interest at the non-default rate will continue to accrue at $152,921.82 per month.  In addition, default interest will continue to accrue at $3,541.67 per day.  All accrued and unpaid amounts shall be added to the Loan balance on a monthly basis.

6. <u>Payments of Available Cash / Expense Pre-Approval</u>.

   a. The Company's[6] disbursements in any given calendar month shall not exceed the amounts specified in **Schedule 2** to the Compromise based on the occupancy rate at the Property on the first day of the month; provided that the Company may apply up to $20,000 per month of Working Capital to spending in excess of the amounts in **Schedule 2** without JKO's prior approval until the Working Capital is exhausted. If the Company applies any Working Capital in that manner, it must provide immediate notice of the amount of Working Capital used and the disbursements for which it was used.

   b. The Company may exceed the disbursement limit described in 6.a. above only if JKO approves such excess disbursement in advance, in writing, which prior approval shall not be unreasonably withheld.  JKO's approval of an disbursement in a given month shall not be deemed approval of said disbursement in any other month, unless JKO expressly states as such.

   c. If Company's gross income for a given month exceeds the disbursements authorized pursuant to paragraph 6a and 6b, the Debtor may use any such "excess income" to refuel the working capital balance back to $150,000, to the extent it had dropped.  Thereafter, the Debtor shall pay JKO all of the excess income for such month by the 5th business day of the subsequent month.

   d. Debtor shall provide JKO a report showing income, expenses, and occupancy rate for each month by the **20th** business day of the subsequent month.

7. <u>Maturity Date</u>. The Maturity Date for the loan shall be the second anniversary of the Closing at which date the Debtor shall pay all outstanding principal, interest, fees, and expenses then due and owing under the Note.

8. <u>Events of Default</u>.

   a. It shall be an "Event of Default" under the Compromise if (i) the Company fails to make any payment of the Loan when due, including on the Maturity Date ("Payment Default"); (ii) the Company fails to comply with or perform any term, obligation, or condition in this Stipulation; (iii) the Debtor defaults under the PACE Loan; (iv) there occurs any Event of Default under any Loan Document (a "Loan Default"); or (v) the Closing does not occur by August 15, 2023. Notwithstanding the foregoing, the following shall not be Events of Default under this Stipulation: (a) a Loan Default that occurred prior to, exists as of, and/or continues after the

---

[6] The term Company shall mean the Debtor and its subsidiary.

265080

Closing; (b) the Debtor's insolvency; (c) the Debtor's non-compliance with the "Net Liquid Assets," "Debt Coverage Ratio" requirements on page 3 of the Business Loan Agreement; (d) the pendency of the Bankruptcy Case; (e) a default that falls within any of the following identified categories of Events of Default enumerated in the Loan Documents: (i) Default in Favor of Third Parties; (ii) Events Affecting Guarantor other than Christine Hanna; (iii) Event Affecting General Partner that were not caused by Christine Hanna; (v) Adverse Change; and/or (vi) Insecurity; (f) any Event of Default arising from or related to the acts, omissions, insolvency, death, or financial condition of Andrew Hanna and Global Premier, LLC; (g) any Event of Default arising from claims against the Company that existed as of the Petition Date; or (h) any Event of Default necessitated by the Company's compliance with the terms of this Stipulation. For sake of clarification, obtaining the PACE loan and any consequences arising from the Company not paying claims that existed as of the Petition Date, including any litigation, recording of liens, etc., shall not constitute an Event of Default.

b. In the event that the Company should default in the performance of any of its obligations hereunder, except for a Payment Default, the remedies for which are specifically provided herein, JKO shall provide to the Company and the Company's counsel, (collectively, the "Noticed Parties") via e-mail and first-class mail, written notice of any such default ("Default Notice"). The Default Notice shall be deemed received one Court day after JKO's service of such notice. The Company shall have a grace period of three (3) Court days after the Company's receipt of the Default Notice ("Grace Period") within which to cure such default. If the Company does not cure the Event of Default within the Grace Period (an "Uncured Default"), JKO and Deed Holder (defined below) may immediately pursue all remedies, including recording the Deed in Lieu (defined below) conditionally provided as part of this Stipulation.

c. The Company may oppose any such Uncured Default asserted by JKO by filing in the Bankruptcy Court a motion contesting the asserted Uncured Default ("Contesting Motion"), which must be filed within three (3) Court days after receipt of the Default Notice. The Company's Contesting Motion shall be limited to: (a) whether the asserted default occurred; (b) whether the asserted default is excused; or (c) whether the Company timely cured the asserted default. If the Court finds that the Company did not commit an Event of Default, was excused from committing an Event of Default, or timely cured an Event of Default, the Company shall be authorized to continue operating in ownership and possession of its Property pursuant to the terms of the Stipulation. If Deed Holder has recorded the Deed in Lieu, Deed Holder must promptly execute a grant deed or other mutually acceptable conveyance to transfer the Property back to the Debtor. This provision may be enforced by specific performance.

9. <u>Holding of Deed in Lieu of Foreclosure.</u>

a. Not later than 3 business days after the execution of this Stipulation, the Debtor shall deliver to G&B Law, LLP, the original completed and notarized grant deed in

265080

lieu of foreclosure in the form attached hereto as **Exhibit 5** (the "Deed in Lieu"). The Deed in Lieu shall be in favor of Blackhawk Solar, LLC, a Delaware limited liability company, prior to the entry of the Approval Order ("Deed Holder"). JKO, on behalf of itself and Deed Holder, acknowledges and agrees that the Deed in Lieu provided under this paragraph is not intended to, and does not, transfer title at the time of execution. Deed Holder shall hold and retain the Deed in Lieu provided that the Company complies in all respect with the terms of this Stipulation and there is no Payment Default or Uncured Default, as defined in Paragraph 11 of the Compromise. Upon the occurrence or continuance of a Payment Default or Uncured Default under this Stipulation or the Loan Documents, Deed Holder may immediately record the Deed in Lieu and shall immediately notify the Debtor of said recording. JKO and Deed Holder shall be granted relief from the automatic stay to the extent necessary to take the foregoing actions.

   b. Upon a Payment Default or Uncured Default, the Debtor agrees to cooperate in the execution, in a timely manner, of any and all documents that are, or may be, necessary to cause the immediate conveyance of the Property to Deed Holder, including execution of a deed other than the Deed in Lieu. This provision may be enforced by specific performance.

   c. The liens and security interests that JKO has on the Property will not merge with the legal estate and title in the Property that may be transferred pursuant to this Paragraph 9.c. The liens and Loan Documents will not be released or relinquished, and the priority of the liens of the Loan Documents will not be altered or subordinated to any other liens or interests. JKO may merge the liens and security interests with the fee or leasehold title to the property, but only by a separate document recorded later or through foreclosure. The statutes of limitation applicable to the exercise of the JKO's rights and remedies under the Loan Documents are extended and tolled until four years after the Maturity Date.

10. <u>Additional Remedies for Default</u>.  Upon a Payment Default or an Uncured Default, JKO may exercise all rights and remedies available under the Loan Documents as if fully described and incorporated herein. All of JKO's remedies under this Stipulation and the Loan Documents are cumulative with one another and with remedies under applicable law.

11. <u>Security</u>. JKO's loan will be secured by all assets of the Debtor, and the Company shall take all actions and execute all documents necessary for JKO to perfect its security interest.

12. <u>"Allowance" of Claim</u>. JKO's claim shall be fixed at $30,489,629.27 as of June 30, 2023, as calculated in **Schedule 1** attached to the Compromise, subject to adjustment of accrued interest and default interest based on the date of the Approval Order, JKO's actual legal fees, and any other expenses accrued through that date, which shall be incorporated into the Approval Order.

13. <u>Contingent Mutual Releases</u>

   a. Effective only upon timely payment of the Loan in full by the Maturity Date, the Parties, on behalf of themselves, their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under

265080

common control with any of the foregoing, affiliates, and assigns, and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them, hereby release and discharge the other Party, together with their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates, and assigns and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting in concert with them (collectively, with respect to each Party, its "Related Parties"), and each of them, from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, expenses (including attorneys' fees and costs actually incurred) (collectively, "Claims"), which either Party or its Related Parties has, or may have had, against the other Party or Related Parties, whether or not apparent or yet to be discovered, related to the Litigation, the Loan Documents, or the Bankruptcy Case.

b.    The aforementioned releases shall not include any Claim of or against (i) Andrew Hanna, or (ii) his affiliates other than the Company, GPA, or Christine Hanna. Nothing in the aforementioned paragraph is intended to limit JKO's ability to execute or collect on any judgment against Andrew Hanna.

14. <u>Dismissal of Litigation/Release of Claims</u>. The Debtor and JKO shall forbear from any further prosecution of the Litigation so long as there is no Payment Default or Uncured Default hereunder. The Litigation shall remain pending during the period of forbearance. Upon timely payment of the Loan in full by the Maturity Date, the Parties shall promptly dismiss the Litigation with prejudice, except as against Andrew Hanna.

15. <u>Disposition of Bankruptcy Case</u>. The Bankruptcy Case shall be dismissed upon Closing or as soon as practicable thereafter, with the Bankruptcy Court retaining jurisdiction as provided in the Compromise.

**F.    Proposed Disposition of Case**

Entry into the Compromise and obtaining the PACE loan will pave the way for the Debtor to pay its senior secured creditor pursuant to the terms of the Compromise, and once JKO is paid in full, try to pay creditors to the extent there is sufficient cash flow available to do so.  The Budget attached as **Exhibit 6** sets forth the projected distributions to be made to creditors in this case.  The Debtor seeks authority to enter into the Compromise, and dismiss the case to allow the Debtor to effectuate the terms of the Compromise and pay creditors consistent with the timing set forth in the Budget.  To that end, the Debtor also seeks to enjoin the creditors from pursuing any

265080

collection effort against the Debtor or its property, so long as the Debtor pays its obligations as set forth in the Budget. This provision shall not affect JKO, the Deed Holder (as defined in the Compromise), their successors-in-interest, or assignees.

### III.

### THE COMPROMISE IS REASONABLE, FAIR AND

### EQUITABLE AND IS IN THE BEST INTERESTS OF THE ESTATE

The Debtor believes that the Compromise is in the best interests of the estate and meets all of the requirements of Rule 9019(a) of the Bankruptcy Rules relative to bankruptcy court approval of compromises of controversy.  Rule 9019(a) of the Bankruptcy Rules provides that:

> On motion of the trustee and after notice and a hearing, the court may approve a compromise or settlement.  Notice shall be given to creditors, the United States trustee, the debtor and indenture trustees as provided in Rule 2002 and to any other entity as the court may direct.

Fed. R. Bankr. P. 9019(a).

It is well established that bankruptcy courts favor compromises.  *See In re Lee Way Holding Co.*, 120 B.R. 881, 891 (Bankr. S.D. Ohio 1990) (citation omitted).  "The purpose of a compromise agreement is to allow the trustee and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims." *Martin v. Kane (In re A & C Props.)*, 784 F.2d 1377, 1380-81 (9th Cir. 1986) (citation omitted), *cert. denied, Martin v. Robinson*, 479 U.S. 854 (1986).  A bankruptcy court does not need to conduct an exhaustive investigation into the merits of the claims sought to be compromised.  *See United States v. Alaska Nat'l Bank (In re Walsh Const., Inc.)*, 669 F.2d 1325, 1328 (9th Cir. 1982).  Rather, a bankruptcy court need only determine that the outcome of the litigation is open to reasonable doubt.  *See In re Walsh Const.*, 669 F.2d at 1328-29 (citations omitted).  Even if faced with objections, a bankruptcy court may still approve a settlement if it is in the best interests of the bankruptcy estate and creditors.  *See A & C Props.*, 784 F.2d at 1382 (citation omitted).

Likewise, a bankruptcy court is not required to decide the questions of law and fact raised in the controversies sought to be settled, nor is it required to determine whether the settlement presented is the best one that could possibly have been achieved.  Rather, it is sufficient that the

265080

settlement not fall "below the lowest point in the zone of reasonableness." *Newman v. Stein*, 464 F.2d 689, 698 (2nd Cir. 1972), *cert.* denied, 409 U.S. 1039 (1972).

The Ninth Circuit Court of Appeals has recognized that bankruptcy courts have wide discretion in approving compromise agreements. *In re Woodson*, 839 F.2d 610, 620 (9th Cir. 1999); *In re A & C Props.*, 784 F.2d at 1380-81 ("The purpose of a compromise agreement is to allow the debtor and the creditors to avoid the expenses and burdens associated with litigating sharply contested and dubious claims").

In evaluating a proposed compromise in a bankruptcy case, a bankruptcy court need not conduct an exhaustive investigation of the disputed issues or conduct a trial with respect to such issues, but need find only that the proposed compromise is fair and equitable and that the negotiations between the parties were conducted in good faith. *In re A & C Props.*, 784 F.2d at 1380-82; *In re Walsh Const.*, 669 F.2d at 1328 ("The bankruptcy court need not conduct an exhaustive investigation into the validity of the asserted claim"). A compromise proposed in a bankruptcy case should be approved if it falls above the lowest point in the range of reasonableness. *In re Milden*, 111 F.3d 138, 1997 WL 189302, at *3 (9th Cir. 1997) ("Rather than conducting a detailed evaluation of the merits of the state court action, the bankruptcy court's function is to examine the proposed settlement to determine if it falls below the lowest point in the range of reasonableness.").

The Ninth Circuit has identified four factors that a bankruptcy court should consider in determining whether a proposed settlement agreement is fair and equitable:

> (i) the probability of success in the litigation; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; [and] (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.

*Id.* (quoting *Lambert v. Flight Transp. Corp. (In re Flight Transp. Corp. Sec. Litigs.*), 730 F.2d 1128, 1135 (8th Cir. 1984), *cert. denied*, 469 U.S. 1207 (1985)); *Woodson v. Fireman's Fund Ins. Co.* (*In re Woodson*), 839 F.2d 610, 620 (9th Cir. 1988).

Applying the factors identified by the Ninth Circuit in determining whether a proposed compromise is fair and equitable, it is clear that the Compromise should be approved.

265080

### A.      The Probability of Success on the Merits

The Debtor recognizes that, particularly given today's financial economy, there is significant risk that it may not be able to confirm a plan over the objection of JKO, and the Debtor knows that JKO will vigorously oppose plan confirmation.  The Debtor further recognizes that it will incur significant fees in a contested of confirmation battle, which will further increase the hurdles for plan confirmation.  The Compromise eliminates any inherent uncertainty with respect to the resolution of the foregoing.  Thus, this part of the *A&C Properties* test favors Court approval of the Compromise.

### B.      Difficulty in Collection

While the Debtor had commenced pre-petition litigation against JKO, the Debtor recognizes that these claims are, at most, offsets against the claim owing to JKO.  In other words, the Debtor is not seeking recovery against JKO, so this prong is not applicable.

### C.      The Complexity, Expense and Inconvenience of Litigation

Litigation over plan confirmation and any litigation against JKO would be significant.  Currently, the Debtor does not have the financial wherewithal to fund this litigation.  Settlement of the foregoing, therefore, will save the Debtor's estate substantial expense and will avoid the risk, delays and inconvenience attendant to litigation.  Accordingly, this part of the A&C Properties test favors Court approval of the Compromise.

### D.      The Interest of the Debtor's Creditors

JKO struck a very hard bargain leaving the Debtor with very limited and difficult options.  Based on the facts and circumstances at this time, the Debtor believes that while it may not be great, the Compromise serves as the best option for the Debtor's creditors.  The Debtor believes that it faces significant hurdles in plan confirmation, with the failure to succeed resulting in the Debtor losing its property and entire business, and creditors receiving nothing.  In contrast, while the Debtor does not know whether it will be able to make all the payments as provided for in the Compromise, the Debtor recognizes that the Compromise provides the Debtor with time to try to reorganize and/or secure additional funding to pay creditors.  Accordingly, the Debtor believes, in its business judgment, that, given the facts and circumstances, the Compromise is a fair and

265080

reasonable result, and shows adequate deference to the Debtor's creditors.  Accordingly, this part of the *A&C Properties* test favors Court approval of the Compromise.

Therefore, upon application of all four factors of the *A&C Properties* test, the Compromise is fair and equitable and should be approved by the Court.

**IV.**

**THE COURT SHOULD DESIGNATE CHRISTINE HANNA AS THE PERSON IN CONTROL OF THE DEBTOR PURSUANT TO 11 U.S.C. § 1107(a) AND F.R.B.P. 9001(5)**

By this Motion, the Debtor further requests an order designating Christine Hanna as the person in control of the Debtor who is authorized to act on behalf of the Debtor, pursuant to 11 U.S.C. § 1107(a) and F.R.B.P. 9001(5), and in particular, authorizing Christine Hanna to enter into the Compromise on behalf of the Debtor and to execute any and all such additional documents, including the Deed in Lieu, as may be necessary to effectuate the Compromise.

Bankruptcy Rule 9001(5) provides that, where the debtor is not a natural person, the Bankruptcy Court can designate a particular officer, partner or other person in control, to act on behalf of such debtor:

> When any act is required by these rules to be performed by a debtor … and the debtor is not a natural person: (A) if the debtor is a corporation, "debtor" includes, **if designated by the court**, any or all of its officers, members of its board of directors or trustees or of a similar controlling body, a controlling stockholder or member, or any other person in control; (B) if the debtor is a partnership, "debtor" includes any or all of its general partners or, **if designated by the court**, any other person in control.

F.R.B.P. 9001(5) (emphasis added).  See also 11 U.S.C. § 1107(a) (debtor in possession has virtually all of the rights, powers and duties of a trustee subject to "such limitations or conditions as the court prescribes").

Case law has consistently interpreted Bankruptcy Rule 9001(5) and Section 1107(a) to authorize the Bankruptcy Court to designate a particular individual to control and act on behalf of a corporate or partnership-debtor.  "This rule permits this court to designate an individual as the person in control of a corporation."  In re Continuum Care Services, Inc., 375 B.R. 692, 694 (Bankr.S.D.Fla. 2007).  See also In re Derivium Capital, LLC, 2010 WL 11719990, at *3 (Bankr.D.S.C. 2010) ("The Court has the authority to designate [individual member of debtor-

265080

LLC] as the representative of Debtor pursuant to Fed. R. Bankr. P. 9001(5)…"); In re Iorizzo, 35 B.R. 465, 467 (Bankr.E.D.N.Y. 1983) ("In cases where a debtor is a corporation, the Bankruptcy Rules provide that the Court may designate officers, directors, trustees or other controlling bodies to be considered the debtor for this and similar purposes."). *See also* Bankr. Proc. Manual § 9001:1 (2023 ed.) ("[F.R.B.P. 9001(5)] allows the court to designate officers, partners, etc., to act on behalf of a debtor that is not a natural person."); Chou, Corporate Governance in Chapter 11, 65 Am. Bankr. L.J. 559, 577 (1991) ("This rule [9001(5)] recognizes that the corporation, an artificial person, cannot by itself implement the rules and operate the business. Management or controlling persons designated by a bankruptcy court are to perform particular acts required by the rules.")

As stated in the treatise, Collier on Bankruptcy, Rule 9001(5) authorizes the court to "appoint" an individual to perform the duties on behalf of the corporate or partnership debtor:

> [I]f the debtor is not a natural person but is a corporation or a partnership (both of which are included in the definition of "person"), **the court may appoint one or more individuals to perform the duties** imposed upon the debtor by these and other rules. If the debtor is a corporation, the debtor includes, if designated by the court, one or more of "any or all of its officers, members of its board of directors or trustees or of a similar controlling body, a controlling stockholder or member, or any other person in control." If the debtor is a partnership, the "debtor" includes any or all of its general partners or, if designated by the court, any other person in control.

10 Collier on Bankruptcy ¶ 9001.06 (16th 2023) (emphasis added) (footnotes omitted).

Courts have also recognized that the person designated to act on behalf of the debtor need *not* be someone with a formal title as an officer, shareholder or partner. See In re Northwest Associates, Inc., 245 B.R. 183, 186 (Bankr.E.D.N.Y. 1999) ("it is clear that a court can look beyond an individual's formal title with the Debtor corporation (or lack of formal title) to make a determination if a party is in control of a corporation based on the party's duties and responsibilities vis-a-vis the Debtor."); Matter of Gaslight Club, Inc., 782 F.2d 767, 771 fn. 6 (7th Cir. 1986) (observing that Rule 9001(5) "anticipates that a person performing the duties of debtor in possession need not be an officer, director or controlling shareholder" but rather can be "any other person in control").

As set forth in the Hanna Declaration, Global Premier America #3, LLC ("GP") is the

265080

1   general partner of the Debtor and has complete control over the decision making of the Debtor.

2   Pursuant to the GP's Operating Agreement and amendments thereto, the Managers of the GP,

3   which are defined as Christine Hanna and Andrew Hanna, together or separately, each have full

4   authority to manage and operate the GP.[7]  Thus, Christine Hanna has authority to manage and

5   operate the GP, and thus, manage and operate the Debtor.  In practice, Christine Hanna has and

6   continues to be the "person in control" of the Debtor.  Accordingly, Christine Hanna had authority

7   to file, on behalf of the Debtor, a petition for relief under Chapter 11 of the Bankruptcy Code,

8   enter into the proposed DIP Financing, and file this Motion.

9        The parties have requested confirmation of Christine Hanna's authority to act on behalf of

10  the Debtor.  Accordingly, the Debtor requests that Christine Hanna be formally designated as the

11  person who is authorized to act on behalf of the Debtor, pursuant to 11 U.S.C. § 1107(a) and

12  F.R.B.P. 9001(5), and in particular, authorizing Christine Hanna to enter into the Compromise on

13  behalf of the Debtor and to execute any and all such additional documents, including the Deed in

14  Lieu, as may be necessary to effectuate the Compromise.

15                              **V.**

16         **<u>THE DEBTOR SHOULD BE AUTHORIZED TO PAY ITS CREDITORS</u>**

17       Based on the Debtor's financial condition, risk of losing the Debtor's property through a

18  foreclosure, thereby wiping out all creditors, and the Compromise with JKO, the Debtor believes

19  that approval of the Compromise and dismissal represents the most likely, if not only, realistic

20  prospect to pay creditors.  In addition to dismissal being a critical condition to the Compromise,

21  the Debtor submits that there is no reason to incur the additional administrative expense to proceed

22  with the approval of a disclosure statement and confirmation of a plan, particularly since: (i) the

23  only reason for filing this bankruptcy has been resolved; and (ii) proceeding with plan

24  confirmation poses too much uncertainty and risk.  Similarly, there is no reason to convert the case

25  to chapter 7 because under a chapter 7, unsecured creditors will definitely not receive any

26  distribution; in contrast, under the proposed dismissal, creditors are intended to be paid in full to

27

28  [7] See, for example, sections 1.7 and 2(e) of the First Amendment to Operating Agreement of Global Premier America
    #3, LLC.  A true and correct copy of the GP's Operating Agreement and amendment thereto are attached collectively
    as **Exhibit 4** to the Hanna Declaration.

265080

the extent the Debtor is able to pay JKO is paid in full, and in any event, have a chance of

recovery.  Accordingly, there is no benefit, and only prejudice, in the event a chapter 7 trustee

were to be appointed. The most efficient disposition of this case and the one that will maximize

distributions to the estate's creditors is to approve the Compromise and dismiss the case and

simply allow the Debtor to pay creditors as contemplated.

The proposed distribution is consistent with the Supreme Court's decision in *Czyzewski v.

Jevic Holding Corp.*, 137 S. Ct. 973, 197 L. Ed. 2d 398 (2017), which generally restricts

bankruptcy courts from approving structured dismissals only where distributions do not follow

ordinary priority rules without the consent of affected creditors.  Here, the Debtor's proposal does

not modify the rules of priority.  Moreover, the Debtor's Budget reflects payment in full to all

creditors.  Accordingly, the Motion is consistent with <u>Jevic</u>.

## VI.

## <u>THE BANKRUPTCY COURT SHALL DISMISS THIS BANKRUPTCY</u>

## <u>BASED ON THE EXISTENCE OF GOOD CAUSE</u>

The Debtor has resolved the only reason it filed bankruptcy, and is now able to emerge

from chapter 11 and pave the way to try to pay creditors as provided for in the Budget.  Based on

the foregoing, the Debtor has determined that remaining in bankruptcy at this point only

prejudices creditors, whereas dismissal is in the best interest of creditors.

### A.    <u>The Court Has Authority, and Based on the Existence of Good Cause, Must Dismiss this Bankruptcy</u>

Courts have adopted a liberal standard in granting motions for voluntary dismissal.  It is

well established in the Ninth Circuit that a debtor is entitled to voluntarily dismiss its bankruptcy

proceeding; "unless dismissal will cause some plain legal prejudice to the creditors, it normally

will be proper."  *Matter of Inter. Airport Inn P'ship*, 517 F.2d 510, 512 (9th Cir. 1975).  See also

*In re Ditter*, 13 F. App'x 686, 687, 2001 WL 791733 (9th Cir. 2001) ("A voluntary dismissal is

proper unless it results in 'plain legal prejudice' to the creditors.").

The Ninth Circuit BAP decisions under the Bankruptcy Code have repeatedly followed

this rule.  See *In re Hickman*, 384 B.R. 832, 840 (B.A.P. 9th Cir. 2008) ("A case will not be

265080

dismissed on the motion of a debtor if such dismissal would cause 'some plain legal prejudice' to

a creditor."); *In re Leach*, 130 B.R. 855, 857 (B.A.P. 9th Cir. 1991) ("The law in the Ninth Circuit

is clear: a voluntary Chapter 7 debtor is entitled to dismissal of his case so long as such dismissal

will cause no 'legal prejudice' to interested parties."); *In re Hall*, 15 B.R. 913, 719 (B.A.P. 9th

Cir. 1981); *In re Integrated Knowledge Mktg., Inc.*, 2007 WL 7540949, at *6 (B.A.P. 9th Cir.

Nov. 6, 2007), aff'd, 433 F. App'x 566 (9th Cir. 2011).[8]

The court in *In re Kimble*, 96 B.R. 305 (Bankr. D. Mont. 1988) opined:

> [W]e would be hard pressed to articulate just what circumstances could constitute
> such 'plain legal prejudice', including the considerations of economy and
> integrity of the Courts, to justify the result of denial of a request to voluntarily
> dismiss. Hence, *we would grant such a motion in all but extraordinary
> circumstances*.

*In re Kimble*, 96 B.R. at 307 (emphasis added).

In addition, § 305(a)(1), applicable to both voluntary and involuntary bankruptcy petitions,

provides that a case may be dismissed if the parties are "better served by such dismissal".

> (a)  The court, after notice and a hearing, may dismiss a case under this title, or
> may suspend all proceedings in a case under this title, at any time if –
>     (1) the interests of creditors and the debtor would be better served by such
>         dismissal or suspension.

§ 305(a)(1).

The bankruptcy courts have the power to dismiss a bankruptcy case if the interests of both

the "creditors and the debtor" would be "better served" by a dismissal.  *In re Eastman*, 188 B.R.

621, 624 (9th Cir. BAP 1995); *In re RAI Marketing Services, Inc.*, 20 B.R. 943, 945-46 (Bankr. D.

Kansas 1982); *In re Martin-Trigona*, 35 B.R. 596, 598-99 (Bankr. S.D.N.Y. 1983); *In re Pine Lake*

---

[8] *See also In re Richmond Unified School Dist.*, 133 B.R. 221, 224 (Bankr. N.D. Cal. 1991) ("The same ['legal prejudice'] rule would presumably apply to a Chapter 11 debtor's motion to dismiss pursuant to § 1112(b)...."); *In re Stevenson*, 2011 WL 2413172 (Bankr. D. Ariz. June 9, 2011) ("The creditors of the estate will not suffer 'plain legal prejudice' by dismissal."); *In re Kimble*, 96 B.R. 305, 308 (Bankr. D. Mont. 1988) ("the Debtor's request should ordinarily be granted unless some 'plain legal prejudice' will result to the creditors."); *In re Mercado-Jimenez*, 193 B.R. 112, 117 (D.P.R. 1996) ("Particularly with respect to voluntary dismissals under Fed.R.Bankr.P. 1017(a), ordinarily, the granting of a voluntary motion to dismiss rests with the sound discretion of the Referee and is reversible only for an abuse of that discretion. And unless dismissal will cause some plain legal prejudice to the creditors, it normally will be proper."); *In re Geller*, 74 B.R. 685, 688-89 (Bankr. E.D. Pa. 1987) ("generally, a debtor wishing dismissal of a case should obtain this result in all but extraordinary situations."); *In re Mazzocone*, 183 B.R. 402 (Bankr. E.D. Pa. 1995) *aff'd*, 200 B.R. 568 (E.D. Pa. 1996) (when debtor requests dismissal of Chapter 11 case, such relief should be granted unless party opposing the relief establishes that "plain legal prejudice" to creditors would otherwise result); *In re Kimball*, 19 B.R. 300, 302 (Bankr. D. Me. 1982) ("Generally, voluntary dismissals are granted 'unless dismissal will cause some plain legal prejudice to the creditors.'").

265080

Vill. Apartment Co., 16 B.R. 750, 753 (Bankr. S.D. N.Y.1982). The legislative history reflects that dismissal is proper under § 305(a) *inter alia* where an arrangement is being worked out by creditors and the debtor out of court, there is no prejudice to the rights of creditors in that arrangement. See, H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 325 (1977).

**B.** **Dismissal is in the Best Interests of the Debtor's Creditors and Estate Because Dismissal Represents the Best Option for Recovery to Creditors**

A variety of factors demonstrate that it is in the best interest of the Debtor's estate and creditors to dismiss the instant chapter 11 proceeding and authorize to allow the Debtor to pay its creditors in the ordinary course of business once JKO is paid pursuant to the terms of the Compromise.

The Debtor does not have the financial wherewithal to engage in protracted litigation in a plan confirmation process. Pursuing a confirmation of a plan will cost the estate significant administrative expense and subject creditors to catastrophic consequences with the significant risk associated with plan confirmation. Converting the case to chapter 7 would only provide certainty that all creditors will be wiped out. In contrast, dismissing the case pursuant to the terms of the Compromise will eliminate the cost and risk associated with plan confirmation, and provide creditors with the greatest opportunity to be paid in full.

Based on the foregoing, it is in the best interests of creditors for this Court to authorize distributions to creditors pursuant to the Budget and dismiss the Debtor's chapter 11 case as described herein.

**C.** **Creditors Will Not Suffer Any Legal Prejudice**

In the case at bar, dismissal of the Debtor's chapter 11 case will not result in any prejudice to creditors. Dismissal of this case will provide the Debtor with time to reorganize and pay its creditors, without the administrative expense and risk of proceeding with the plan and disclosure statement process. The largest secured creditor, who is the only party that effectively has appeared and raised any issues in this case, not only consents to, but conditions the Compromise upon, dismissal of the case. The Debtor intends to pay creditors in full. Accordingly, there is no benefit to be derived by keeping the case in chapter 11, nor is there prejudice that could be

265080

suffered by creditors if the case were dismissed.  Based on the foregoing, the Debtor submits that there is no "plain legal prejudice" to creditors, and, therefore, the Debtor is entitled to an order dismissing its chapter 11 case.

## VII.

## **ALL ORDERS OF THE COURT IN THIS**

## **CHAPTER 11 PROCEEDING SHOULD SURVIVE DISMISSAL**

The Debtor submits that, for the same reasons as stated above with respect to the dismissal of this bankruptcy proceeding, cause exists for all orders entered in this chapter 11 case by this Court (as the same may be further amended, supplemented, modified and/or restated by this Court), to survive and remain in full force and effect upon the dismissal of the chapter 11 case, notwithstanding Section 349 of the Bankruptcy Code.  This Court's provision for the survival of all orders entered in the underlying bankruptcy proceeding or any related adversary proceeding is necessary to protect the integrity of the Debtor's efforts to resolve the underlying controversies in this case and matters related thereto without need for further or additional litigation.

## VIII.

## **CONCLUSION**

Based upon the foregoing, the Debtor respectfully requests that the Court enter an order granting the relief requested herein.

DATED:  July 14, 2023                      **WINTHROP GOLUBOW HOLLANDER, LLP**


By:___ /s/  *Garrick A. Hollander*_____
         Garrick A. Hollander
General Insolvency Counsel for
Debtor and Debtor-in-Possession

265080

## DECLARATION OF CHRISTINE HANNA

I, Christine Hanna, declare and state as follows:

1.      I am the Manager of Global Premier America #3, LLC, the general partner of Global Premier Regency Palms Oxnard, L.P., a California limited partnership and the debtor and debtor-in-possession in the above-captioned Chapter 11 proceeding (the "Debtor").  The matters set forth herein are within my own personal knowledge, and, if called upon to testify, I could and would do so competently and truthfully.

2.      I make this declaration in support of the Debtor's Notice of Motion and Motion For Order: (1) Approving Compromise of Controversy with JKO Group, Inc., and (2) Voluntarily Dismissing Chapter 11 Case ("Motion") filed by the Debtor.  I have reviewed the Motion and, to the best of my knowledge, the factual representations contained therein regarding the Firm's representation of the Debtor are materially true and correct.

3.      The Debtor commenced this case to stay the foreclosure of the Debtor's real property and nursing facility and restructure the debt of JKO Group, LLC ("JKO"), its senior secured creditor.  The Debtor has reached an agreement to restructure its debt to JKO, thereby providing a path to pay its creditors.  The resolution of JKO's claim eliminates the Debtor's need to remain in bankruptcy, and paves the way for a prompt dismissal.

4.      Approving the Compromise resolves the issues with the Debtor's senior secured creditor, who holds the majority of the claims in this case.  Meanwhile, dismissing the case is not only a required condition of the Compromise, but it also relieves the Debtor of the administrative expense of pursuing a plan process and the risk associated with plan confirmation.  Based on the foregoing, I submit that it is in the best interests of creditors to approve the Compromise, authorize the dismissal of the case, and approve all other relief requested herein.

5.      The Debtor was formed in 2014 to purchase land and develop and operate an assisted living/memory care facility in Oxnard, California.  Global Premier America #3, LLC

265080

("GP") is the general partner of, and has complete decision making control over, the Debtor.[9]
Pursuant to the GP's Operating Agreement and amendments thereto, the Managers of the GP,
which are defined as Christine Hanna and Andrew Hanna, together or separately, each have full
authority to manage and operate the GP.[10]  Thus, I have authority to manage and operate the GP,
and thus, manage and operate the Debtor.  In practice, I have and continue to be the "person in
control" of the Debtor.  Accordingly, I have authority to file, on behalf of the Debtor, a petition
for relief under Chapter 11 of the Bankruptcy Code, enter into the Compromise, and file this
Motion.

6.      The Debtor was initially funded with $10 million of investment from foreign
investors, who invested in the Debtor pursuant to a program of the United States government to
allow foreign investors to make investments in the United States in order to obtain residency
status.  This program is designed to stimulate the U.S. economy through job creation and capital
investment.  The Debtor's successful completion and operation of this project preserves jobs,
protects the investment of these foreign investors, and ensures their continued residency in the
United States.

7.      The Debtor owns and since January 2021, with its wholly owned non-debtor
subsidiary, Global Regency Oxnard Senior Care Services LLC, dba Regency Palms Senior
Living, a California limited liability company, operates an assisted living/memory care facility
located on the Property. Regency Senior Living provides housing and a full spectrum of care
and services to fragile seniors in need of a moderate level of medical assistance, including
specialized memory care for seniors who suffer from Alzheimer's Disease and other forms of
dementia.  The Debtor's subsidiary employ approximately 60 persons.  The Debtor's sole

---

[9] See, e.g., Section 10(a) of the Debtor's limited partnership agreement, which is attached hereto as **Exhibit 3** and incorporated herein by this reference (General Partner shall be solely responsible for the day-to-day operations of the Partnership business and shall have all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith, or in connection with accomplishing the purposes of the Partnership as set forth in Section 3).

[10] See, for example, sections 1.7 and 2(e) of the First Amendment to Operating Agreement of Global Premier America #3, LLC, a true and correct copy of the GP's Operating Agreement and amendment thereto are attached collectively hereto as **Exhibit 4** and incorporated herein by this reference.

265080

revenue source is the rental income and distributions, if any, from its sole tenant, Regency Senior Living.

8.      Similar to many other companies, in 2020, the Debtor experienced significant financial and operational challenges as a result of the COVID-19 pandemic.  In the course of building its assisted living/memory care facility, the outbreak of COVID-19, and the subsequent shutdown and imposition of restrictions, caused construction delays and cost overruns for the Debtor's project.  A Certificate of Occupancy was ultimately issued on June 17, 2020, and thereafter a license was issued by the Department of Social Services.  It was only at this time when the Debtor was first authorized to begin to accept residents into its facility

9.      While the facility opened in January of 2021, the COVID-19 pandemic continued to negatively impact nursing homes and senior care facilities like the Debtor's business by restricting the Debtor's ability to accept residents into its facility. These restrictions caused unexpected delays in the Debtor's ability to receive residents in the assisted living facility during 2021 and into 2022.

10.      Pursuant to its loan obligations, the Debtor was required to make monthly interest payments in the amount of $129,202.  The interest payments were set up in the loan through an account called an "interest reserve."  When the loan was originally funded, $1,196,000 of the loan amount was placed in this interest reserve account.  Every month, monthly interest payments would be paid from that interest reserve account.

11.      In October of 2021, the Debtor entered into discussions with its bank for a COVID-19 forbearance agreement, which would have prevented the loan from going into default at that time.  The discussions were unsuccessful.

12.      On or about April 22, 2022, the Debtor was informed that its bank sold the Debtor's loan to JKO.  On April 25, 2022, the Debtor received a Notice of Default and Election to Sell Under Deed of Trust recorded in the Official Records, County of Ventura, Doc No. 2022000005980.  Pursuant to this notice, the Trustee Sale was scheduled for May 17, 2022.

13.      On May 6, 2022, the Debtor commenced a lawsuit against JKO seeking, among other things, a temporary restraining order, preliminary injunction, and permanent injunction, to

265080

enjoin the JKO from proceeding with the Trustee Sale.  On May 10, 2022, the state court

granted the Debtor's ex parte application for a temporary restraining order.  The state court,

however, ultimately denied the Debtor's request for injunctive relief.  The temporary restraining

order issued on May 10, 2022 was dissolved.  The Trustee Sale was rescheduled and continued

from time to time until August 18, 2022, prior to which the Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code.

14.    The Debtor's primary assets are the Property and its 100% interest in Regency

Senior Living.  The Debtor also owns 100% interests in the following subsidiaries, Global Food,

Global Health, and Global Senior Care; however, none of these entities have or ever had any

assets or business operations.  For more details on the Debtor's assets, see the Debtor's

bankruptcy schedules [Docket No. 17].  In an appraisal dated April 7, 2022, the Property was

estimated to have an "as-is" value of $40,600,000 as of November 15, 2021, and prospective

value at stabilization of $42,700,000 for the date December 1, 2022.

15.    The following is a summary of the Debtor's pre-petition and post-petition

liabilities:

A.    **General Unsecured Claims**: The Debtor owes $4,678,782 to pre-petition

creditors holding general unsecured claims.  Approximately $4,262,349 of these claims

are held by insiders or affiliates of insiders of the Debtor.

B.    **Secured Debt**:        On June 27, 2018, the Debtor obtained a loan from

Nano Banc in the amount of $15.5 million to purchase the Property and build and

operate an assisted living/memory care facility at the Property.  The Nano Banc loan was

evidenced by, among other things, a Construction Loan Agreement and Promissory

Note.  In connection with the loan, the Debtor provided a Deed of Trust in favor of Nano

Banc.  Nano Banc also filed a UCC-1 financing statement dated August 30, 2018 with

the California Secretary of State.

C.    On March 23, 2020, executed a new promissory note in the amount of

$23 million.  The Debtor also executed a Commercial Security Agreement, pursuant to

which the Debtor granted a security interest in collateral, including inventory, accounts

265080

(including but not limited to all health-care-insurance receivables), and cash.  On November 19, 2020, the parties executed a change in terms agreement to increase the loan from $23 million to $25.5 million, and assign a deposit account in the amount of $500,000 held at Nano Banc as additional security to make the interest payments in the event the interest reserve was depleted.

D.      On or about April 22, 2022, Nano sold and assigned to JKO 100% of Nano's interests in its claims against the Debtor.  As of the Petition Date, JKO asserts a secured claim against the Debtor's Assets in the amount of approximately $28 million. As of the Petition Date, the Debtor had $64.31 in cash and $7,317.87 in accounts receivable from Regency Senior Living. Based on the terms of the Compromise, JKO's claim is $30,489,629 as of June 30, 2023.

E.      Top Tier Painting and ArtMex Artistic Design, Inc. also assert secured claims against the Property in the amounts of $87,147 and $22,660, respectively. These asserted secured claims are based on alleged mechanics lien rights arising from contracting services provided to the Debtor.

F.      **Administrative Claims**.  The Debtor owes approximately $750,000 to its professionals (general insolvency counsel and financial advisor).  I am not aware of any additional administrative claims held or asserted against the Debtor's estate.

16.      The Debtor and JKO have been working diligently throughout this case toward resolution of its disputes over claim amount and restructuring of its debt.  The Debtor and JKO have resolved their disputes over the rights to, and claims arising from, the loan, which resolution paves the way for emergence from chapter 11.  To that end, the Debtor and JKO have entered into the Compromise resolving claims and re-defining the parties' rights and obligations.  A true and correct copy of the Compromise is attached hereto as **Exhibit 2** and incorporated herein by this reference.

17.      Entry into the Compromise and obtaining the PACE loan will pave the way for the Debtor to pay its senior secured creditor pursuant to the terms of the Compromise, and if

265080

1  paid in full, thereafter pay creditors to the extent the Debtor's cash flow is sufficient to pay

2  creditors.

3       18.    I supervised Wilshire Pacific Advisors in the preparation of a cash flow budget

4  for the Debtor for the next five years, which reflects an estimated projection of the Debtor's

5  receipts and disbursements, including projected distributions to be made to creditors in this case.

6  A true and correct copy of the Budget is attached hereto as **Exhibit 6** and incorporated herein by

7  this reference.

8       19.    I recognize that, particularly given today's financial economy, there is significant

9  risk that it may not be able to confirm a plan over the objection of JKO, and I know that JKO

10 will vigorously oppose plan confirmation.  I further recognize that the Debtor will incur

11 significant fees in a contested of confirmation battle, which will further increase the hurdles for

12 plan confirmation.  The Compromise eliminates any inherent uncertainty with respect to the

13 resolution of the foregoing.

14      20.    While the Debtor had commenced pre-petition litigation against JKO, the Debtor

15 recognizes that these claims are, at most, offsets against the claim owing to JKO.  In other

16 words, the Debtor is not seeking recovery against JKO, so this prong is not applicable.

17      21.    Litigation over plan confirmation and any litigation against JKO would be

18 significant.  Currently, the Debtor does not have the financial wherewithal to fund this litigation.

19 Settlement of the foregoing, therefore, will save the Debtor's estate substantial expense and will

20 avoid the risk, delays and inconvenience attendant to litigation.

21      22.    JKO struck a very hard bargain leaving the Debtor with very limited and difficult

22 options.  Based on the facts and circumstances at this time, I believe that while it may not be

23 great, the Compromise serves as the best option for the Debtor's creditors.

24      23.    Based on the facts and circumstances at this time, I believe that the Compromise

25 serves as the best, if not only, option for the Debtor's creditors.  I believe that the Debtor faces

26 significant hurdles in plan confirmation, with the failure to succeed resulting in the Debtor

27 losing its property and entire business, and creditors receiving nothing.  In contrast, while I do

28 not know whether the Debtor will be able to make all the payments as provided for in the

265080

Compromise, I recognize that the Compromise provides the Debtor with time to try to reorganize and/or secure additional funding to pay creditors. Accordingly, I believe, in my business judgment, that, given the facts and circumstances, the Compromise is a fair and reasonable result and shows adequate deference to the Debtor's creditors.

24.    Based on the Debtor's financial condition, risk of losing the Debtor's property through a foreclosure, thereby wiping out all creditors, and the Compromise with JKO, I believe that approval of the Compromise and dismissal represents the most likely, if not only, realistic prospect to pay creditors. In addition to dismissal being a critical condition to the Compromise, I submit that there is no reason to incur the additional administrative expense to proceed with the approval of a disclosure statement and confirmation of a plan, particularly since: (i) the only reason for filing this bankruptcy has been resolved; and (ii) proceeding with plan confirmation poses too much uncertainty and risk. Similarly, there is no reason to convert the case to chapter 7 because under a chapter 7, unsecured creditors will definitely not receive any distribution; in contrast, under the proposed dismissal, creditors are intended to be paid in full, and in any event, have a chance of recovery. Accordingly, there is no benefit, and only prejudice, in the event a chapter 7 trustee were to be appointed. The most efficient disposition of this case and the one that will maximize distributions to the estate's creditors is to approve the Compromise and dismiss the case and simply allow the Debtor to pay creditors as contemplated.

25.    The Debtor has resolved the only reason it filed bankruptcy, and is now able to emerge from chapter 11 and pave the way to try to pay creditors as provided for in the Budget. Based on the foregoing, I have determined that remaining in bankruptcy at this point only prejudices creditors, whereas dismissal is in the best interest of creditors.

26.    A variety of factors demonstrate that it is in the best interest of the Debtor's estate and creditors to dismiss the instant chapter 11 proceeding and authorize to allow the Debtor to pay its creditors in the ordinary course of business once JKO is paid pursuant to the terms of the Compromise.

27.    The Debtor does not have the financial wherewithal to engage in protracted litigation in a plan confirmation process. Pursuing a confirmation of a plan will cost the estate

265080

significant administrative expense and subject creditors to catastrophic consequences with the significant risk associated with plan confirmation.  Converting the case to chapter 7 would only provide certainty that all creditors will be wiped out.  In contrast, dismissing the case pursuant to the terms of the Compromise will eliminate the cost and risk associated with plan confirmation, and provide creditors with the greatest opportunity to be paid in full.

28.    Based on the foregoing, it is in the best interests of creditors for this Court to authorize distributions to creditors pursuant to the Budget and dismiss the Debtor's chapter 11 case as described herein.

29.    In the case at bar, dismissal of the Debtor's chapter 11 case will not result in any prejudice to creditors.  Dismissal of this case will provide the Debtor with time to reorganize and pay its creditors, without the administrative expense and risk of proceeding with the plan and disclosure statement process.  The largest secured creditor, who is the only party that effectively has appeared and raised any issues in this case, not only consents to, but conditions the Compromise upon, dismissal of the case.  The Debtor intends to pay creditors in full.  Accordingly, there is no benefit to be derived by keeping the case in chapter 11, nor is there prejudice that could be suffered by creditors if the case were dismissed.  Based on the foregoing, the Debtor submits that there is no "plain legal prejudice" to creditors, and, therefore, the Debtor is entitled to an order dismissing its chapter 11 case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 14th day of July 2023, at Irvine, California.

Christine Hanna

265080

EXHIBIT 1

GARRICK A. HOLLANDER – State Bar No. 166316
ghollander@wghlawyers.com
**WINTHROP GOLUBOW HOLLANDER, LLP**
1301 Dove Street, Suite 500
Newport Beach, CA 92660
Telephone:   (949) 720-4100
Facsimile:    (949) 720-4111

General Insolvency Counsel for Global Premier Regency
Palms Oxnard, L.P., Debtor and Debtor-in-Possession

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA – NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>GLOBAL PREMIER REGENCY PALMS OXNARD, L.P., a California limited partnership,<br><br>      Debtor and<br>      Debtor-in-Possession | Case No. 9:22-bk-10626-RC<br><br>Chapter 11 Proceeding<br><br>**ORDER APPROVING DEBTOR'S MOTION FOR ORDER: (1) APPROVING COMPROMISE OF CONTROVERSY WITH JKO GROUP, INC. AND (2) DISMISSING CHAPTER 11 CASE**<br><br>DATE:     August 8, 2023<br>TIME:     2:00 p.m.<br>PLACE[1]:  Courtroom 201<br>          1415 State Street<br>          Santa Barbara, CA  91301 |

On August 8, 2023 at 2:00 p.m., the Court held a hearing on the *Notice of Motion and Motion for Order: (1) Approving Compromise of Controversy with JKO Group, Inc. and (2) Dismissing Chapter 11 Case* [Docket No. _____] (the "Motion") filed by Global Premier Regency Palms Oxnard, L.P., a California limited partnership, the debtor and debtor-in-possession in the above-entitled Chapter 11 proceeding (the "Debtor"), the memorandum of points and authorities,

---

[1] The hearing on the Motion is scheduled to be heard via Zoom.  Please check the Court's calendar just prior to the hearing to confirm. http://ecf-ciao.cacb.uscourts.gov/CiaoPosted/.

265801

EXHIBIT 1 - PAGE 1

and the declaration of Christina Hanna in support of the Motion (the "Hanna Declaration").  The

Court having reviewed and considered the Motion, the memorandum of points and authorities, the

Hanna Declaration and all exhibits appended thereto, finding that due and proper notice of the

Motion and the hearing on the Motion was appropriately given and no opposition to the Motion

having been filed, and for good and sufficient cause appearing therefore, the Court hereby makes

the following Findings of Fact, Conclusions of Law, and Order:

**IT IS HEREBY FOUND AND DETERMINED** that:

a.      The notice given of the hearing on the Motion was sufficient under the
circumstances of this case.

b.      Christine Hanna has the authority, as Manager of Global Premier America #3,
LLC, a California limited liability company, the general partner of the Debtor, to act on
behalf of the Debtor, in and out of Chapter 11, to execute, enter into, and deliver the
Compromise with JKO Group,  LLC (including any successor-in-interest or assignee thereof,
"JKO"), and all such other documents necessary to obtain, close, consummate, and perform
under the Compromise,[2] and to take such other and further acts as may be necessary or
desirable in connection with, and to close and consummate, the Compromise.

c.      The Compromise is critical to the Debtor's ability to preserve its going
concern and emerge from Chapter 11 and provides creditors with the greatest opportunity for
payment.

d.      The Compromise and terms and conditions thereof of comply with the
requirements of Rule 9019 of the Federal Rules of Bankruptcy Procedure, and is reasonable,
fair, prudent, equitable, and in the best interests of creditors.

e.      Good and adequate cause exists for granting the Motion.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED**
that:

1.      The Motion is granted;

---

[2] Except as otherwise defined herein, the definitions of the capitalized terms contained herein are as set forth in the
Motion.

-2-

265801

EXHIBIT 1 - PAGE 2

2.    The findings of fact and conclusions of law of the Court set forth herein and at the Hearing on the Motion shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, as made applicable herein by Bankruptcy Rule 9014, and the findings and conclusions of the Court at the Confirmation Hearing are incorporated herein by reference. To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and vice versa.

3.    Except as otherwise expressly set forth herein, any formal or informal objection to confirmation, to the extent not already withdrawn, waived, or settled, and all reservations of rights included therein, shall be, and hereby are overruled.

4.    The Compromise[3] and all terms contained therein are hereby approved in all respects pursuant to Bankruptcy Rule 9019, is binding upon all Persons affected thereby, and shall be effectuated in accordance with the terms thereof.

5.    The Debtor, and Christine Hanna on behalf of the Debtor, is authorized to enter into the Compromise, execute any and all such additional documents as may be necessary to effectuate the Compromise, and take all actions necessary to effectuate the Compromise.

6.    The Loan Documents constitute valid, binding, and enforceable obligations of the Debtor, as modified by the Stipulation and this Order.

7.    JKO shall have an allowed claim against the Debtor of $_____ as of the date hereof.

8.    Not later than three business days after the execution of the Compromise, the Debtor shall deliver to G&B Law, LLP, the original completed and notarized grant deed in lieu of foreclosure in the form attached as **Exhibit 5** (the "Deed in Lieu") to the Hanna Declaration. The Deed in Lieu shall be in favor of [an entity to be identified by Newco prior to the entry of the Approval Order] (including any successor-in-interest or assignee thereof, "Deed Holder"). JKO, on behalf of itself and Deed Holder, acknowledges and agrees that the Deed in Lieu provided under this paragraph is not intended to, and does not, transfer title at the time of execution. Deed Holder shall hold and retain the Deed in Lieu provided that the Company complies in all respect with the terms of

---

[3] Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Compromise. If not defined in the Compromise, such terms shall have the meanings set forth in the Motion or as defined in Section 101 of the Bankruptcy Code, as context dictates.

-3-

the Compromise and there is no Payment Default or Uncured Default, as defined in Paragraph 11 of the Compromise. Upon the occurrence or continuance of a Payment Default or Uncured Default under the Compromise or the Loan Documents, Deed Holder may immediately record the Deed in Lieu and shall immediately notify the Debtor of said recording. JKO and Deed Holder shall be granted relief from the automatic stay to the extent necessary to take the foregoing actions.

9.      Upon a Payment Default or Uncured Default, the Debtor agrees to cooperate in the execution, in a timely manner, of any and all documents that are, or may be, necessary to cause the immediate conveyance of the Property to Deed Holder, including execution of a deed other than the Deed in Lieu. This provision may be enforced by specific performance.

10.     The liens and security interests that JKO has on the Property will not merge with the legal estate and title in the Property that may be transferred pursuant to the terms set forth in the Compromise.  The liens and Loan Documents will not be released or relinquished, and the priority of the liens of the Loan Documents will not be altered or subordinated to any other liens or interests. JKO may merge the liens and security interests with the fee or leasehold title to the property, but only by a separate document recorded later or through foreclosure. The statutes of limitation applicable to the exercise of the JKO's rights and remedies under the Loan Documents are extended and tolled until four years after the Maturity Date.

11.     Upon a Payment Default or an Uncured Default, JKO may exercise all rights and remedies available under the Loan Documents as if fully described and incorporated into the Compromise. All of JKO's remedies under the Compromise and the Loan Documents are cumulative with one another and with remedies under applicable law.

12.     The Debtor is authorized to continue operating its business and pay its creditors in the ordinary course of business, as projected in the Budget attached as **Exhibit 6** to the Hanna Declaration, to the extent funds exist to pay such creditors, and such payment is consistent with the terms of the Compromise.

13.     Except as otherwise provided in the Compromise, Budget or Motion, or until such time as the Debtor fails to pay its debts as projected in the Budget, all persons or entities who have held, hold or may hold claims against, or interests in, the Debtor shall be enjoined on and after the

-4-

date of entry of this Order and through the Maturity Date of the Compromise, from (i) the

enforcement, attachment, collection or recovery by any manner or means of any judgment, award,

decree or order against the Debtor, the Debtor's property, against the estate or against the proceeds

of such property, on account of any such claim or interest; (ii) creating, perfecting or enforcing any

encumbrance of any kind against the Debtor's property or interests in such property, on account of

any such claim or interest; (iii) asserting any right of setoff, subrogation or recoupment of any kind

against any obligation due to the Debtor or against the property or interest in property of the Debtor

on account of any claim or interest; and (iv) asserting any claim or interest against the Debtor. This

paragraph shall not apply to JKO or Deed Holder.

14.     Except as provided in the Compromise, Motion of this Order, effective as of the date

of the entry of this Order, all Persons shall be precluded from asserting against the Debtor, its

partners, officers, directors, agents, attorneys, consultants, and each of their successors, or their

property, any claims, debts, rights, causes of action, liabilities, or equity interests based upon any act,

omission, transaction, or other activity of any nature that occurred during the Debtor's bankruptcy,

as a result of the filing of the bankruptcy, or anything related to, or in connection with, the

bankruptcy and this or any Order of the Court. This paragraph shall not apply to JKO or Deed

Holder.

15.     This Chapter 11 case is hereby dismissed, effective upon the later of the: (a) approval

of debtor in possession financing necessary to consummate the Compromise; (b) the Closing under

the Compromise; (c) payment of all unpaid administrative expenses incurred in this case; and (d)

entry of this order.

16.     Notwithstanding anything to the contrary in the Bankruptcy Code, the Federal Rules

of Bankruptcy Procedures, or the Local Bankruptcy Rules of the United States Bankruptcy Court for

the Central District of California to the contrary, including, without limitation, Section 349 of the

Bankruptcy Code all prior orders and judgments entered in this case, including, without limitation

this order and the Court's Order granting the Debtor's Motion for Order Authorizing Debtor To

Enter Into Assessment Contract and Obtain Debtor-in-Possession Financing Secured Against Real

Property (Docket No. _____), shall remain in full force and effect, shall be unaffected by the

-5-

265801

EXHIBIT 1 - PAGE 5

dismissal of this case, are legally binding on all applicable parties, and are specifically preserved for purposes of finality of judgment and res judicata.

17.    Notwithstanding the dismissal of this case, to the extent allowed by applicable law, this Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation, interpretation, or enforcement of the Compromise, the Motion, this Order, or any other Order of this Court entered in this case.

18.    No further notice of hearing shall be necessary to effectuate the foregoing.

# # #

-6-

265801

EXHIBIT 1 - PAGE 6

EXHIBIT 2

DocuSign Envelope ID: 96265B36-BAAC-47BA-AA4F-81F598B4D93C

# STIPULATION

This Stipulation (the "Stipulation") is entered into as of June 20, 2023, by and between, Global Premier Regency Palms Oxnard, L.P. (the "Debtor"), Global Regency Oxnard Senior Care Services, LLC (the "Subsidiary" and, with the Debtor, the "Company"), on the one hand, and on the other hand, JKO Group, LLC ("JKO"), a Delaware limited liability company ("JKO"). The Debtor, the Subsidiary, and JKO shall be referred to herein individually as a "Party" or collectively as the "Parties."

# R E C I T A L S

The Parties enter into this Stipulation with reference to the following facts:

A.    On or about March 23, 2020, the Debtor entered into a loan (the "Loan") with Nano Banc ("Nano") in the original principal amount of $23,000,000.00. The Loan was documented by, among other things, the following documents (collectively, the "Loan Documents"):

a.    That certain Business Loan Agreement dated March 23, 2020 ("Business Loan Agreement"), a copy of which is attached as **Exhibit A**.

b.    That certain Promissory Note ("Note") dated March 23, 2020, in the original principal face amount of Twenty-Three Million Dollars ($23,000,000.00), a copy of which is attached as **Exhibit B**.

c.    That certain Deed of Trust dated March 23, 2020 ("Deed of Trust") and recorded and filed on March 27, 2020 in the Official Records of the Ventura County Clerk and Recorder as Document No. 20200327-00043822-0 in connection with the real property commonly known as 1020 Bismark Way, Oxnard, California 93033, Assessor's Parcel Number 221-0-063-185 (the "Property"), a copy of which is attached as **Exhibit C**.

d.    That certain Commercial Guaranty dated March 23, 2020 by Global Premier America, LLC ("GPA") as modified by the Nonrecourse/Limited Liability Addendum to Guaranty (collectively the "GPA Guaranty"), a copy of which is attached as **Exhibit D**.

e.    That certain Commercial Guaranty dated March 23, 2020 by Andrew Hanna ("Hanna") as modified by the Nonrecourse/Limited Liability Addendum to Guaranty (collectively the "Hanna Guaranty" and, with the "GPA Guaranty," the "Guaranties"), a copy of which is attached as **Exhibit E**.

f.    That certain Commercial Security Agreement dated March 23, 2020 by the Debtor with respect to various personal property collateral as defined in said agreement, a copy of which is attached as **Exhibit F**.

B.    On November 19, 2020, the Debtor and Nano entered into a Change in Terms Agreement which, among other things, increased the principal amount of the loan from $23,000,000.00 to $25,500,000.00. A copy of the agreement is attached as **Exhibit G**. As part of

1

EXHIBIT 2 - PAGE 1

this modification, the Debtor also entered into a duly recorded Modification of Deed of Trust, a copy of which is attached as **Exhibit H**.

C.    On or about April 15, 2022, Nano assigned its rights in the Loan Documents to JKO, pursuant to the following documents:

a.    That certain Allonge to Promissory Note dated April 15, 2022, a copy of which is attached as **Exhibit I**.

b.    That certain duly recorded Assignment of Deed of Trust, a copy of which is attached as **Exhibit J**.

c.    That certain General Assignment and Bill of Sale dated April 15, 2022, a copy of which is attached as **Exhibit K**.

D.    The Debtor has been in default on its payment obligations under the Loan since November 11, 2021 and breached various covenants under the Loan Documents. A trustee's sale was scheduled for May 17, 2022.

E.    On May 6, 2022, JKO filed an action against the Debtor, GPA, and Hanna in the Superior Court of California for the County of Ventura (Case No. 56-2022-00565422-CU-CO-VTA) seeking, among other things, judicial foreclosure of the Property and collection on the Guaranties.  That same day, the Debtor filed an action in the Superior Court of California for the County of Orange (30-2022-01258382-CU-BC-CJC) against JKO and others seeking, among other things, an injunction to enjoin the trustee's sale (such actions, together, the "Litigation"). The Debtor's request for temporary restraining order was granted, but injunctive relief was ultimately denied.

F.    On September 2, 2022 (the "Petition Date"), the Debtor filed a voluntary petition under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Central District of California (the "Bankruptcy Court") initiating Case No. 22-bk-10626-RC (the "Bankruptcy Case").

G.    The balance owed on the Loan will be $30,489,629.27 as of June 30, 2023, as calculated in **Schedule 1** hereto, subject to adjustment based on JKO's actual legal fees accrued through that date.

H.    The Debtor intends to obtain commercial PACE financing in an amount of $12,800,000 (the "PACE Loan") from White Oak Global Advisors, LLC, or such other lender as the Debtor may select (in either case, the "PACE Lender").

I.    JKO is willing to consent to the PACE Loan on the terms set forth herein.

## S T I P U L A T I O N

NOW, THEREFORE, the Parties agree and stipulate as follows:

2359204.3 - 32572.0001

EXHIBIT 2 - PAGE 2

DocuSign Envelope ID: 96265B36-BAAC-47BA-AA4F-81B598B4D93C

1.    **JKO Consent to PACE Loan.** Subject to the terms hereof, JKO will consent to the Debtor's taking of a PACE Loan from the PACE Lender in the amount of $12,800,000. The Debtor shall not execute the PACE Loan documents until they have been reviewed and approved by JKO in writing in its sole discretion. The PACE Loan may include a contractual assessment on the Property that would be recorded with the local tax authority, with delinquent assessments subject to the same process and penalties as property taxes. JKO reserves its rights to cure any default under PACE Loan without any consent from the Debtor, with the resultant expenses added to the balance of the Loan. JKO may require intercreditor agreement with PACE Lender or a letter of instruction/authorization with following verbiage:

> This letter will confirm and advise that you are authorized and instructed to transmit any and all information requested by _____ or its loan servicing agent and/or their agents/assigns. This information includes but is not limited to: existing principal balance, payment amount, late charge amount, escrow amounts, suspense balances, delinquency amounts, et cetera. I authorize and instruct you to respond as you would be required to respond to the undersigned as trustor under the Deed of Trust. Please maintain this information in your database for future reference.

2.    **JKO Secured Claim.**

a.    JKO shall be allowed a claim in the amounts and natures described in **Schedule 1** attached hereto (including default interest), subject to adjustment of accrued interest and default interest based on the date of the Approval Order (defined below), JKO's actual legal fees, and any other expenses accrued through that date, which shall be incorporated into the Approval Order.  As of June 30, 2023, excluding JKO's accrued attorneys' fees, JKO's claim amount is $30,312,879.27.

b.    The Debtor waives and releases any defenses or objections to default interest, late charges, or the validity of any of the Loan Documents. The Approval Order shall provide that the Loan Documents constitute valid, binding, and enforceable obligations of the Debtor, as modified by this Stipulation and the Approval Order.

c.    The Loan shall be secured by all assets of the Debtor, and the Company shall take all actions and execute all documents necessary for JKO to perfect its security interest.

3.    **Closing.** The closing (the "Closing") and funding of the transaction under this Stipulation shall be the later of: (a) two (2) business days after the date of funding and closing of the PACE Loan, or (b) two (2) business days after the date of entry of an order approving this Agreement and dismissal of the Bankruptcy Case; but in no event later than August 15, 2023.

4.    **Monthly Payments.** The Debtor shall re-commence making monthly payments under the Promissory Note at the rate of $89,000 per month (the "Monthly Payments"). Monthly principal and interest at the non-default rate will continue to accrue at $152,921.82 per month. In addition, default interest will continue to accrue at $3,541.67 per day. All accrued and unpaid amounts shall be added to the Loan balance on a monthly basis.

EXHIBIT 2 - PAGE 3

5. **PACE Loan Proceeds.** At the closing of the PACE Loan, the PACE Lender shall pay all of the proceeds of the PACE Loan directly to JKO, subject to the following exceptions:

a.    PACE Loan Capitalized Interest: $2,170,000. To be held by the PACE Lender in an account inaccessible to the Debtor, Andrew Hanna, Christine Hanna, or any Debtor Related Party (defined below) without JKO's written consent. This amount assumes the PACE Loan closes no later than August 15, 2023.

b.    The PACE Lender's fees and costs associated with the PACE Loan, in the amount of $386,471.

c.    Professional fees allowed by the Bankruptcy Court, up to a maximum of $750,000, to be paid directly to the Debtor's retained professionals from the PACE Loan proceeds.

d.    $150,000 ("Working Capital") to the Debtor to be used for the working capital needs of the Company.

e.    $102,581.72 to the County of Los Angeles for overdue property tax purposes.

6. **JKO's Application of Remaining Proceeds.**

a.    At Closing, JKO shall withhold from the PACE Loan proceeds $1,068,000 to be used as a reserve for Monthly Payments (the "Reserve"). So long as no Event of Default is continuing and there are sufficient funds in the Reserve, on the first of each month, JKO shall withdraw amounts from the Reserve sufficient to make the Monthly Payment then due and shall so apply such sums. Depletion of the Reserve shall not release the Debtor from any its obligations under this Stipulation or the Loan Documents, including without limitation, the obligation to make all payments when due.

b.    JKO will apply the remaining PACE Loan proceeds in accordance with the Loan Documents.

7. **Maturity Date.** The maturity date for this Stipulation and the Note, shall be the second anniversary of the Closing (the "Maturity Date"), on which date the Debtor shall pay all outstanding principal, interest, fees, and expenses then due and owing under the Note.

8. **Court Approval.** This Stipulation and the terms set forth herein are expressly conditioned (and shall become effective) upon entry of Bankruptcy Court order (the "Approval Order") approving and authorizing the Debtor's entry into this Stipulation. The Debtor shall file a motion seeking the Approval Order within 10 days of the date first written above.

9. **Expense Pre-Approval and Payments of Available Cash.**

a.    The Company's disbursements in any given calendar month shall not exceed the amounts specified in **Schedule 2**, based on the occupancy rate at the Property on the first day of the month; *provided that* the Company may apply up to $20,000 per month of the

EXHIBIT 2 - PAGE 4

DocuSign Envelope ID: 96265B36-BAAC-47BA-AA4F-81BE98B4D93C

Working Capital to spending in excess of the amounts in **Schedule 2** without JKO's prior approval until the Working Capital is exhausted. If the Company applies any Working Capital in that manner, it must be provide immediate notice of the amount of Working Capital was used and the disbursements for which it was used. By way of example, if the Property is 54% occupied on the first day of a month and the Company has sufficient Working Capital, the Company could spend up to $246,196 without JKO's approval (i.e., $226,196 (maximum monthly amount based on occupancy) plus $20,000 (maximum monthly excess working capital) = $246,196).

        b.     The Company may exceed the disbursement limit described in Paragraph 9.a only if JKO approves such excess disbursement in advance, in writing, which prior approval shall not be unreasonably withheld. JKO's approval of an disbursement in a given month shall not be deemed approval of said disbursement in any other month, unless JKO expressly states as such.

        c.     The Company shall provide JKO a report showing its income, disbursements, and occupancy rate for each month by the 20th day of the subsequent month.

        d.     If the Company's gross income for a given month exceeds the disbursements authorized pursuant to Paragraph 9.a and 9.b, the Company may use any such "excess income" to refuel the working capital balance back to $150,000, to the extent it had dropped. Thereafter, the Company shall pay JKO all of the excess income for such month by the 5th business day of the subsequent month. JKO will apply the amounts paid in accordance with the Loan Documents.

      10.   **Events of Default.**

        a.     It shall be an "Event of Default" under this Stipulation if (i) the Company fails to make any payment of the Loan when due, including on the Maturity Date ("Payment Default"); (ii) the Company fails to comply with or perform any term, obligation, or condition in this Stipulation; (iii) the Debtor defaults under the PACE Loan; (iv) there occurs any Event of Default under any Loan Document (a "Loan Default"); or (v) the Closing does not occur by August 15, 2023. Notwithstanding the foregoing, the following shall not be Events of Default under this Stipulation: (a) a Loan Default that occurred prior to, exists as of, and/or continues after the Closing; (b) the Debtor's insolvency; (c) the Debtor's non-compliance with the "Net Liquid Assets," "Debt Coverage Ratio" requirements on page 3 of the Business Loan Agreement; (d) the pendency of the Bankruptcy Case; (e) a default that falls within any of the following identified categories of Events of Default enumerated in the Loan Documents: (i) Default in Favor of Third Parties; (ii) Events Affecting Guarantor other than Christine Hanna; (iii) Event Affecting General Partner that were not caused by Christine Hanna; (v) Adverse Change; and/or (vi) Insecurity; (f) any Event of Default arising from or related to the acts, omissions, insolvency, death, or financial condition of Andrew Hanna and Global Premier, LLC; (g) any Event of Default arising from claims against the Company that existed as of the Petition Date; or (h) any Event of Default necessitated by the Company's compliance with the terms of this Stipulation. For sake of clarification, obtaining the PACE loan and any consequences arising from the Company not paying claims that existed as of the Petition Date, including any litigation, recording of liens, etc., shall not constitute an Event of Default.

2359204.3 - 32572.0001

EXHIBIT 2 - PAGE 5

b.      In the event that the Company should default in the performance of any of its obligations hereunder, except for a Payment Default, the remedies for which are specifically provided herein, JKO shall provide to the Company and the Company's counsel, (collectively, the "Noticed Parties") via e-mail and first-class mail, written notice of any such default ("Default Notice"). The Default Notice shall be deemed received one Court day after JKO's service of such notice. The Company shall have a grace period of three (3) Court days after the Company's receipt of the Default Notice ("Grace Period") within which to cure such default. If the Company does not cure the Event of Default within the Grace Period (an "Uncured Default"), JKO and Deed Holder (defined below) may immediately pursue all remedies, including recording the Deed in Lieu (defined below) conditionally provided as part of this Stipulation.

c.      The Company may oppose any such Uncured Default asserted by JKO by filing in the Bankruptcy Court a motion contesting the asserted Uncured Default ("Contesting Motion"), which must be filed within three (3) Court days after receipt of the Default Notice. The Company's Contesting Motion shall be limited to: (a) whether the asserted default occurred; (b) whether the asserted default is excused; or (c) whether the Company timely cured the asserted default. If the Court finds that the Company did not commit an Event of Default, was excused from committing an Event of Default, or timely cured an Event of Default, the Company shall be authorized to continue operating in ownership and possession of its Property pursuant to the terms of the Stipulation.  If Deed Holder has recorded the Deed in Lieu, Deed Holder must promptly execute a grant deed or other mutually acceptable conveyance to transfer the Property back to the Debtor. This provision may be enforced by specific performance.

11.    **Holding of Deed in Lieu of Foreclosure.**

a.      Not later than 3 business days after the execution of this Stipulation, the Debtor shall deliver to G&B Law, LLP, the original completed and notarized grant deed in lieu of foreclosure in the form attached hereto as Exhibit __ (the "Deed in Lieu"). The Deed in Lieu shall be in favor of an entity to be identified by Newco prior to the entry of the Approval Order ("Deed Holder"). JKO, on behalf of itself and Deed Holder, acknowledges and agrees that the Deed in Lieu provided under this paragraph is not intended to, and does not, transfer title at the time of execution. Deed Holder shall hold and retain the Deed in Lieu provided that the Company complies in all respect with the terms of this Stipulation and there is no Payment Default or Uncured Default, as defined in Paragraph 11. Upon the occurrence or continuance of a Payment Default or Uncured Default under this Stipulation or the Loan Documents, Deed Holder may immediately record the Deed in Lieu and shall immediately notify the Debtor of said recording. JKO and Deed Holder shall be granted relief from the automatic stay to the extent necessary to take the foregoing actions. This paragraph, with the exception of this sentence, shall be included in the Approval Order.

b.      Upon a Payment Default or Uncured Default, the Debtor agrees to cooperate in the execution, in a timely manner, of any and all documents that are, or may be, necessary to cause the immediate conveyance of the Property to Deed Holder, including execution of a deed other than the Deed in Lieu. This provision may be enforced by specific performance.

2359204.3 - 32572.0001

EXHIBIT 2 - PAGE 6

DocuSign Envelope ID: 9626SB36-BAAC-47BA-AA4F-84BF98B4D93C

c.    The liens and security interests that JKO has on the Property will not merge with the legal estate and title in the Property that may be transferred pursuant to this Paragraph 11.c. The liens and Loan Documents will not be released or relinquished, and the priority of the liens of the Loan Documents will not be altered or subordinated to any other liens or interests. JKO may merge the liens and security interests with the fee or leasehold title to the property, but only by a separate document recorded later or through foreclosure. The statutes of limitation applicable to the exercise of the JKO's rights and remedies under the Loan Documents are extended and tolled until four years after the Maturity Date.

12.    **Additional Remedies Upon Default.** Upon a Payment Default or an Uncured Default, JKO may exercise all rights and remedies available under the Loan Documents as if fully described and incorporated herein. All of JKO's remedies under this Stipulation and the Loan Documents are cumulative with one another and with remedies under applicable law.

13.    **Terms of the Loan Documents.** Except as modified to give effect to the terms herein, all terms and covenants under the Loan Documents shall remain in effect, including the GPA Guaranty and Hanna Guaranty. In the event of a conflict between this Stipulation and any Loan Document, the terms of this Stipulation shall govern.

14.    **Contingent Mutual Releases.**

a.    Effective only upon timely payment of the Loan in full by the Maturity Date, the Parties, on behalf of themselves, their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates, and assigns, and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting by, through, under, or in concert with them, and each of them, hereby release and discharge the other Party, together with their predecessors, successors, direct and indirect parent companies, direct and indirect subsidiary companies, companies under common control with any of the foregoing, affiliates, and assigns and its and their past, present, and future officers, directors, shareholders, interest holders, members, partners, attorneys, agents, employees, managers, representatives, assigns, and successors in interest, and all persons acting in concert with them (collectively, with respect to each Party, its "Related Parties"), and each of them, from all known and unknown charges, complaints, claims, grievances, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts, penalties, fees, expenses (including attorneys' fees and costs actually incurred) (collectively, "Claims"), which either Party or its Related Parties has, or may have had, against the other Party or Related Parties, whether or not apparent or yet to be discovered, related to the Litigation, the Loan Documents, or the Bankruptcy Case.

b.    Notwithstanding Paragraph 14.a, the releases shall not include any Claim of or against (i) Andrew Hanna, or (ii) his affiliates other than the Company, GPA, or Christine Hanna. Nothing in Paragraph 14.a is intended to limit JKO's ability to execute or collect on any judgment against Andrew Hanna.

7

EXHIBIT 2 - PAGE 7

15.    **Effect on Litigation.** The Debtor and JKO shall forbear from any further prosecution of the Litigation so long as there is no Payment Default or Uncured Default hereunder. The Litigation shall remain pending during the period of forbearance. Upon timely payment of the Loan in full by the Maturity Date, the Parties shall promptly dismiss the Litigation with prejudice, except as against Andrew Hanna.

16.    **Venue and Jurisdiction.** The Bankruptcy Court shall have exclusive personal and subject matter jurisdiction and shall be the exclusive venue to resolve any and all disputes relating to this Stipulation, including under Paragraph 9. For the avoidance of doubt, this provision shall not affect jurisdiction or propriety of venue of the courts of California with respect to the Litigation.

17.    **Disposition of Bankruptcy Case.** The Bankruptcy Case shall be dismissed upon Closing or as soon as practicable thereafter, with the Bankruptcy Court retaining jurisdiction as provided in Paragraph 16.

18.    **Notice.** Any notices required under this Stipulation shall be given to the following addressees in accordance with notice requirements of the Business Loan Agreement.

**To the Debtor:**

Global Premier Regency Palms Oxnard, LP
Attn: Christine Hanna
1900 Main Street, Suite 315
Irvine, CA 92614
christine@geb5.com; sarang@clarityh.com

with a copy to

Garrick Hollander
Winthrop Golubow Hollander
1301 Dove Street, 5th Floor
Newport Beach, CA  92660
ghollander@wghlawyers.com;

**To the Subsidiary:**

Global Regency Oxnard Senior Care Services, LLC
Attn: Christine Hanna
1900 Main Street, Suite 315
Irvine, CA 92614
christine@geb5.com; sarang@clarityh.com

with a copy to Garrick Hollander at the address above.

8

**To JKO:**

JKO Group, LLC
c/o Jeremy Rothstein
G&B Law, LLP
16000 Ventura Boulevard, Suite 1000
Encino, California  91436-2730
jrothstein@gblawllp.com

The foregoing addresses shall also be deemed the current addresses for the respective Parties for notice purposes under the Loan Documents.

19.    **Additional Terms.**

a.    **Authority.** Each Party represents and warrants he, she, or it has the full corporate power and authority to execute and deliver this Agreement.

b.    **Attorney's Fees.** Each Party to this Agreement will bear its own attorneys' fees and costs that it/he/she incurred, or will incur, in connection with this Agreement.

c.    **Choice of Law.** The laws of the State of California will govern the interpretation of the Agreement.

d.    **Advice of Counsel.** Each Party acknowledges and agrees that it had the opportunity to review this Agreement independently with legal counsel of its choice, and/or had the requisite experience and sophistication to understand, interpret, and agree to the particular language of the provisions in this Agreement.

e.    **Title and Captions.** The Parties have inserted the paragraph titles in this Agreement only as a matter of convenience and for reference, and the paragraph titles in no way define, limit, extend, or describe the scope of this Agreement or the intent of the Parties in including any particular provision in this Agreement.

f.    **Execution.** Although the Parties may execute this Agreement in more than one counterpart, each such originally signed counterpart constitutes an original, and all of them constitute one and the same Agreement. The Parties agree that this Agreement may be executed and delivered by email and that any such signature shall be effective and binding on the party so signing.

g.    **Additional Documents.** The Parties agree to cooperate in the execution, in a timely manner, of any and all documents that are, or may be, necessary to give full effect to this Agreement.

*[Signatures on the following page]*

9

IN WITNESS WHEREOF, the Parties hereto have executed this Stipulation to be effective as of the date(s) set forth in the Preamble.

**JKO GROUP, LLC,**
**a Delaware limited liability company**

By: _Michael Kluchin_____
Michael Kluchin, Authorized Representative


**GLOBAL PREMIER REGENCY PALMS OXNARD, L.P.,**
**a California limited partnership**

By:    GLOBAL PREMIER AMERICA #3, LLC
       a California limited liability company
       its general partner

       By: _Christine Hanna_____
           Christine Hanna, Manager


**GLOBAL REGENCY OXNARD SENIOR CARE SERVICES, LLC,**
**a California limited liability company, dba Regency Palms Senior Living**

By:    Global Premier Regency Palms Oxnard, LP
       a California limited liability company
       its Managing Member

       By: _Christine Hanna_____
           Christine Hanna, Manager


10

EXHIBIT 2 - PAGE 10

**DocuSign**

## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 962C5B36BAAC47DAAA4F81BF98DAD93C | | Status: Completed |
| Subject: Complete with DocuSign: JKO-Global Stipulation (Executed by Debtor) with attached exhibits.pdf | | |
| Source Envelope: | | |
| Document Pages: 10 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 5 | Initials: 0 | G&B Law LLP |
| AutoNav: Enabled | | 16000 Ventura Blvd., #1000 |
| EnvelopeId Stamping: Enabled | | Encino, CA  91436 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | Fax_Electronic-Sig@gblawllp.com |
| | | IP Address: 34.211.249.79 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: G&B Law LLP | Location: DocuSign |
| 6/28/2023 5:38:36 PM | Fax_Electronic-Sig@gblawllp.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Michael Kluchin | *DocuSigned by:* Michael Kluchin — 3445C69B6D7E429... | Sent: 6/28/2023 5:41:52 PM |
| michael@continuumanalytics.com | | Viewed: 6/28/2023 5:49:00 PM |
| Authorized Agent. | | Signed: 6/28/2023 6:06:53 PM |
| Continuum Analytics | | |
| Security Level: Email, Account Authentication (None) | Signature Adoption: Pre-selected Style Using IP Address: 184.188.124.50 | |
| **Electronic Record and Signature Disclosure:** Accepted: 6/28/2023 5:49:00 PM ID: 0b9bd89d-7656-4d8e-8c32-f5d5a5fdf9ba | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Jeremy Rothstein | COPIED | Sent: 6/28/2023 5:41:52 PM |
| jrothstein@gblawllp.com | | Viewed: 6/28/2023 6:07:26 PM |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** Not Offered via DocuSign | | |
| Marleigh Singleman | COPIED | Sent: 6/28/2023 5:41:53 PM |
| msingleman@gblawllp.com | | |
| Security Level: Email, Account Authentication (None) | | |
| **Electronic Record and Signature Disclosure:** Accepted: 6/14/2023 10:55:40 AM ID: 88b92172-7fa7-4e19-b81c-c42a98513788 | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

EXHIBIT 2 - PAGE 11

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 6/28/2023 5:41:53 PM |
| Certified Delivered | Security Checked | 6/28/2023 5:49:00 PM |
| Signing Complete | Security Checked | 6/28/2023 6:06:53 PM |
| Completed | Security Checked | 6/28/2023 6:06:53 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

EXHIBIT 2 - PAGE 12

JKO Group, LLC

2549 Eastbluff Dr #720

Newport Beach, CA 92660

Borrower: Global Premier Regency Palms Oxnard, LP

Attention: Andrew & Christine Hanna

2010 Main St., Suite 250

Irvine, CA 92614

## Payoff Demand

| **Loan Payoff for:** | | |
|---|---|---|
| Global Premier Regency Palms Oxnard, LP | **Loan Number:** | |
| 1020 Bismark Way, Oxnard, CA 93033 | **Date Interest Quoted to**: | 6/30/2023 |
| | **Payoff Good To:** | 6/30/2023 |
| | | |
| Principal Balance: | | $25,500,000.00 |
| Prepayment Penalty: | | $0.00 |
| Regular Interest: | | $2,515,433.33 |
| Default Interest Margin: | | $2,110,833.33 |
| Late Charges: | | $140,563.61 |
| Legal Fees*: | | $176,750.00 |
| Title Fees: | | $31,178.00 |
| Trustee & Publication Fee: | | $14,871.00 |
| **Net Amount Due:** | | **$30,489,629.27** |

EXHIBIT 2 - PAGE 13

## SCHEDULE 2

| Occupancy | Pre-approved Expense Limit |
|-----------|---------------------------|
| 45% | $220,000 |
| 50% | $226,196 |
| 55% | $239,267 |
| 60% | $249,267 |
| 65% | $259,267 |
| 70% | $269,267 |
| 75% | $289,267 |
| 80% | $307,462 |
| 85% | $319,038 |
| 90% | $330,623 |

# EXHIBIT 3

## EXHIBIT "A"

## LIMITED PARTNERSHIP AGREEMENT

## OF

## GLOBAL PREMIER REGENCY PALMS OXNARD, LP

_____

THE LIMITED PARTNERSHIP INTERESTS EVIDENCED BY THIS LIMITED PARTNERSHIP AGREEMENT (THE "**AGREEMENT**") HAVE NOT BEEN REGISTERED WITH THE SECURITIES AND EXCHANGE COMMISSION UNDER THE SECURITIES ACT OF 1933 (THE "**1933 ACT**") OR PURSUANT TO APPLICABLE STATE SECURITIES LAWS ("**BLUE SKY LAWS**"). ACCORDINGLY, THE LIMITED PARTNERSHIP INTERESTS CANNOT BE RESOLD OR TRANSFERRED BY ANY PURCHASER THEREOF WITHOUT REGISTRATION OF THE SAME UNDER THE 1933 ACT AND THE BLUE SKY LAWS OF SUCH STATE(S) AS MAY BE APPLICABLE, EXCEPT IN A TRANSACTION WHICH IS EXEMPT FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT AND THE BLUE SKY LAWS OR WHICH IS OTHERWISE IN COMPLIANCE THEREWITH. IN ADDITION, THE SALE OR TRANSFER OF SUCH LIMITED PARTNERSHIP INTERESTS IS SUBJECT TO CERTAIN RESTRICTIONS SET FORTH IN THIS AGREEMENT.

_____

**THIS LIMITED PARTNERSHIP AGREEMENT OF GLOBAL PREMIER REGENCY PALMS, OXNARD, LP** (the "Agreement") is made as of April 18, 2014, by and among Global Premier America #3, LLC, a California limited liability company (the "General Partner"), and the Limited Partners.

**NOW, THEREFORE,** the parties hereto hereby agree as follows:

**1.    FORMATION.** A Certificate of Limited Partnership for the formation of GLOBAL PREMIER REGENCY PALMS OXNARD, LP (the "Partnership") pursuant to the Act was filed with the Secretary of State of California on April 7, 2014 evidencing the formation of the Partnership.

**2.    NAME AND PLACE OF BUSINESS.** The business of the Partnership shall be conducted under the name of GLOBAL PREMIER REGENCY PALMS OXNARD, LP; provided, however, that the General Partner may, in its sole discretion, change the name of the Partnership at any time and from time to time, except that in no event shall the name of the Partnership include the name or initials of any Limited Partner or any name or initials which are substantially similar thereto. The principal place of business of the Partnership shall be 1020 Bismark Way, Oxnard, California 93033. The initial office of the Partnership shall be at 2010 Main Street, Suite 1250, Irvine, California 92614; provided, however, that the General Partner may change such address in its sole discretion. The General Partner shall deliver written notice to the Limited Partners of any change in location.

**3.    PURPOSE.** The principal purpose of the Partnership is to develop, renovate, remodel, own, and manage an assisted living and memory care facility that will include a private and semi-private senior residential units (the "Assisted Living Memory Care Facility"), resident food services and catering (the "Food Services"), and home health care services (the "HHC Business"). The Partnership will organize three subsidiary limited liability companies (the "Subsidiary Companies") that will conduct the operations of the Assisted Living Memory Care Facility, the Food Services, and the HHC Business (hereinafter collectively referred to as the "Facilities") and will conduct the business of the Partnership through these Subsidiary Companies:

- Global Regency Oxnard Senior Care Services, LLC will operate the Assisted Living Memory Care Facility, a residential facility for seniors with a mixture of 105 private and semi-private rooms for a proposed occupancy of 158 beds;

- Global Regency Oxnard Food Services, LLC will operate the Food Services providing resident food services in the Facilities and catering to the local community outside of the Facilities; and

- Global Regency Oxnard Home Health Care Services, LLC will operate the HHC Business, a separate portion of the Facilities providing office space for the administration of the HHC Business operating as a franchisee of Interim HealthCare Inc. and including a broad array of in-home care and in-home health care services including permanent and temporary placement of nursing and other health care personnel, non-medical support and companion care services, and health care-related home medical equipment, products, and supplies.

The Partnership may engage in any and all general business activities related or incidental to its business purpose as described herein.  The Partnership may also engage in such other activities as may be reasonably incident or appropriate to furthering the business purpose of the Partnership.

## 4.    TERM OF PARTNERSHIP; FILINGS: AGENT FOR SERVICE OF PROCESS.

(a)    Term. The Partnership commenced on April 7, 2014, and shall continue until December 31, 2044, unless sooner terminated as herein provided or by operation of law.

(b)    Certificate of Limited Partnership. A Certificate of Limited Partnership has been filed with the Secretary of State of California in accordance with the Act. The General Partner shall amend the Certificate of Limited Partnership from time to time, as required by the Act. The General Partner shall also qualify the Partnership to do business in any other jurisdiction as may be required under the laws of such jurisdiction.

(c)    Agent for Service of Process. The registered agent for the Partnership may be changed from time to time by the General Partner in its sole and absolute discretion, subject to applicable law.

## 5.    DEFINITIONS. The following terms shall have the meanings set forth below:

(a)    "Act" shall mean the provisions of the Uniform Limited Partnership Act of 2008, as amended from time to time, as set forth in California Corporations Code Section 15900 et seq.

(b)    "Adjusted Capital Account Deficit" shall mean, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account as of the end of the relevant Fiscal Year, after crediting to such Capital Account any amounts which such Partner is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore pursuant to the penultimate sentences of Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations and debiting to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), and (6) of the Regulations.  The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

(c)    "Adjusted Capital Contribution" of a Partner shall mean the Capital Contributions of a Partner, reduced (but not below zero) by (i) distributions to such Partner pursuant to Section 9(a) hereof, (ii) allocations of tax credits, if any, to such Partner, and (iii) Net Losses allocated to such Partner.

(d)    "Affiliate" shall mean any Person that directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with another designated Person.

(e)    "Available Cash Flow" shall mean funds provided from the Partnership's operations without deductions for depreciation, but after deducting funds used to pay all expenses and debts, including payments to service Secured Debt, if any, of the Partnership, administrative operational expenses, debt payments, capital improvements, and less the amount set aside by the General Partner, in the exercise of its sole discretion, for reserves.

(f)    "Bankruptcy" shall mean:

1.    The commencement of any voluntary proceedings under the United States bankruptcy laws which is not vacated or dismissed within 60 days following the commencement thereof;

2.    The failure to terminate any involuntary proceeding under said laws within 60 days following the commencement thereof;

3.    A general assignment for the benefit of creditors; or

4.    The issuance of a charging order against the interest of any person without the removal thereof within 60 days following said issuance.

(g)    "Capital Account" shall mean an account established for each Partner and determined in accordance with Section 1.704-1(b) of the Regulations.  The Capital Accounts shall be adjusted in order to reflect allocations of Depreciation and gain and loss as computed for book purposes. Upon the transfer of any Partner's Unit(s), the Capital Account of the transferor Partner shall carry over to the transferee Partner.

(h)    "Capital Contribution" shall mean cash a Partner contributes to the Partnership as capital in that Partner's capacity as a Partner pursuant to an agreement between the Partners.

(i)    "Capital Event" means the finance, refinance, sale, exchange or other disposition of the Project or any other portion thereof, including conversion or condemnation of the real property or any portion thereof.

(j)    "Closing" shall mean the closing of the sale of 24 Units pursuant to the Offering.

(k)    "Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

(l)    "Depreciation" with respect to the Partnership's indirect interest in any property shall mean the Partnership's allocable share of depreciation, amortization, and other cost recovery deductions taken into account in computing the taxable income and loss of the Partnership.

(m)    "Distributions" shall mean that portion from Available Cash Flow and the Net Proceeds from a Capital Event, or that the General Partner determines should be paid to the Partners.

(n)    "EB-5 Program" shall mean Title 8 of the U.S. Code, Section 1153(b) et. seq. and Title 8, Code of Federal Regulations Part 204.6 et. Seq.

(o)    "Early Release Amount" shall mean that portion of a Limited Partner's Capital Contribution that a Limited Partner agrees to have the Escrow Agent release to the Partnership prior to

the approval of such Limited Partner's I-526 Petition to allow the business of the Partnership to go forward.

(p)    "Economic Interest" shall have the meaning set forth in Section 10(h)(i).

(q)    "Escrow Agent" shall mean Granite Escrow Services, Inc., 1400 Newport Center Drive, Suite 250, Newport Beach, California 92660.

(r)    "Fiscal Year" shall mean the fiscal year of the Partnership, determined in accordance with Section 706(b) of the Code.

(s)    "General Partner" shall mean Global Premier America #3, LLC, a California limited liability company, as well as any other person or entity who has been admitted to the Partnership as a General Partner in accordance with this Agreement, or a person or entity who has been admitted as a General Partner pursuant to applicable law.

(t)    "Gross Income" shall mean the Partnership's distributive share of items of income and gain only, unreduced by the Partnership's distributive share of items of deduction and loss from the Partnership, and any other items of income and gain generated by the Partnership.

(u)    "Limited Partners" shall mean collectively those individuals and entities admitted to the Partnership as a limited partner in accordance with this Agreement, or an assignee of a Partnership interest in the Partnership who has become a Limited Partner pursuant to applicable law. "Limited Partner" shall mean any of the Limited Partners.

(v)    "Majority in Interest of the Limited Partners" shall mean those Limited Partners owning more than 50% of the outstanding Units in the Partnership.

(w)    "Net Proceeds" means net proceeds derived by the Partnership from a Capital Event or dissolution after payment or allowance for the expenses incurred in connection with such Capital Event or dissolution and after payment or allowance for existing indebtedness (but not including any outstanding Secured Debt), the discharge of any other expenses or liabilities of the Partnership and the establishment of appropriate reserves, all as determined by the General Partner, in its sole discretion.

(x)    "Net Profits" and "Net Losses" shall mean the net profits or net losses, respectively, of the Partnership as determined on the basis of the accrual accounting method at the close of the Fiscal Year by the Partnership's accountants in accordance with consistently applied Federal income tax principles, and as set forth on the information return filed by the Partnership for Federal income tax purposes.

(y)    "Nonrecourse Deductions" shall mean the Partnership deductions that are characterized as "nonrecourse deductions" pursuant to Regulations Section 1.704-2(c).

(z)    "Offering" shall mean the initial offering of Units to investors as described in Section 6(a) made in accordance with the terms of the Confidential Private Offering Circular of the Partnership dated April 18, 2014 or any subsequent amendment thereto (the "Offering Circular").

(aa)    "Participation Percentage" shall mean for each Limited Partner his pro rata share of 70% (based on percentage ownership of Units) and 30% to the General Partner.

(bb)    "Partner" shall mean a General Partner or a Limited Partner. The term "Partners" shall refer collectively to the General Partner and to the Limited Partners.

(cc)    "Partner Nonrecourse Deductions" shall mean the Partnership deductions that are characterized as "partner nonrecourse deductions" pursuant to Regulations Sections 1.704-2(i)(1) and 1.704-2(i)(2).

(dd)    "Partnership Property" means that certain parcel of real property located at 1020 Bismark Way, Oxnard, California 93033, as improved or remodeled in accordance with the Partnership's business plan.

(ee)    "Person" shall mean any individual, partnership, corporation, trust, limited liability company or other entity.

(ff)    "Project" shall mean the development, improvement, renovation, remodel, ownership, and operation of an assisted living and memory care facility that will include private and semi-private senior residential units (the "Assisted Living Memory Care Facility") and offices for the HHC Business on the Partnership Property.

(gg)    "Regulations" shall mean the Income Tax Regulations promulgated under the Code, including Temporary and Proposed Regulations, as such Regulations may be amended from time to time, including corresponding provisions of succeeding Regulations.

(hh)    "Secured Debt" shall mean the debt that may arise from loan proceeds using the Project or the Partnership Property as security for the loan.

(ii)    "Termination Date" shall mean the date on which the Offering terminates.

(jj)    "Transfer" shall mean any encumbrance, gift, assignment, pledge, hypothecation, sale or other transfer of all or any portion of a Partnership interest.

(kk)    "Units" shall mean collectively the Limited Partner Interests in the Partnership and "Unit" shall mean one Limited Partner Interest.  The Partnership shall offer 24 Units to the Limited Partners.

(ll)    "USCIS" shall mean the U.S. Citizenship and Immigration Services.

6.    **OFFERING OF UNITS.**

(a)    <u>Initial Offering of Limited Partnership Interests.</u> The Partnership initially intends to offer and sell 24 Units for a cash purchase price of US $500,000 per Unit, and to admit as Limited Partners the persons whose subscriptions for a minimum of one Unit (US $500,000) are accepted by the General Partner (who may refuse to admit any person or persons as Limited Partners for any reason whatsoever).  Each subscriber for Units shall be admitted as a Limited Partner upon the General Partner's execution of the Subscription Agreement.

(b)    <u>Admission of Additional Limited Partners.</u> The General Partner may in its discretion from time to time following the Offering, and upon such terms as the General Partner deems appropriate, offer and sell Units, without further consent of the Limited Partners, including but not limited to the admission of a new Limited Partner to replace a Limited Partner who ceases to participate in the EB-5 Program as described in Section 12(i) below.  Without limiting the generality of the foregoing, any such Units may be issued in one or more classes, or in one or more series of any of such classes, with designations, preferences and relative participating, option or other special rights, powers and duties, including rights, powers and duties senior to units previously issued to our Partners, all as shall be determined by the General Partner in its sole discretion and without the approval of any Limited Partner.

7.    **PARTNERSHIP CAPITAL CONTRIBUTIONS.**

(a)    <u>Capital Contribution of the General Partner.</u> The General Partner, as its capital contribution, will assign to the Partnership (i) its rights under the Lease Agreement dated April 8, 2014 for the Property, (ii) its rights under the Purchase Agreement dated April 8, 2014 for the Property, and (iii) its rights to US $1,000,000 of the purchase price for the Property originally due to Urban Planning Consultants, Inc., an affiliate of the General Partner of the Partnership, which rights have been assigned to the General Partner.  The General Partner may also make Capital Contributions in connection with the purchase of Units at its sole discretion.  The General Partner will be treated as a Limited Partner with respect to all Units purchased and owned by the General Partner.

(b)    <u>Capital Contribution of the Limited Partners.</u> The Limited Partners shall make initial Capital Contributions to the Partnership of US $500,000 (one Unit) in connection with the Offering.  No Limited Partner shall be required to make further contributions to the Partnership.

(c)    <u>Interest on Contributions.</u> No interest shall be paid by the Partnership on any Capital Contribution made by any Partner to the Partnership.

(d)    <u>Use of Capital Contributions.</u> Capital Contributions shall be used as determined by the General Partner exclusively for the Partnership Property and the Project and no other purposes, including but not limited to the acquisition, development, and improvement of the Partnership Property and the operation of the Project as described in the Offering Circular.

(e)    <u>Limited Liability of Limited Partners.</u> Except as may otherwise be provided under applicable law, no Limited Partner shall be bound by, or personally liable for, the expenses, liabilities or obligations of the Partnership.

(f)    <u>Return of Capital.</u> Except as provided in this Section 7(f), no Partner shall have the right to withdraw or reduce such Partner's Capital Contribution or to receive any distributions, except as a result of dissolution. No Partner shall have the right to demand or receive property other than cash in return for such Partner's Capital Contributions.  Limited Partners may withdraw as a Limited Partner and have his or her Capital Contribution returned only under the following circumstances:

(i)    If a Limited Partner fails to file the I-526 petition with the USCIS within 90 days of the date the Limited Partner is approved for admission to the Partnership by the General Partner, such Limited Partner shall have the right to a return of his or her Capital Contribution.   Upon written notice to the General Partner of his or her desire to withdraw as a Limited Partner, the General Partner will cause the Escrow Agent to return the denied Limited Partner's Capital Contribution within 90 days of the written notice from the Limited Partner to the General Partner.

(ii)    If a Limited Partner's I-526 petition is denied by the USCIS, the General Partner will cause the Escrow Agent to return the denied Limited Partner's Capital Contribution within 90 days of the written notice from the Limited Partner to the General Partner.

(iii)    If a Limited Partner's I-485 application or immigrant visa application is denied after the I-526 petition is approved, the Partnership will return the Capital Contribution.  If there are insufficient funds available in the Partnership's general operating account to refund the Capital Contribution to the denied Limited Partner, then such refund may be delayed until there are funds in the Partnership's general operating account to enable the Partnership to pay the refund. The Partnership must use its best efforts to substitute the denied Limited Partner with a new Limited Partner in accordance with the provisions of Section 6(b) below and return the denied Limited Partner's Capital Contribution when such new Limited Partner's I-526 Petition is approved by the USCIS.

(iv)    If a Limited Partner has agreed with the Partnership to allow the Early Release Amount to be released by the Escrow Agent to the Partnership and such Limited Partner's I-526

petition is subsequently denied by the USCIS, the General Partner will cause the Escrow Agent to return that portion of the denied Limited Partner's Capital Contribution still being held by the Escrow Agent for the benefit of the denied Limited Partner within 90 days of written notice from the Limited Partner to the General Partner.  The Partnership will return the balance of the Capital Contribution as set forth in subsection (iii) above.

(v)     The Partners agree that the Escrow Agent shall not be liable to the denied Limited Partner or be responsible for refunding any portion of the Capital Contribution not in the Capital Contribution Escrow Account following the release of the Capital Contribution after the approval of a Limited Partner's I-526 petition or as a result of an Early Release.

(vi)    Upon the full return of a Limited Partner's Capital Contribution he or she will cease to be a Limited Partner of the Partnership.

(vii)   In the circumstance set forth in this Section 7(f), no interest will be paid on the Capital Contribution being returned to a Limited Partner.

(g)     <u>Number of Limited Partners.</u> There shall be no more than 99 Limited Partners of the Partnership, in accordance with the requirements for an exemption under Section 3(c)(1) from the registration requirements of the Investment Company Act of 1940.  Further, the number of Limited Partners must be within the limitations of the EB-5 Program administered by the U.S. Citizenship and Immigration Services ("USCIS").

8.    <u>**ALLOCATIONS.**</u>

(a)     <u>Allocation of Net Profits.</u> For each Fiscal Year, Net Profits shall be allocated as follows:

(i)     First, in the event that any class of partners has an aggregate negative capital account balance and another class of partners has an aggregate positive capital account balance, to the class of partners with the negative balance, pro rata in accordance with their negative Capital Accounts, up to the amount necessary to cause the aggregate capital account balance of that class to equal zero;

(ii)    Second, in the event that any one or more individual partners has a negative capital account balance, to those individual partners with the negative balances, pro rata in accordance with their negative Capital Accounts, up to the amount necessary to cause their individual capital account balances to equal zero;

(iii)   Third, in such a manner and amount as is necessary to cause the positive Capital Account balances of the Partners to be equal to their deemed liquidation distributions (taking into account all prior Distributions), determined as if the Partnership were dissolved and liquidated and (A) the Partnership's assets were sold for their fair market value; (B) the Partnership's liabilities were paid; and (C) the Partnership's remaining cash were distributed in accordance with the provisions applicable; and

(iv)    Thereafter, 70% to the Limited Partners (pro rata, in accordance with their respective ownership of Units) and 30% to the General Partner.

(b)     <u>Allocation of Net Losses.</u> For each Fiscal Year, Net Losses shall be allocated 70% to the Limited Partners (pro rata, in accordance with their respective ownership of Units) and 30% to the General Partner.

(c)     <u>Qualified Income Offset.</u> In the event any Limited Partner unexpectedly receives an adjustment, allocation or distribution described in Regulations Sections 1.704-1(b)(2)(ii)(4)(4), (1) or

(6), items of income and gain shall be specially allocated to each such Limited Partner in an amount and manner sufficient to eliminate, to the extent required by the Regulations, any deficit in said Limited Partner's Capital Account as quickly as possible. For purposes of this Section 8(d), the Limited Partner's Capital Account, as of the end of the relevant Fiscal Year, shall take into account the adjustments described in Regulations Sections 1.704- 1(b)(2)(ii)(c1)(4), (5) and (6), any amount of any deficit Capital Account balance which the Limited Partner is obligated to restore, and any amount of any deficit Capital Account balance which the Limited Partner is deemed obligated to restore pursuant to the Regulations promulgated under Section 704(b) of the Code.

(d)    Special Allocation of Interest Expense. Notwithstanding anything contained herein to the contrary, any item of interest expense attributable to a loan by the General Partner to the Partnership shall be allocated solely to the General Partner.

(e)    Allocations of Book Items. All items of book income, gain, loss and deduction shall be allocated among the Partners in the same percentage that Net Profits and Net Losses are allocated for the same Fiscal Year, or as otherwise provided by the Regulations promulgated under Section 704(b) of the Code.

(f)    Tax Restrictions. In order to preserve and protect the determinations and allocations provided for in this Section 8, the General Partner shall have the authority to allocate income, gain, loss, deduction, or credit (or item thereof) arising in any year differently than otherwise provided for in this Section 8 to the extent that, upon advice of tax counsel, allocating income, gain, loss, deduction or credit (or item thereof) in the manner provided for in this Section 8 would cause the determinations and allocations of each Partner's distributive share of income, gain, loss, deduction, or credit (or item thereof) not to be permitted by Section 704(b) of the Code and regulations promulgated thereunder.  Any allocation made pursuant to this Section 8(g) shall be deemed to be a complete substitute for any allocation otherwise provided for in Section 8, and no amendment of this Agreement or approval of any Partner shall be required.

(g)    Allocation of Nonrecourse Deductions.  Nonrecourse Deductions for each Fiscal Year shall be allocated among the Partners in accordance with their respective Participation Percentages.

(h)    Allocation of Partner Nonrecourse Deductions.  Partner Nonrecourse Deductions for each Fiscal Year shall be allocated among the Partners as required by Regulations Section 1.704-2.

(i)    Gross Income Allocation.  In the event any Partner has an Adjusted Capital Account Deficit at the end of any Fiscal Year, items of Gross Income shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible; provided that an allocation pursuant to this Paragraph shall be made if and only to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for herein have been tentatively made as if this Paragraph were not in this Agreement.

(j)    Minimum Gain Chargeback.  Prior to any allocation hereunder and subject to the exceptions set forth in Regulations Section 1.704-2(f), in the event that there is a net decrease in the partnership minimum gain during a Partnership Fiscal Year, each Partner shall be allocated items of Gross Income for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease (which share of such decrease shall be determined in accordance with Regulations Section 1.704-2(g)).  It is intended that this subsection shall constitute a "minimum gain chargeback" as provided by Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(k)    Partner Nonrecourse Debt Minimum Gain Chargeback.  Prior to any allocation hereunder (other than Section 8(k)) and subject to the exceptions set forth in Regulations Section 1.704-2(i)(4), in the event that there is a net decrease in the Partner nonrecourse debt minimum gain during a Partnership Fiscal Year, each Partner with a share of such Partner nonrecourse debt minimum gain

EXHIBIT 3 - PAGE 8

(determined in accordance with Regulations Section 1.704-2(i)(5)) shall be allocated items of Gross Income for such Fiscal Year (and, if necessary, for subsequent Fiscal Years) in an amount equal to such Partner's share of the net decrease (which share of such decrease shall be determined in accordance with Regulations Section 1.704-2(i)(4)). It is intended that this subsection shall constitute a "chargeback of partner nonrecourse debt minimum gain" as provided by Regulations Section 1.704-2(i)(4) and shall be interpreted consistently therewith.

(l)    Depreciation.  Subject to Section 8(n), Depreciation of the Partnership for any Fiscal Year (to the extent such Depreciation does not constitute a Nonrecourse Deduction or Partner Nonrecourse Deduction in such Fiscal Year) shall be specially allocated to the Partners in accordance with their respective Participation Percentages.

(m)    Loss Limitation.  Subject to Section 8(o) hereof, the Net Losses and Depreciation allocated pursuant to Section 8(b) and 8(l) shall not exceed the maximum amount of such items that can be allocated without causing any Limited Partner to have an Adjusted Capital Account Deficit at the end of any Fiscal Year taking into account the special allocations of Section 8(d) and 8(j) for such Fiscal Year.

(n)    Interest Income.  Any interest income recognized by the Partnership in connection with the payment of a Capital Contribution will be allocated to the Limited Partner making such payment.

9.    **DISTRIBUTIONS.**

(a)    Distribution of Available Cash Flow.  Available Cash Flow shall be distributed 70% to the Limited Partners, pro rata in accordance with their respective ownership of Units, and 30% to the General Partner.  Distributions of Available Cash Flow will generally be made once annually. Distributions of Available Cash Flow shall not be taken out of Capital Contributions made by Limited Partners.

(b)    Distribution of Net Proceeds from a Capital Event.  Net Proceeds from a Capital Event shall be distributed 100% to the Limited Partners up to their Adjusted Capital Contributions; thereafter, Net Proceeds from such Capital Event shall be distributed 70% to the Limited Partners, pro rata in accordance with their respective ownership of Units, and 30% to the General Partner. Distributions from a Capital Event will generally be made on a one-time basis in the event of a financing or sale of Partnership Property.  Distributions of Net Proceeds from a Capital Event shall not be taken out of Capital Contributions made by Limited Partners.

(c)    To Whom Distributions Are Made. Unless named in this Agreement or unless admitted as a Substitute Limited Partner as provided herein, no person or entity shall be considered a Partner in the Partnership. All Transfers of interests by the Limited Partners shall be subject to Article 12 hereof, and, until admitted as a Substitute Limited Partner thereunder, no assignee shall have any right as a Limited Partner herein, including, but not limited to, the right to acquire any information regarding the Partnership, or to inspect the Partnership books, or to vote on any matter presented to the vote of Limited Partners, whether or not such assignee is otherwise entitled to distributions as assignee. Any payment by the Partnership to the person shown on the Partnership records as a Limited Partner, or to such Limited Partner's legal representatives, or to a named assignee of the right to receive distributions, shall acquit the Partnership and the General Partner of all liability to any other person who may be interested in such payment by reason of an assignment by a Limited Partner or for any other reason.

(d)    Distributions Not Guaranteed.  Distributions are not guaranteed, but will be made in accordance with the foregoing paragraphs of this Section 9 and the discretion of the General Partner.

EXHIBIT 3 - PAGE 9

## 10.   POWERS AND DUTIES OF THE PARTNERS.

(a)   <u>Powers of the General Partner.</u> The General Partner and its management shall devote such time to the Partnership as shall be necessary to conduct the Partnership business. Subject to the remaining provisions of this Agreement, the General Partner shall be solely responsible for the day-to-day operations of the Partnership business and shall have all rights and powers generally conferred by law or necessary, advisable or consistent in connection therewith, or in connection with accomplishing the purposes of the Partnership as set forth in Section 3.

(b)   <u>Management Decisions.</u> Subject to the rights to formulate policy and to vote of the Limited Partners set forth herein, with respect to the day-to-day management, conduct and operation of the Partnership business, the decisions of the General Partner shall prevail.

(c)   <u>Independent Activities of Partners.</u> Except as provided elsewhere herein, any of the Partners, General or Limited, may engage in or possess an interest in other business ventures of every nature and description, including businesses that compete with the Partnership, independently or with others.

(d)   <u>Tax Matters Partner.</u> The Manager of the General Partner shall be the designated "Tax Matters Partner" of the Partnership, as that term is defined in the Code.

(e)   <u>Execution of Documents.</u> Except as otherwise authorized by the General Partner, each check, contract, deed, lease, promissory note, deed of trust, escrow instruction, bond, release or any other documents of any nature whatsoever, in any way pertaining to this Partnership or on behalf of the Partnership, shall be signed by the General Partner.

(f)   <u>Liability; Indemnification.</u>  Neither the General Partner nor any of its members, officers, agents, employees, successors and assigns shall be liable, responsible or accountable in damages or otherwise to the Partnership or to the Limited Partners for any acts performed or omitted to be performed by the General Partner in connection with the Partnership, except to the extent that such acts or omissions constitute actual fraud, gross negligence or willful misconduct.  The Partnership shall indemnify and hold harmless the General Partner and its members, officers, agents, attorneys, employees, successors and assigns from and against all losses, liabilities, damages, judgments, settlements and expenses (including legal fees) (collectively, "Damages") incurred as a result of actions against the General Partner in its capacity as general partner of the Partnership, except to the extent a court of competent jurisdiction determines that the actions of the General Partner constituted actual fraud, gross negligence or willful misconduct. Notwithstanding the foregoing, the Partnership shall not indemnify the General Partner with respect to any Damages for which the General Partner receives insurance proceeds carried for the benefit of the Partnership or the General Partner. The indemnification provided herein is in addition to and not a limit on any other right of contribution or indemnity which otherwise exists under any contract or under applicable law in favor of the General Partner.

(g)   <u>Reimbursement of Expenses.</u> The Partnership shall reimburse the General Partner for reasonable expenses incurred by it in managing the business of the Partnership. The General Partner will endeavor to have Partnership expenses billed directly to the Partnership whenever feasible.

(h)   <u>Transfer of Economic Interest.</u>

(i)   Without the consent of any Limited Partner, the General Partner may Transfer all or any portion of the economic rights associated with its General Partner interest (including, without limitation, rights to distributions and allocations of income, gain, loss, deduction, credit or similar items) (collectively, the "Economic Interest"); provided, however, any such Transfer shall be on the condition that upon the removal and replacement of the General Partner in accordance with Section 13, such Economic Interest shall be deemed transferred to the replacement General Partner. Any other Transfer by the General Partner of its interest in the Partnership following the date of this Agreement

shall be effective only: (A) upon the consent of a Majority in Interest of the Limited Partners, and (B) if applicable, upon the admission of a successor or additional General Partner, as the case may be.  Except as provided otherwise in this Agreement, the General Partner may not, without the consent of a Majority in Interest of the Limited Partners, Transfer or delegate its obligations under this Agreement and shall continue to be responsible for those obligations.  The transferee or other person receiving a disposition shall have only the rights of an assignee of an Economic Interest.

(ii)    The Transfer of all or any part of the General Partner's Economic Interest in accordance with the provisions of this Agreement will not: (A) cause the dissolution of the Partnership, (B) cause the General Partner to cease being the General Partner of the Partnership, or (C) provide the Limited Partners with the right to remove the General Partner as general partner.

(iii)    The provisions of this Section 10(h) apply notwithstanding any other provision in this Agreement to the contrary, and are in addition to any rights of the General Partner set forth in this Agreement.

## 11.    RIGHTS OF LIMITED PARTNERS.

(a)    <u>Powers of Limited Partners</u>.  Limited Partners shall participate in policy formulation activities and have the following rights, duties and powers normally granted to limited partners under the Act.

(b)    <u>Voting Rights.</u>  The following shall require the vote or written consent of the General Partner and a Majority in Interest of the Limited Partners:

(i)    Merger or combination of the Partnership with any other entity; and

(ii)    Sale of all or substantially all of the assets of the Partnership.

(c)    <u>No Authority to Act on Behalf of Partnership.</u>  Except as may otherwise be provided in this Agreement, no Limited Partner shall, in the capacity of a Limited Partner, take part in or interfere in any manner with the conduct or control of the business of the Partnership, or have any right or authority to act for or on behalf of the Partnership.

(d)    <u>Right to Inspect the Partnership's Books and Reports.</u>  The Partnership's books and records shall be open to the inspection and examination of the Limited Partners or their duly authorized representatives at all reasonable times after reasonable advance notice has been given to the General Partner of an intention to inspect the books and records.  Upon request, a Limited Partner will, at the Partnership's expense, be provided with (i) a current list of the full name and last known business or residence address of each Limited Partner set forth in alphabetical order together with the Capital Contribution and the number of Units owned by each Limited Partner; (ii) a copy of the Certificate of Limited Partnership and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been issued, (iii) copies of the original Partnership agreement and all amendments thereto; and (iv) a copy of such other records as the Partnership, by law, is required to maintain.

## 12.    RESTRICTIONS ON TRANSFER BY LIMITED PARTNERS; GENERAL PARTNER'S RIGHT TO PURCHASE LIMITED PARTNERS' INTEREST.

(a)    <u>General.</u>  No transfer of, or offer to transfer, a Limited Partner interest, in whole or in part, shall be made: (i) which could cause a termination of the Partnership for Federal income tax purposes; (ii) which alone or in conjunction with the transfer of other Limited Partner interests, might adversely affect, or tend to affect adversely, the characterization of the Partnership as a partnership for Federal income tax purposes; (iii) which could result in the assets of the Partnership being considered by law to be assets of employee benefit plans and therefore subjecting those assets to the fiduciary

standards of the Employee Retirement Income Security Act of 1974, as amended; (iv) which violates the Securities Act of 1933, as amended, and any rules promulgated thereunder and any similar state "Blue Sky" laws; or (v) without the written consent of the General Partner, which may be withheld in its sole discretion. Notwithstanding the foregoing, a Limited Partner may, without the General Partner's consent, transfer all or a portion of such Limited Partner's Units to a member of that limited partner's immediate family or a trust or other entity created or controlled by that limited partner or a member of that limited partner's immediate family; provided, however, that in no event may any sale, assignment or transfer be made if it would violate any of clauses (i) through (iv) of this Section or violate Section 7(h), or which would violate the EB-5 Program requirements. Specifically, a Limited Partner under the EB-5 Program may not transfer his/her interest unless he/she ceases to participate in the EB-5 Program.

(b)    <u>Assignee.</u> Subject to Section 12(a), a transferee of the Partner's interest shall become a mere assignee if all of the following conditions are satisfied:

(i)    If the General Partner shall so request, the transferor shall deliver to the General Partner an opinion of counsel in form and substance satisfactory to the General Partner and counsel for the Partnership to the effect that each of the conditions set forth in Section 12(a) have been satisfied.

(ii)    The transferee shall have paid the Partnership a reasonable fee set by the General Partner for processing transfers. A fee of no more than US $3,000 plus out of pocket costs for legal and other expenses shall be deemed reasonable. Notwithstanding the foregoing, no fee shall be payable for a transfer to an heir of a Limited Partner upon the death of the Limited Partner.

(iii)    The transferor and any transferee shall have executed, acknowledged and delivered to the General Partner an instrument of assignment satisfactory to the General Partner and its counsel.

(c)    <u>Substitute Partners.</u> Subject to Section 12(a), a transferee of any Limited Partner's interest may become a "Substitute Limited Partner" in place of the transferor of such interest if, in addition to satisfying all of the applicable requirements set forth herein for an assignee, all of the following conditions are satisfied:

(i)    The transferor and any transferee shall have executed, acknowledged and delivered to the General Partner such instruments of transfer, assignment and agreement to be bound by the terms of this Agreement as are satisfactory to the General Partner and its counsel.

(ii)    The General Partner has determined, in its sole discretion, that the Limited Partner meets the requirements for an investment in the Partnership, as determined by the General Partner.

(d)    <u>Rights of Assignee.</u> An assignee who does not become a Substitute Limited Partner has no right to request any information or account of the Partnership, to inspect the Partnership books, or to vote on any of the matters as to which a Limited Partner would be entitled to vote pursuant to this Agreement. A mere assignee shall be entitled only to receive the allocations of Net Profits, Net Losses and other items and share of cash distributions to which his transferor would otherwise be entitled.

(e)    <u>Division of Allocations and Distributions.</u>    If any Partnership interest, or part thereof, is transferred during any accounting period in compliance with the provisions of this Agreement, Net Profits, Net Losses, each item thereof and all other items attributable to such interest for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any convention permitted by law selected by the General Partner. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the

transferee. Solely for purposes of making such allocations and distributions, the Partnership shall recognize such Transfer not later than the end of the calendar month during which the provisions of Section 12(a), (b) and/or (c) are satisfied, provided that if the Partnership does not receive (a) a notice stating the date such interest was transferred, and (b) such other information as the General Partner may reasonably require, within 30 days after the end of the accounting period during which the Transfer occurs, then all of such items shall be allocated and all distributions shall be made to the person who according to the books and records of the Partnership on the last day of the accounting period during which the Transfer occurred was the owner of the Partnership interest. Neither the Partnership nor the General Partner shall incur any liability for making allocations and distributions in accordance with the provisions of this Section, whether the General Partner or the Partnership has knowledge of any Transfer of ownership of any Partnership interest.

(f)     <u>Agreement Applies to Transferred Interest.</u> Each Partner agrees that notwithstanding the provisions for the Transfer of any interest contained herein, the interest, when and if transferred, shall remain subject to all of the terms and conditions of this Agreement.

(g)     <u>Heirs, Devisees and Legatees.</u> The heirs, devisees and legatees of a deceased Limited Partner shall have the rights of a transferee of a Limited Partner, subject to administration of such deceased Limited Partner's estate, and may become Substitute Limited Partners in lieu of the deceased Limited Partner upon compliance with all of the conditions of this Agreement required for such substitution.

(h)     <u>No Dissolution.</u> If a Limited Partner Transfers all or any part of his interest without complying with the provisions of this Agreement, such action shall not cause or constitute a dissolution of the Partnership.

(i)     <u>General Partner's Right to Purchase</u>.  The General Partner shall have the right to purchase the Units of Limited Partnership Interest from the Limited Partners upon the earlier of when a Limited Partner has ceased to participate in the EB-5 Program or the granting of a Limited Partner's I-829 petition for removal of conditions, the General Partner has the right to purchase the Limited Partner's Partnership Interests.  The General Partner will determine whether and for what amount to acquire any or all of the Limited Partnership Interests based on the fair market value of the Limited Partnership Interests as determined by the General Partner in its sole discretion.

13.     <u>WITHDRAWAL AND ADDITION OF A GENERAL PARTNER.</u>

(a)     <u>Withdrawal of a General Partner.</u> The withdrawal of the General Partner shall require the consent of a Majority in Interest of the Limited Partners, and shall not be permitted prior to the removal of conditions on residence for each Limited Partner under the EB-5 Program, except those Limited Partners who cease to participate in the EB-5 Program.

(b)     <u>Addition of a General Partner.</u> The addition of an additional General Partner shall require the consent of a Majority in Interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may admit additional General Partner(s) without the vote or consent of the Limited Partners (i) if required to assure the continued classification of the Partnership as a limited partnership for Federal income tax purposes or (ii) if such additional General Partner is a not for profit entity admitted to obtain a real estate tax exemption for the Partnership.

14.     <u>DISSOLUTION AND WINDING UP OF THE PARTNERSHIP.</u>

(a)     <u>Dissolution of Partnership.</u> The Partnership shall be dissolved upon the occurrence of any of the following events, but in no event prior to the removal of conditions on permanent residence for Limited Partners admitted under the EB-5 Program, except for those Limited Partners who ceased to participate in the EB-5 Program:

1.      The vote or written consent of a Majority in Interest of the Limited Partners together with the written consent of the General Partner;

2.      The date of receipt in cash by the Partnership of the entire proceeds from a sale or other disposition by the Partnership of all, or substantially all, of the Partnership's property, provided that if such a sale is made for consideration payable in whole or part over a period of time, such date shall be the date upon which all payments therefor shall have been received;

3.      The removal, Bankruptcy, dissolution or other cessation to exist as a legal entity of the last General Partner, unless, within 60 days after the occurrence of any such event, a Majority in Interest of Limited Partners elects to continue the business of the Partnership and elect a successor General Partner; or

4.      Expiration of the term of the Partnership as set forth in Section 4(a) hereof.

(b)      <u>Continuation of Partnership.</u> If a Majority in Interest of Limited Partners elect to continue the business of the Partnership and elect a successor General Partner in accordance with Section 14(a)(3), the successor General Partner shall assume the obligations of the former General Partner and shall indemnify the former General Partners and hold them harmless from and against any and all loss, damage, liability and expense, including costs and reasonable attorneys' fees, which the former General Partners may be incur by reason of or in connection with any of the debts, obligations or liabilities of the Partnership theretofore or thereafter made, incurred or created.

(c)      <u>Winding Up of the Partnership.</u> Upon dissolution of the Partnership, the General Partner shall wind up the affairs and liquidate the assets of the Partnership in accordance with the provisions of this Section.  Net Profits and Net Losses and all other Partnership items shall be allocated until the liquidation is completed in the same ratio as such items were allocated prior thereto. The proceeds from liquidation of the Partnership when and as received by the Partnership shall be utilized, paid and distributed in the following order:

1.      First, to pay expenses of liquidation and the debts of the Partnership to third parties other than the Partners;

2.      Next, to pay the debts of the Partnership owing to Partners;

3.      Next, to the establishment of any Cash Reserves; and

4.      Finally, to the Partners in accordance with the provisions of Section 9.

(d)      <u>Right To Receive Partnership Property.</u> The Limited Partners shall have no right to demand or receive any Partnership Property other than cash in return for their Capital Contributions to the Partnership, and each Limited Partner agrees to and shall look solely to the assets of the Partnership for the return of such Limited Partner's Capital Contributions. If the assets of the Partnership remaining after discharge of the debts and liabilities of the Partnership are insufficient to return the then unreimbursed Capital Contributions of a Limited Partner, such Limited Partner shall not have, and hereby waives, any recourse against the General Partner. The winding-up of the affairs of the Partnership and the distribution of its assets shall be conducted exclusively by the General Partner, who is hereby authorized to do any and all acts and things authorized by law for such purposes at the expense of the Partnership. If there is no General Partner, the winding-up of the affairs of the Partnership shall be conducted as otherwise provided by law.

15.    **BOOKS AND RECORDS.**

(a)    Books of Account. The General Partner shall, at the Partnership's sole cost and expense, keep adequate books of account of the Partnership wherein shall be recorded and reflected, in accordance with a method of accounting determined by the General Partner, all of the Capital Contributions and all of the income, expenses and transactions of the Partnership and a list of the names and addresses, and interests in the Partnership held by the Partners in alphabetical order.

(b)    Accounting and Reports.

1.    The General Partner shall, at the Partnership's sole cost and expense, cause Federal and state returns for the Partnership to be prepared and filed with the appropriate authorities, and shall furnish to the Limited Partners, within 60 days after the close of each Fiscal Year of the Partnership, such financial information with respect to each Fiscal Year as shall be reportable for Federal and state income tax purposes.

2.    Unless required by applicable law, the Partnership will not file quarterly or annual reports with any governmental authorities. Within 120 days after the close of each Fiscal Year, the General Partner will provide to Limited Partners audited financial statements prepared by the Partnership's accountants in accordance with generally accepted accounting principles.

(c)    Banking. All funds of the Partnership shall be deposited in a separate bank account or accounts as shall be determined by the General Partner. All withdrawals therefrom shall be made upon checks signed by the General Partner.

(d)    Accountants. The General Partner shall select the accountants for the Partnership.

16.    **WAIVER OF ACTION FOR PARTITION.** Each of the Partners hereby irrevocably waives, during the term of the Partnership, any right such Partner may have to maintain any action for partition with respect to any property of the Partnership.

17.    **AMENDMENTS.** This Agreement may be modified or amended at any time in writing by the General Partner and a Majority in Interest of the Limited Partners. Notwithstanding anything contained herein to the contrary the General Partner shall have the authority to amend this Agreement without any vote or other action by the Limited Partners: (1) to modify the allocation provisions of this Agreement to comply with Section 704(b) of the Code; (2) to add to the representations, duties, services or obligations of the General Partner or its Affiliates for the benefit of the Partners; (3) to cure any ambiguity or mistake, correct or supplement any provision in this Agreement that may be inconsistent with any other provision, or to make any other provision with respect to matters or questions arising under this Agreement that will not be inconsistent with the existing provisions of this Agreement; (4) to delete or add any provision of this Agreement required to be so deleted or added by the staff of the Securities and Exchange Commission or by a state "Blue Sky" Commissioner or similar official, which addition or deletion is deemed by such commission or official to be for the benefit or protection of the Limited Partners or is required to cause the Partnership not to be classified as a "publicly traded partnership"; (5) to reflect the addition or substitution of Limited Partners or the reduction of the Capital Accounts upon the return of capital to the Partners; (6) to reconstitute the Partnership under the laws of another state if beneficial; or (7) to change the name and/or principal place of business of the Partnership. In addition, notwithstanding anything contained herein to the contrary the General Partner shall have the authority to amend this Agreement without any vote or other action by the Limited Partners; (x) to decrease the rights and powers of the General Partner (so long as such decrease does not impair the ability of the General Partner to manage the Partnership and conduct its business affairs); or (y) to make any changes requested by a lender that are requested or required to obtain financing or add or delete any such provisions after repayment of any such loans provided that the adoption of such amendment (i) is for the benefit of and not adverse to the interests of the Limited Partners; (ii) is not inconsistent with provisions of this Agreement pertaining to the management and

administration of the Partnership by the General Partner; and (iii) does not affect the limited liability of the Limited Partners or the status of the Partnership as a partnership for Federal income tax purposes. Notwithstanding anything to the contrary contained herein, no amendment under which any of the following occurs shall be effective unless such amendment is approved by the vote or written consent of all Limited Partners:

        (a)       Converts a Limited Partner into a general partner; or

        (b)       Modifies the limited liability of a Limited Partner.

The General Partner shall have the authority to execute, acknowledge, and deliver any and all instruments to effectuate the provisions of this Section, including the execution, acknowledgment and delivery of any such instrument by the attorney-in-fact for the General Partner under a special or limited power of attorney, and to take all such actions in connection therewith as the General Partner shall deem necessary or appropriate with the signature of the General Partner acting alone.  The General Partner shall provide written notice of any amendment to all Limited Partners.

        18.    **EQUITABLE RELIEF.** It is agreed that the rights granted to the parties hereunder are of a special and unique kind and character and that, if there is a breach by any party of any material provision of this Agreement, the other parties would not have an adequate remedy at law. It is expressly agreed, therefore, that the rights of the parties hereunder may be enforced by equitable relief as is provided under the laws of the State of California.

        19.    **NOTICES.** Any and all notices, demands or other communications required or desired to be given hereunder by any party shall be in writing and shall be validly given or made to another party only if served either personally or by facsimile transmission or if deposited in the United States first class mail, certified or registered, postage prepaid. If such notice, demand or other communication is served personally, service shall be conclusively deemed made at the time of such personal service. If such notice is sent by facsimile transmission, service shall be conclusively deemed made at the time of written confirmation of receipt. If such notice, demand or other communication is given by mail, such shall be conclusively deemed given 72 hours after the deposit thereof in the United States mail addressed to the party to whom such notice, demand or other communication is to be given at the address set forth in the records of the Partnership. Any party hereto may change its address for the purpose of receiving notices, demands and other communications as herein provided by a written notice given in the manner aforesaid to the other party or parties hereto.

        20.    **PARTNERSHIP MEETINGS.**

        (a)       Annual Meeting.  Shall be held for record-keeping purposes.

        (b)       Call and Place of Meetings. Meetings of the Partners may be called at the principal executive office of the Partnership or at any place designated by the General Partner at the call and pursuant to the written request of any General Partner or of Limited Partners representing more than 10% of the outstanding Units of the Partnership for consideration of any of the matters as to which Limited Partners are entitled to vote pursuant to the terms of this Agreement.  This subsection shall not apply to a meeting to remove or replace the General Partner.

        (c)       Notice of Meeting. Immediately upon receipt of a written request to the General Partner requesting a meeting pursuant to Section 21(a) on a specific date (which date shall be not less than 15 nor more than 60 days after the receipt of the request by the General Partner), the General Partner shall immediately give notice to all Partners entitled to vote. Valid notice shall be given not less than 10 nor more than 60 days prior to the date of the meeting, and shall state the place, date and hour of the meeting and the general nature of the business to be transacted. No business other than the business stated in the notice of the meeting may be transacted at the meeting. Notice shall be given in accordance with the provisions of Article 20 hereof.

(d)     _Quorum._ At any duly held or called meeting of Partners, a Majority in Interest of Limited Partners represented in person shall constitute a quorum. The Partners present at a duly called or held meeting at which a quorum is present may continue to transact business until adjournment, notwithstanding the withdrawal of enough Limited Partners to leave less than a quorum, if any action taken, other than adjournment, is approved by the owners of the requisite number of Units.

(e)     _Adjournment of Meetings._ A meeting at which a quorum is present may be adjourned to another time or place and any business which might have been transacted at the original meeting may be transacted at the adjourned meeting. If a quorum is not present at an original meeting, that meeting may be adjourned by the vote of a Majority In Interest of the Limited Partners represented in person.  Notice of the adjourned meeting need not be given to Partners entitled to notice if the time and place thereof are announced at the meeting at which the adjournment is taken, unless the adjournment is for more than 45 days or if, after the adjournment, a new record date is fixed for the adjourned meeting, in which case notice of the adjourned meeting shall be given to each Partner of record entitled to vote at the adjourned meeting.

(f)     _Meetings Not Duly Called, Noticed or Held._ The transactions of any meeting of Partners, however called and noticed, and wherever held, shall be as valid as though consummated at a meeting duly held after regular call and notice, if a quorum is present at that meeting, in person, and if, either before or after the meeting, each of the persons entitled to vote, not present in person, signs either a written waiver of notice, a consent to the holding of the meeting or an approval of the minutes of the meeting.

(g)     _Waiver of Notice._ Attendance of a Partner at a meeting shall constitute waiver of notice, except when that Partner objects, at the beginning of the meeting, to the transaction of any business on the ground that the meeting was not lawfully called or convened. Attendance at a meeting is not a waiver of any right to object to the consideration of matters required to be described in the notice of the meeting and not so included, if the objection is expressly made at the meeting.

(h)     _Consent to Action Without Meeting._ Any action that may be taken at any meeting of the Partners may be taken without a meeting if a consent in writing, setting forth the action so taken, is signed by Partners having not less than the minimum number of votes that would be necessary to authorize or take that action at a meeting at which all Partners entitled to vote thereon were present and voted; provided, however removal and replacement of the General Partner may not be taken without a meeting of the Limited Partners.

(i)     _Conduct of Meeting._ The General Partner shall have full power and authority concerning the manner of conducting any meeting of Partners, including, without limitation, the determination of Limited Partners entitled to vote at the meeting, the existence of a quorum, the conduct of voting, and the determination of any controversies, votes or challenges arising in connection with or during the meeting. The General Partner shall designate a person to serve as chairman of the meeting and shall further designate a person to take the minutes of the meeting, in either case including, without limitation, an officer of the General Partner.  All minutes shall be kept with the records of the Partnership maintained by the General Partner.

## 21.     UNIT CERTIFICATES.

(a)     _Form of Unit Certificates._ If the General Partner deems it necessary or appropriate for the Units of the Partnership to be evidenced by a physical instrument, it may adopt a form of Unit Certificate to represent the Units. Each Unit Certificate shall be signed in the name of the Partnership by the General Partner and shall certify the number of Units owned by the Limited Partner. Any or all of the signatures on a Unit Certificate may be facsimile. There shall also appear conspicuously on the Unit Certificates (i) a statement to the effect that the Units are subject to restrictions upon Transfer; and (ii) any required Federal or state securities legends. The Units shall be issued only in registered form.

(b)      Issuance of Unit Certificates. If a form of Unit Certificate has been adopted by the General Partner, each Limited Partner shall be entitled to be issued a Unit Certificate certifying the number of Units owned by the Limited Partner. The Unit Certificates shall be deemed issued when signed by the General Partner on behalf of the Partnership and delivered to the Limited Partners or their designees. If the General Partner elects to adopt Unit Certificates, Limited Partners may transfer their Units only be endorsing and delivering to assignees the Unit Certificate relating to their Units, subject to the additional requirements of Article 12 hereof. If the endorsement is on a separate document, Limited Partners must deliver to assignees both the document and the Unit Certificates relating to their Units.

(c)      Lost, Stolen or Destroyed Unit Certificates. The Partnership may issue a new Unit Certificate in place of any previously issued Unit Certificate alleged to have been lost, stolen or destroyed, and the General Partner may require the Limited Partner owning the lost, stolen or destroyed Unit Certificate (or the Limited Partner's legal representative) to give the Partnership a bond (or other adequate security) sufficient to indemnify it against any claim that may be made against it (including any expense or liability) on account of the alleged loss, theft or destruction of any Unit Certificate or the issuance of such new certificate.

(d)      Surrender and Cancellation of Unit Certificates. When this Agreement is amended in any way affecting the statements contained in any Unit Certificate representing outstanding Units, or it otherwise becomes desirable for any reason, in the discretion of the General Partner, to cancel any outstanding Unit Certificate and to issue a new Unit Certificate conforming to the rights of the Limited Partner holding the Unit Certificate, the General Partner may order any Limited Partners holding an outstanding Unit Certificate to surrender and exchange them within a reasonable time to be fixed by the general Partner. The order may provide that a Limited Partner holding any Unit Certificates so ordered to be surrendered is not entitled to vote or to receive cash distributions or exercise any of the other rights of a Limited Partner until the Limited Partner has complied with the order, but such order shall operate to suspend such rights only after notice and until compliance. The duty of a Limited Partner to surrender any outstanding Unit Certificate shall also be enforceable by civil action.

## 22.      POWER OF ATTORNEY.

(a)      Grant of Power. Each Limited Partner hereby makes, constitutes, and appoints the General Partner, any successor individual general partner or president of a successor corporate general partner, and Global Premier America, LLC, d.b.a. Global Premier America Regional Center (the "Subscriber Representative"), with full power of substitution and re-substitution, his agent and attorney-in-fact for him and in his name, place, and stead and for his use and benefit, to certify, acknowledge, swear to, file, and/or record this Agreement or a certificate thereof and to sign, execute, certify, acknowledge, swear to, file, and/or record any other instruments that may be required in connection with the formation of the Partnership, any amendment of this Agreement, the day-to-day conduct of the Partnership's business or the dissolution and winding up of the Partnership under the laws of the State of California or any other jurisdiction, including without limitation instruments (1) to reflect the exercise by the General Partner of any of the powers, authorizations, or rights granted to him under this Agreement or the taking by the General Partner of any action that it is required, authorized, or permitted to take hereunder; (2) to reflect any amendments made to this Agreement or the cancellation of this Agreement upon the dissolution of the Partnership; (3) to make filings under fictitious-name statutes or other filings required by the Partnership; (4) to reflect the admission to the Partnership of any additional or substituted limited partners, in the manner prescribed in this Agreement; (5) to complete, execute, and file on behalf of a Limited Partner a UCC-1 to perfect a security interest in the Limited Partner's interest in the Partnership; (6) to fill in any missing information on any subscription document executed by the Limited Partners, including but not limited to, amending any nonmonetary term or filling the date on any promissory note or any other subscription documents, in order to conform same to the terms of this Agreement; (7) to cause the Partnership to be qualified to do business in or, if required, to exist as a partnership under the laws of any jurisdiction in which it may conduct business; and (8) any other instruments that may be required of the Partnership or of the Partners or deemed desirable by the General Partner. Each Limited Partner authorizes such attorney-in-

fact to take any further actions that such attorney-in-fact shall consider necessary or advisable in connection with any of the foregoing, hereby giving such attorney-in-fact full power and authority to do and perform each and every acts or thing whatsoever requisite or advisable to be done in and about the foregoing as fully as such Limited Partner might or could do if personally present and hereby ratifying and confirming all that such attorney-in-fact shall lawfully do or cause to be done by virtue hereof. Each of the Limited Partners waives any and all defense that may be available to the Limited Partners to contest, negate, or disaffirm the actions of the General Partner under the power of attorney herein granted.

(b)    <u>Nature of Power</u>.  The power of attorney granted pursuant to Section 22(a):

(1)    is a special power of attorney coupled with an interest and is irrevocable;

(2)    may be exercised by such attorney-in-fact by listing the names of all of the Limited Partners who are to be parties to any agreement, certificate, instrument, or document, with the single signature of such attorney-in-fact together with the recital that it acts as attorney-in-fact for all of them; and

(3)    shall survive the death, bankruptcy, or mental incapacity of any Limited Partner, to the extent he or she may legally contract for such survival, or the transfer or assignment by such Partner of any Unit(s), except that where such transfer or assignment is of the last remaining Unit(s) held by such Partner and the transferee or assignee thereof has the right to be and with the consent of the General Partner is admitted as a substituted Limited Partner, the power of attorney given by the transferor shall survive such transfer or assignment for the sole purpose of enabling such attorney-in-fact to execute, acknowledge, swear to, and file any agreement, certificate, instrument, or document necessary to effect such substitution.

(c)    <u>Execution of Additional Documents</u>.  Upon request of the General Partner, each Limited Partner shall promptly execute all certificates and other documents necessary or desirable for the General Partner to accomplish all such filings, recordings, publications, and other acts as the General Partner determines may be appropriate to comply with (1) the requirements for the formation, operation, amendment, or dissolution, as the case may be, of a limited partnership under the laws of the State of California; and (2) similar requirements of applicable law in all other jurisdictions with the Partnership may conduct business.

23.    <u>**MISCELLANEOUS.**</u>

(a)    <u>Applicable Law.</u> This Agreement shall, in all respects, be governed by the laws of the State of California applicable to agreements executed and to be wholly performed within the State of California.

(b)    <u>Severability.</u> Nothing contained herein shall be construed so as to require the commission of any act contrary to law, and wherever there is any conflict between any provisions contained herein and any present or future statute, law, ordinance or regulation contrary to which the parties have no legal right to contract, the latter shall prevail; but the provision of this Agreement which is affected shall be curtailed and limited only to the extent necessary to bring it within the requirements of the law. If any provision of this Agreement shall be held to be invalid, the same shall not affect the validity, legality or enforceability of the remainder of this Agreement.

(c)    <u>Further Assurances.</u> Each of the parties hereto shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things reasonably necessary in connection with the performance of their obligations hereunder to carry out the intent of the parties hereto.

(d)     <u>Successors and Assigns.</u> All of the terms and provisions contained herein shall inure to the benefit of and shall be binding upon the parties hereto and their respective heirs, legal representatives, successors and assigns.

(e)     <u>Number and Gender.</u> In this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each be deemed to include the others whenever the context so requires.

(f)     <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)     <u>Non-Waiver: Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)     <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)     <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)     <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

*(The remainder of this page is intentionally blank; the signature page follows.)*

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" - Page 21 of 21

EXHIBIT 3 - PAGE 21

(f)    <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    <u>Non-Waiver: Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
    Christine Hanna, Manager

Limited Partners:

_____    WANG WEN HAI
(Signature)

_____
WANG WENHAI
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 22

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 23

(f)    **Entire Agreement.** This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    **Non-Waiver; Consents.** No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    **Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    **Captions.** The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    **Parties in Interest.** Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

       **IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
      Christine Hanna, Manager

Limited Partners:

周海霞   Zhou Haixia
(Signature)

周海霞  ZHOU HAIXIA
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 24

(f)    <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    <u>Non-Waiver: Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____
(Signature)

姜艳涛  JIANG YANTAO
_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 25

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
　　Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 26

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_Aifang Feng_____
(Signature)

_____Aifang Feng_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 27

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_Qiao hong Li_
(Signature)

_Qiao hong Li_
(Printed Name)

_____
(Signature)

_____
(Printed Name)

exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 28

     (f)    <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

     (g)    <u>Non-Waiver: Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

     (h)    <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

     (i)    <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

     (j)    <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
    Christine Hanna, Manager

Limited Partners:

丁寒   DING HAN
_____
(Signature)

丁寒   DING HAN
_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" - Page 20 of 20

EXHIBIT 3 - PAGE 29

(f)    <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    <u>Non-Waiver: Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

黃柯 Huang Yang
(Signature)

黃柯 HUANG YANG
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 30

(f)    <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)    <u>Non-Waiver; Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)    <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)    <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)    <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____ ZHU CHANGLING
(Signature)

ZHU CHANGLING
_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 31

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_Hou Lin Qiang_
(Signature)

_HOU LIN QIANG_
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 32

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
        Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 33

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
     Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 34

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
       Christine Hanna, Manager

Limited Partners:

_____
(Signature)

BIRJANDI    MOHAMMADSADEGH
(Printed Name)

_____
(Signature)

_____
(Printed Name)

(f)      <u>Entire Agreement.</u> This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)      <u>Non-Waiver; Consents.</u> No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)      <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)      <u>Captions.</u> The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)      <u>Parties in Interest.</u> Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

EXHIBIT 3 - PAGE 36

(f)     Entire Agreement. This Agreement constitutes the entire understanding and agreement of the parties with respect to its subject matter and any and all prior agreements, understandings or representations with respect to its subject matter are hereby terminated and cancelled in their entirety and are of no further force or effect.

(g)     Non-Waiver: Consents. No waiver by any party hereto of any breach of this Agreement or any provision hereof shall be deemed to be a waiver of any preceding or succeeding breach of the same or any other provision hereof. Any consent of a Limited Partner required under this Agreement shall only be effective if given in writing by such Limited Partner.

(h)     Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

(i)     Captions. The captions appearing at the commencement of the paragraphs hereof are descriptive only and for convenience in reference. Should there be any conflict between any such caption and the paragraph at the head of which it appears, the paragraph and not such caption shall control and govern in the construction of this Agreement.

(j)     Parties in Interest. Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any persons other than the parties and their respective successors and assigns, nor is anything in this Agreement intended to relieve or discharge the obligation or liability of any third persons to any party to this Agreement, nor shall any provision give any third person any right of subrogation or action over or against any party to this Agreement.

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
         Christine Hanna, Manager

Limited Partners:

_____
(Signature)

Qi Lu
(Printed Name)

_____
(Signature)

Xiao Shang
(Printed Name)

Exhibit "A" – Page 20 of 20

EXHIBIT 3 - PAGE 37

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
     Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 38

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____   Sun Huanfang
(Signature)

_____   SUN HUANFANG
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 39

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

_____
(Signature)

_____
Wu Bibo
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 40

**IN WITNESS WHEREOF,** the parties have executed this Agreement on the date first hereinabove mentioned.

**General Partner:**

GLOBAL PREMIER AMERICA #3, LLC

By:  _____
Christine Hanna, Manager

**Limited Partners:**

_____
(Signature)

Qiu Zihan
_____
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 41

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
      Christine Hanna, Manager

Limited Partners:

_____
(Signature)

ZHANG, MEIYU
(Printed Name)

_____
(Signature)

_____
(Printed Name)

EXHIBIT 3 - PAGE 42

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
    Christine Hanna, Manager

Limited Partners:

Wang Chao
_____
(Signature)

WANG CHAO
_____
(Printed Name)

Wang Chao
_____
(Signature)

WANG CHAO
_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 43

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first hereinabove mentioned.

General Partner:

GLOBAL PREMIER AMERICA #3, LLC

By: _____
Christine Hanna, Manager

Limited Partners:

罗泠泠  Luo Lingling
(Signature)

罗泠泠  LUO LING LING
(Printed Name)

_____
(Signature)

_____
(Printed Name)

Exhibit "A" – Page 21 of 21

EXHIBIT 3 - PAGE 44

EXHIBIT 4

## FIRST AMENDMENT TO OPERATING AGREEMENT OF
## GLOBAL PREMIER AMERICA #3, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY

THIS FIRST AMENDMENT TO THE OPERATING AGREEMENT OF **GLOBAL PREMIER AMERICA #3, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY (the "Company"),** is made, adopted and executed this 27th day of September, 2017 by the undersigned persons. All of the capitalized words and terms in the Amendment shall have the meaning ascribed to them in the Operating Agreement of **GLOBAL PREMIER AMERICA #3, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY**.

Amendments. The Company's Operating Agreement is amended as follows:

1. Section 1.7 - **"Manager"** means CHRISTINE HANNA and ANDREW HANNA, who, together or acting separately, shall each have full authority to manage and operate the Company in accordance with the terms of this Agreement.

2. Notwithstanding anything to the contrary contained in this Agreement, so long as the Loan (defined herein below) remains outstanding, the following terms shall govern:

(a)    The Company is General Partner of Global Premier Regency Palms Oxnard, LP, a California limited partnership (the "Partnership");

(b)    The Company, as General Partner of the Partnership, agrees that the Partnership (1) is organized solely for the limited purpose of acquiring, owning, improving, leasing, managing, operating, holding for investment and selling or otherwise disposing of the Property and doing only those things necessary in connection therewith, (2) shall not engage in any other business unrelated to the Property, (3) shall have no other purpose unrelated to the Property, (d) shall not own or acquire any real property other than the real estate included in the Property or any personal (tangible or intangible) property other than personal property included in the Property or in furtherance of the purposes of the Property and the Partnership as stated herein, and (4) shall not incur, create, or assume any indebtedness or liabilities, secured or unsecured, direct or contingent, other than (i) the Loan, and (ii) unsecured indebtedness that represents trade payables or accrued expenses occurring in the normal course of business of owning and operating the Property; and the General Partner shall take no action in contradiction of the foregoing. **"Loan"** means the loan evidenced by that certain Promissory Note Secured by Deed of Trust, in the original principal sum of $12,500,000 to be executed by the Company as General Partner of the Partnership in favor of IBORROW FINANCE LOAN FUND I, a Delaware limited partnership (**"Lender"**);

(c)    If an event of default under the documents evidencing and securing the Loan exists and is continuing, no consent of any Member will be required for the **General Partner** to take any of the actions described in this Agreement;

EXHIBIT 4 - PAGE 1 7924025

(d)    The **General Partner** may be replaced as General Partner of the Partnership by only (1) a guarantor under the Loan, or (2) such other party as may be reasonably acceptable to Lender, which party will be required to guaranty the Loan under the same terms as the then existing guarantor(s); and

(e)    The Company shall be the sole **General Partner** of the Partnership with complete control over all decisions on behalf of the Partnership.

3. Ratification. The Company's Operating Agreement, as amended, is hereby ratified, confirmed and approved by the Member(s). The undersigned hereby affirms that they are the Manager of the Company and the Manager of the sole member and that the facts stated in this First Amendment to the Company's Operating Agreement are true.

_____ Manager
Andrew Hanna

_____ Manager
Christine Hanna

# OPERATING AGREEMENT

## OF

## GLOBAL PREMIER AMERICA #3, LLC

**THIS OPERATING AGREEMENT** (the "Agreement") is made and entered into and effective as of February 27, 2014 (the "Effective Date").

## RECITALS:

**WHEREAS,** CHRISTINE HANNA formed a limited liability company named GLOBAL PREMIER AMERICA #3, LLC (the "Company") by filing the Articles of Organization of the Company with the Secretary of State of California on February 27, 2014;

**NOW THEREFORE,** in consideration of the covenants and the promises made herein, the parties hereby agree as follows:

## SECTION 1: DEFINITIONS

1.1    **"Agreement"** means this Operating Agreement of GLOBAL PREMIER AMERICA #3, LLC dated February 27, 2014.

1.2    **"Articles of Organization"** means the Articles of Organization forming this LLC filed with the State of California and recorded as filed on February 27, 2014.

1.4    **"Capital Account"** means the amount of the Member's Capital Contribution, as adjusted, including but not limited to increases due to profits or additional contributions and decreases due to losses and distributions.

1.5    **"Capital Contribution"** means any contribution of value, including but not limited to cash, property, assets, etc., by the Member to the capital of the Company.

1.6    **"Distributable Cash"** shall mean the amount of cash derived from the Company's net revenues after expenses, less the amount of a reasonable reserve for future expenses, as determined by the Manager in her sole discretion.

1.7    **"Manager"** means CHRISTINE HANNA, who shall manage and operate the Company in accordance with the terms of this Agreement.

1.8    **"Member"** means GLOBAL PREMIER AMERICA or any other person or entity who owns any Interest in the Company.

EXHIBIT 4 - PAGE 3

1.9    **"Statute"** means the California Revised Uniform Limited Liability Company Act as found in Section 17701.01 et seq. of the California Corporations Code, as amended, modified or supplemented from time to time or any corresponding provisions of succeeding law.

1.10    **"Units"** means an ownership interest in the Company issued to the Member for its Capital Contribution. The authorized number of Units is 100,000.

## SECTION 2:  FORMATION

2.1    **Name**.  The name of the Company is GLOBAL PREMIER AMERICA #3, LLC.  The Manager shall operate the business of the Company under such name of the Company or such other name or names as the Manager or the Member approves to promote the business of the Company, provided that such names do not violate the Statute.

2.2    **Principal Office**.  The Company's principal place of business will be 2010 Main Street, Suite 1250, Irvine, California 92614 or any other location determined by the Manager.

2.3    **Term**. The Company shall exist for a period of 50 years from the date of the filing of its Articles of Organization unless sooner terminated or dissolved in accordance with its Articles of Organization or this Agreement.

2.4    **Business Purpose**.  The purpose of the Company is to manage Global Premier Regency Palms Oxnard, LP, located at 2010 Main Street, Suite 1250, Irvine, California 92614 (the "Partnership"), and such other business that the Company may lawfully engage in related to the Partnership.

2.5    **Agent for Service of Process**.  The agent for service of process for the Company is Mark Butler, 1300 Bristol Street, Suite 160, Newport Beach, California 92660 or any other natural person or qualified entity with an office in the State of California as determined by the Manager.

## SECTION 3:  MEMBERSHIP

3.1    **Members**.  The initial Members of the Company are GLOBAL PREMIER AMERICA, LLC, who shall own 100,000 Units. No other members shall be admitted to the Company without the consent of the Members.

3.2    **Liability to Third Parties**.  The Members shall not be liable for the debts, obligations or liabilities of the Company to a third party unless the Members agree in writing to be liable.

EXHIBIT 4 - PAGE 4

3.3     **Authority**.  The Members have no authority or power to act for or on behalf of, to bind, or to incur any liability on behalf of the Company except as provided in this Agreement and any other written agreements entered into with the Company.

## SECTION 4:  CAPITAL ACCOUNTS

4.1     **Capital Accounts**.  A Capital Account shall be established and maintained for the Members, maintained in accordance with generally accepted accounting principles.

## SECTION 5:  ALLOCATION OF PROFITS AND LOSSES
## AND DISTRIBUTIONS

5.1     **Net Losses**. The Members will be allocated all of the Net Losses for each fiscal year of the Company.

5.2     **Net Profits**.  The Members will be allocated all of the Net Profits for each fiscal year of the Company.

5.3     **Cash Distributions** The Members will be allocated all of the Cash Distributions for each fiscal year of the Company.

## SECTION 6:  MANAGER AND MEMBER DUTIES AND ACTIONS

6.1     **Manager's Duties; Replacement Manager**.  The Manager shall supervise and direct the day-to-day operations of the Company as are reasonably necessary to accomplish the business purposes of the Company.  The Manager shall also have the rights and duties set forth in this Agreement. If the Manager resigns or is unable to function as a Manager due to death or disability, the Members shall appoint a replacement Manager.  The Manager may act and adopt resolutions from time to time evidencing decisions of the Manager without a meeting as permitted by the Statute.

6.2     **Action by the Members**.  Meetings of Members shall be held in accordance with the provisions of the Statute.  The Members may act and adopt resolutions from time to time evidencing decisions of the Members without a meeting as permitted by the Statute.

## SECTION 7:  BOOKS AND RECORDS

EXHIBIT 4 - PAGE 5

7.1 **Maintenance of Books and Records**. The Company shall establish and maintain appropriate books and records of the Company in accordance with generally accepted accounting principles. There shall be kept at the principal office of the Company and the registered office of the Company such books and records required by the Statute.

7.2 **Fiscal Year.** The Company's fiscal year shall end on December 31st.

## SECTION 8: TAXATION

8.1 **Tax Year.** The Company's taxable year shall end on December 31st.

8.2 **Tax Matters Partner.** The Manager shall be the Tax Matters Partner pursuant to Code Section 6231 to represent the Company.

## SECTION 9: INDEMNIFICATION

9.1 **Indemnification Generally.** The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he, she, or it is or was a Manager, Member, employee or agent of the Company (individually an "Indemnified Party)"), or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Manager and the Members jointly determine that the Indemnified Party acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company.

9.2 **Indemnification in a Criminal Matters.** With respect to any criminal action proceeding, has no reasonable cause to believe his, her or its conduct was unlawful. The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his, her or its conduct was lawful.

## SECTION 10: AMENDMENTS

10.1 **Amendments by Member.** This Agreement may be adopted, amended, altered, or repealed only by the written consent of the Members.

EXHIBIT 4 - PAGE 6

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

*MANAGER:*

**CHRISTINE HANNA**

*MEMBERS:*

**GLOBAL PREMIER AMERICA, LLC**

By: _____
Christine Hanna
Manager

By: _____
Andrew Hanna
Manager

Page 5 of 5

EXHIBIT 4 - PAGE 7

# OPERATING AGREEMENT

## OF

## GLOBAL REGENCY OXNARD SENIOR CARE SERVICES, LLC

**THIS OPERATING AGREEMENT** (the "Agreement") is made and entered into and effective as of May 6, 2014 (the "Effective Date").

## RECITALS:

**WHEREAS,** CHRISTINE HANNA formed a limited liability company named GLOBAL REGENCY OXNARD SENIOR CARE SERVICES, LLC (the "Company") by filing the Articles of Organization of the Company with the Secretary of State of California on May 6, 2014;

**NOW THEREFORE,** in consideration of the covenants and the promises made herein, the parties hereby agree as follows:

## SECTION 1: DEFINITIONS

1.1      **"Agreement"** means this Operating Agreement of GLOBAL REGENCY OXNARD SENIOR CARE SERVICES, LLC dated May 6, 2014.

1.2      **"Articles of Organization"** means the Articles of Organization forming this LLC filed with the State of California and recorded as filed on May 6, 2104.

1.4      **"Capital Account"** means the amount of the Member's Capital Contribution, as adjusted, including but not limited to increases due to profits or additional contributions and decreases due to losses and distributions.

1.5      **"Capital Contribution"** means any contribution of value, including but not limited to cash, property, assets, etc., by the Member to the capital of the Company.

1.6      **"Distributable Cash"** shall mean the amount of cash derived from the Company's net revenues after expenses, less the amount of a reasonable reserve for future expenses, as determined by the Manager in her sole discretion.

1.7      **"Manager"** means CHRISTINE HANNA, who shall manage and operate the Company in accordance with the terms of this Agreement.

1.8      **"Member"** means GLOBAL PREMIER REGENCY PALMS OXNARD, LP or any other person or entity who owns any Interest in the Company.

EXHIBIT 4 - PAGE 8

1.9    **"Statute"** means the California Revised Uniform Limited Liability Company Act as found in Section 17701.01 et seq. of the California Corporations Code, as amended, modified or supplemented from time to time or any corresponding provisions of succeeding law.

1.10    **"Units"** means an ownership interest in the Company issued to the Member for its Capital Contribution. The authorized number of Units is 100,000.

## SECTION 2:  FORMATION

2.1    **Name**.  The name of the Company is GLOBAL REGENCY OXNARD SENIOR CARE SERVICES LLC.  The Manager shall operate the business of the Company under such name of the Company or such other name or names as the Manager or the Member approves to promote the business of the Company, provided that such names do not violate the Statute.

2.2    **Principal Office**.  The Company's principal place of business will be 2010 Main Street, Suite 1250, Irvine, California 92614 or any other location determined by the Manager.

2.3    **Term**. The Company shall exist for a period of 50 years from the date of the filing of its Articles of Organization unless sooner terminated or dissolved in accordance with its Articles of Organization or this Agreement.

2.4    **Business Purpose**.  The purpose of the Company is to operate the Regency Palms residential assisted living memory care facility located at 1020 Bismark Way, Oxnard, California 93033 (the "Facility") and such other business that the Company may lawfully engage in related to the Facility.

2.5    **Agent for Service of Process**.  The agent for service of process for the Company is Mark Butler, 1103 Quail Street, Newport Beach, California 92660 or any other natural person or qualified entity with an office in the State of California as determined by the Manager.

## SECTION 3:  MEMBERSHIP

3.1    **Member**.  The initial and only Member of the Company is GLOBAL PREMIER REGENCY PALMS OXNARD, LP, who shall own 100,000 Units.  No other members shall be admitted to the Company without the consent of the Member

3.2    **Liability to Third Parties**.  The Member shall not be liable for the debts, obligations or liabilities of the Company to a third party unless the Member agrees in writing to be liable.

EXHIBIT 4 - PAGE 9

3.3    **Authority**.  The Member has no authority or power to act for or on behalf of, to bind, or to incur any liability on behalf of the Company except as provided in this Agreement and any other written agreements entered into with the Company.

## SECTION 4:  CAPITAL ACCOUNTS

4.1    **Capital Accounts**.  A Capital Account shall be established and maintained for the Member, maintained in accordance with generally accepted accounting principles.

## SECTION 5:  ALLOCATION OF PROFITS AND LOSSES
## AND DISTRIBUTIONS

5.1    **Net Losses.** The Member will be allocated all of the Net Losses for each fiscal year of the Company.

5.2    **Net Profits**.  The Member will be allocated all of the Net Profits for each fiscal year of the Company.

5.3    **Cash Distributions** The Member will be allocated all of the Cash Distributions for each fiscal year of the Company.

## SECTION 6:  MANAGER AND MEMBER DUTIES AND ACTIONS

6.1    **Manager's Duties; Replacement Manager**.  The Manager shall supervise and direct the day-to-day operations of the Company as are reasonably necessary to accomplish the business purposes of the Company.  The Manager shall also have the rights and duties set forth in this Agreement. If the Manager resigns or is unable to function as a Manager due to death or disability, the Member shall appoint a replacement Manager.  The Manager may act and adopt resolutions from time to time evidencing decisions of the Manager without a meeting as permitted by the Statute.

6.2    **Action by the Member**.  Meetings of Member shall be held in accordance with the provisions of the Statute.  The Member may act and adopt resolutions from time to time evidencing decisions of the Member without a meeting as permitted by the Statute.

## SECTION 7:  BOOKS AND RECORDS

7.1    **Maintenance of Books and Records**.  The Company shall establish and maintain appropriate books and records of the Company in accordance with generally accepted accounting principles.  There shall be kept at the principal office of the Company and the registered office of the Company such books and records required by the Statute.

EXHIBIT 4 - PAGE 10

7.2    **Fiscal Year.** The Company's fiscal year shall end on December 31st.

## SECTION 8: TAXATION

8.1    **Tax Year.** The Company's taxable year shall end on December 31st.

8.2    **Tax Matters Partner.** The Manager shall be the Tax Matters Partner pursuant to Code Section 6231 to represent the Company.

## SECTION 9: INDEMNIFICATION

9.1    **Indemnification Generally.** The Company shall indemnify any person who was or is a party defendant or is threatened to be made a party defendant, pending or completed action, suit or proceeding, whether civil, criminal, administrative, or investigative (other than an action by or in the right of the Company) by reason of the fact that he, she, or it is or was a Manager, Member, employee or agent of the Company (individually an "Indemnified Party)"), or is or was serving at the request of the Company, for instant expenses (including attorney's fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with such action, suit or proceeding if the Manager and the Member jointly determine that the Indemnified Party acted in good faith and in a manner he, she or it reasonably believed to be in or not opposed to the best interests of the Company.

9.2    **Indemnification in a Criminal Matters.** With respect to any criminal action proceeding, has no reasonable cause to believe his, her or its conduct was unlawful.  The termination of any action, suit, or proceeding by judgment, order, settlement, conviction, or upon a plea of "no lo contendere" or its equivalent, shall not in itself create a presumption that the person did or did not act in good faith and in a manner which he reasonably believed to be in the best interest of the Company, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his, her or its conduct was lawful.

## SECTION 10: AMENDMENTS

10.1    **Amendments by Member.** This Agreement may be adopted, amended, altered, or repealed only by the written consent of the Member.

***

EXHIBIT 4 - PAGE 11

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be duly executed as of the Effective Date.

*MANAGER:*

_____

CHRISTINE HANNA

*MEMBER:*

**GLOBAL PREMIER REGENCY PALMS OXNARD, LP**

By: _____

Christine Hanna, Manager,
Global Premier America #3, LLC,
General Partner of Global Premier
Regency Palms Oxnard, LP

EXHIBIT 4 - PAGE 12

**AMENDED OPERATING AGREEMENT**
**OF**
**GLOBAL PREMIER AMERICA, LLC,**
**a California Limited Liability Company**

WHEREAS, Global Premier America, LLC, a California Limited Liability Company (the "Company") caused to be executed an Operating Agreement dated July 8, 2010, between the Company and its then existing Members, which as of the date of the execution of the Agreement consisted only of Andrew Hanna; and

WHEREAS, upon the execution of the Operating Agreement Andrew Hanna was the owner of 1,000 Membership Certificates of the Company which constituted a 100% interest in the Company; and

WHEREAS, on January 2, 2012, the Company authorized the sale of 500 Membership Certificates by Andrew Hanna to Christine Hanna. Said sale was documented by a Membership Certificate Purchase Agreement dated December 31, 2011, and approved by the Managing Member on January 2, 2012. Thereafter the Member ownership of the Company was as follows:

> Andrew Hanna: 50%
> Christine Hanna: 50%

WHEREAS, the Members wish to amended the Operating agreement as follows:

Section 2.7 states:

"Section 2.7 Names of Members and Managers. The Members, along with their percentage of interest, and Co-Managers of the Company are:

> Andrew Hanna: 100%"

Said section shall be deleted in its entirety and amended and replaced with the following:

"Section 2.7 Names of Members and Managers. The Members, along with their percentage of interest, and Co-Managers of the Company are:

> Andrew Hanna: 50%
> Christine Hanna: 50%"

Page 1 of 2

EXHIBIT 4 - PAGE 13

This Amendment has been approved by all of the existing Members of the Company.

IN WITNESS WHEREOF, all of the Members of Global Premier America, LLC, a California Limited Liability Company, hereby agree to and approve of this Amendment and signify such agreement and approval by their this Amendment effective as of the date set forth herein.

_____          _____
Andrew Hanna                                              1/2/12
                                                                    Date

_____          _____
Christine Hanna                                          1/2/12
                                                                    Date

Page 2 of 2

EXHIBIT 4 - PAGE 14

**OPERATING AGREEMENT OF GLOBAL PREMIER AMERICA, LLC,**
**a California Limited Liability Company**

This Operating Agreement (the "Agreement"), is made and entered into on July 8, 2010, by and between Andrew Hanna, being the sole Member, and all future Members, referred to herein in the plural of "Members", and Global Premier America, LLC, a California Limited Liability Company (the "Company").

Whereas, on July 7, 2010, on behalf of the Company, Articles of Organization were filed with the Secretary of State for the State of California; and

Whereas, the Members desire to create an Operating Agreement in accordance with the Beverly-Killea Limited Liability Company Act (the "Act").

NOW, THEREFORE, the Members agree as follows:

**ARTICLE**
**I.**
**DEFINITIONS**

When used in this Agreement, the following capitalized terms shall have the meanings provided below:

Section 1.1. "Act" means the Beverly-Killea Limited Liability Company Act, contained in California Corporations Code sections 17000 et seq., as amended from time to time.

Section 1.2. "Affiliate of a Member or Manager" means any Person under the control of, in common control with, or in control of a Member or Manager, whether that control is direct or indirect. The term "control," as used herein, means, with respect to a corporation or limited liability company, the ability to exercise more than fifty percent (50%) of the voting rights of the controlled entity, and with respect to an individual, partnership, trust, or other entity or association, the ability, directly or indirectly, to direct the management or policies of the controlled entity or individual.

Section 1.3. "Agreement" means this Operating Agreement, in its original form and as amended from time to time.

Section 1.4. "Articles" means the Articles of Organization filed with the California Secretary of State forming this limited

EXHIBIT 4 - PAGE 15

liability company, as initially filed and as they may be amended from time to time.

Section 1.5.  "Bankruptcy" means, with respect to any Person, being the subject of an order for relief under Title 11 of the United States Code, or any successor statute or other statute in any foreign jurisdiction having like import or effect.

Section 1.6.  "Capital Account" means the amount of the capital interest of a Member in the Company, consisting of the amount of money and the fair market value, net of liabilities, of any property initially contributed by the Member, as (1) increased by any additional contributions and the Member's share of the Company's profits; and (2) decreased by any distribution to that Member as well as that Member's share of Company losses.

Section 1.7.  "Capital Contribution" means the total amount of money and the fair market value, net of liabilities, of any property contributed by the Members to the Company.

Section 1.8. "Code" means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provision of any succeeding revenue law.

Section 1.9.  "Company" means Global Premier America, LLC, the entity formed in accordance with this Agreement and the Articles.

Section 1.10.  "Company Minimum Gain" shall have the same meaning as set forth for the term "Partnership Minimum Gain" in the Regulations section 1.704-2(d) set forth in 26 C.F.R. § 1.704-2(d). Section 1.11."Corporations Code" means the California Corporations Code, as amended from time to time and the provisions of any succeeding law.

Section 1.12.  "Departing Member" means any Member whose conduct results in a Dissolution Event or who withdraws from the Company in accordance with Section 4.3, where such withdrawal does not result in dissolution of the Company.

Section 1.13. "Dissolution Event" means, with respect to any Member, one or more of the following: the death, resignation, retirement, expulsion, bankruptcy, or dissolution of any Member.

Section 1.14. "Distribution" means the transfer of money or property by the Company to the Members without consideration.

EXHIBIT 4 - PAGE 16

Section 1.15. "Fiscal Year" means the Company's fiscal year, which shall be the calendar year.

Section 1.16. "Majority Interest" means the interest of the Members holding greater than fifty percent (50%) of the total interests held by the Members.

Section 1.17. "Manager" means the Person or Persons designated as such in Article V.

Section 1.18. "Member" means each Person who (1) has been admitted into membership in the Company; (2) executes or causes to be executed this Agreement and any subsequent amendments hereto; and (3) has not engaged in conduct resulting in a Dissolution Event or terminated membership for any other reason.

Section 1.19. "Member Nonrecourse Debt" shall have the same meaning as set forth for the term "Partnership Nonrecourse Debt" in Regulations section 1.704-2(b)(4). [26 C.F.R. § 1.704-2(b)(4)]

Section 1.20. "Member Nonrecourse Deductions" means items of Company loss, deduction, or Code section 705(a)(2)(B) set forth in 26 U.S.C.A. § 705(a)(2)(B)] expenditures which are attributable to Member Nonrecourse Debt.

Section 1.21. "Membership Interest" means a Member's rights in the Company, collectively, including the Member's economic interest, right to vote and participate in management, and right to information concerning the business and affairs of the Company provided in this Agreement or under the Act.

Section 1.22. "Negative Capital Account" means a Capital account with a balance of less than zero.

Section 1.23. "Net Profits" and "Net Losses" mean the Company's income, loss, and deductions computed at the close of each fiscal year in accordance with the accounting methods used to prepare the Company's information tax return filed for federal income tax purposes.

Section 1.24. "Nonrecourse Liability" has the meaning provided in the Regulations section 1.752-1(a)(2) set forth in 26 C.F.R. § 1.752-1(a)(2).

Section 1.25. "Percentage Interest" means the percentage ownership of the Company of each Member as set forth herein and as

EXHIBIT 4 - PAGE 17

recalculated from time to time pursuant to this Agreement.

Section 1.26. "Person" means an individual, partnership, limited partnership, corporation, limited liability company, registered limited liability partnership, trust, association, estate, or any other entity.

Section 1.27. "Positive Capital Account" means a Capital Account with a balance greater than zero.

Section 1.28. "Regulations," as used in this Agreement, refers to the income tax regulations of the United States Treasury Department promulgated under the Code, including any temporary regulations, and any successor regulations which may be promulgated.

Section 1.29. "Remaining Members" means, upon the occurrence of a Dissolution Event, those Members of the Company whose conduct did not cause its occurrence.

Section 1.30. "Secretary of State" means the Secretary of State for the State of California.

Section 1.31. "Tax Matters Member" ("Tax Matters Partner"), as defined in Code section 6231(a)(7) set forth in 26 U.S.C.A. Section 6231(a)(7), is that Person designated by the Company in Section 8.6 to serve as the Company's representative in all examinations of the Company's affairs by taxing authorities.

## ARTICLE
## II.
### FORMATION AND ORGANIZATION

Section 2.1. Initial Date and Initial Parties. This Agreement is first entered into on July 8, 2010, by and among the Company and the Persons who are Members of the Company on that date.

Section 2.2. Subsequent Parties. No Person may become a Member of the Company without agreeing to and without becoming a signatory of this Agreement, and any offer or assignment of a Membership interest is contingent upon the fulfillment of this condition.

Section 2.3. Name. The name of this Company is Global Premier America, LLC.

Section 2.4. Term. The Company shall commence upon the filing of its Articles and it shall continue in existence until terminated

EXHIBIT 4 - PAGE 18

under the provisions of the Act or Section 9.1 of this Agreement.

Section 2.5. Principal Place of Business. The Company will have its principal place of business at be 2010 Main Street, Suite 1250, Irvine, California, 92614, or at any other address within the State of California upon which the Manager or Managers agree. The Company shall maintain its principal executive offices at its principal place of business, as well as all records and documents which it is required to keep by Corporations Code § 17058.

Section 2.6. Resident Agent. The name and address of the Company's agent for service of process in the State of California are Randall K. Johnson, 100 Bayview Circle, #3200, Newport Beach, CA, 92660.

Section 2.7. Names of Members and Managers. The Members, along with their percentage of interest, and Co-Managers of the Company are:

Andrew Hanna: 100%

Section 2.8. Authorization and Purpose. Pursuant to the Beverly-Killea Limited Liability Company Act, the Members have formed this Company and, in accordance therewith, have filed Articles of Organization with the Secretary of State. The Members intend to govern the Company in accordance with the Act, the Articles, and this Agreement and to have their rights and liabilities in connection with the Company to be so determined. In the event of any conflict between the Act and the Articles and Agreement, this Agreement will control, to the extent permitted by the Act.

The purpose of the Company is to engage in any lawful business activity that is permitted by the Act.

### ARTICLE
### III.
### CAPITAL CONTRIBUTIONS AND ACCOUNTS

Section 3.1. Initial Capital Contributions. The initial Capital Contribution of each Member is $2,500. Any additional contributions will be documented pursuant to Section 3.2.

Section 3.2. Additional Contributions. No Member shall be required to make any additional contribution to the Company. However, upon agreement by Majority of Members that additional capital is desirable or necessary, any Member may, but shall not be required to, contribute additional capital to the Company on a pro rata

EXHIBIT 4 - PAGE 19

basis consistent with the Percentage Interest of each of the Members. Upon receipt of such additional contributions, the Members' capital accounts shall be adjusted accordingly.

Section 3.3. Interest Payments. No Member shall be entitled to receive interest payments in connection with any contribution of capital to the Company.

Section 3.4. Right to Return of Contributions. No Member shall be entitled to a return of any capital contributed to the Company, except as expressly provided in this Agreement in Article IX.

Section 3.5. Capital Accounts. A Capital Account shall be created and maintained by the Company for each Member, in conformance with Regulations section 1.704-1(b)(2)(iv) set forth in 26 C.F.R. § 1.704-1(b)(2)(iv), which shall reflect all Capital Contributions to the Company. Should any Member transfer or assign all or any part of his or her membership interest in accordance with this Agreement, the successor shall receive that portion of the Member's Capital Account attributable to the interest assigned or transferred.

Section 3.6. Failure of Member to Make Contribution. All Members shall make timely payment to the Company of required Capital Contributions. The failure of any Member to make such a contribution will render him or her in default under this Agreement. If a default occurs, the Managers will give the defaulting Member written notice that the default must be cured within fifteen (15) days from the date that such notice is mailed. If the defaulting Member fails to make the required Capital Contribution to the Company within the fifteen (15)-day period, the Managers may, at their sole discretion, elect to take any of the following actions:

(a) Require a Member who was to contribute property or services to contribute cash equal to the fair market value, or agreed value if stated in writing and signed by the Company and the Member, of the contribution that was not made;

(b) The Percentage Interests may be adjusted to reflect actual Capital Contributions, so that each Member's Percentage Interest may be represented by a fraction, the numerator of which consists of the Member's actual Capital Contribution and the denominator of which is the total actual Capital Contributions of all the Members;

(c) The non-defaulting Members may advance the monies owed by the defaulting Member. The monies so advanced shall be a loan due and owing from the defaulting Member to the Member or Members who advanced the monies and shall bear interest at the rate of 10% per

EXHIBIT 4 - PAGE 20

annum, payable on a monthly basis. Any cash distribution which would otherwise be made to the defaulting Member shall instead be made to the Members who advanced the funds until the obligation created thereby is satisfied. Further, the amount advanced under this provision shall be evidenced by a promissory note, due and payable within one year of the date of the advancement and any payments made thereon shall be applied first to interest and then to principal. In entering into this Agreement, each Member agrees that, upon becoming a defaulting Member, he or she grants to any Member who advances funds hereunder a security interest in his or her Membership Interest to secure the obligation to repay the funds advanced, and agrees to sign and execute the promissory note described herein as well as a security agreement and UCC-1 financing statement and any other supporting documentation as the Members who advance the funds shall reasonably request;

(d) The non-defaulting Members may elect to dissolve the Company, in which case the Company shall be duly liquidated and wound up in accordance with Article IX;

(e) The Company or the non-defaulting Members may purchase the defaulting Member's interest in accordance with the terms and conditions described in Article VII, except that the purchase price shall be seventy-five percent (75%) of that which would otherwise be paid in a purchase under Article VII;

(f) The defaulting Member shall forfeit his or her voting and approval rights under this Agreement, the Articles, and the Act, until the default is cured;

(g) The defaulting Member shall lose his or her right to receive distributions until the non-defaulting Members who advance funds to the Company shall be repaid those monies as well as a cumulative, non-compounded return thereon at the rate of ten percent (10%) per annum; or

(h) The defaulting Member shall lose his or her ability to participate, whether as Member or Manager, in the management and affairs of the Company, until the default is cured. Election by the majority of the non-defaulting Members to pursue any of the foregoing remedies shall not be deemed a waiver of or limitation on the right to pursue any other remedy available under this Agreement or at law or equity in the event of a subsequent default.

Each Member agrees that: (1) the Company and the non-defaulting Members shall incur certain costs, obligations, and damages in the event of a default by any Member, which shall be extremely difficult to ascertain; (2) the remedies described in this Section 3.6 bear a reasonable relationship to the damages that may be suffered in the event that any Member defaults in his or her obligation to make the required Capital Contribution to the

EXHIBIT 4 - PAGE 21

Company; and (3) election of any of the foregoing remedies would
not be unreasonable based on the facts and circumstances existing
as of the date that this Agreement is executed.

## ARTICLE
## IV.
## MEMBERS

Section 4.1. Limitation of Liability. No Member shall be personally
liable for the debts, obligations, liabilities, or judgments of the
Company solely by virtue of his or her Membership in the Company,
except as expressly set forth in this Agreement or required by law.

Section 4.2. Additional Members. The Managers may admit additional
Members to the Company only if approved by a two-thirds majority in
interest of the Company Membership. Additional Members shall be
permitted to participate in management at the discretion of the
Managers upon agreement by the existing Members. Likewise, the
Managers shall determine and the existing Members shall agree upon
an Additional Member's participation in "Net Profits," "Net
Losses," and distributions, as those terms are defined in Article
I. The Company records shall be amended to include the name,
present mailing address, taxpayer identification number, and
percentage ownership of any Additional Members.

Section 4.3. Withdrawal from Membership. Any Member who is under an
obligation to render services to the Company may withdraw at any
time after sixty (60) days' written notice to the Company, without
prejudice to the rights of the Company or any Member under any
contract to which the withdrawing Member is a party. Such
withdrawing Member shall have the rights of a transferee under
Article VII and the remaining Members shall be entitled to purchase
the withdrawing Member's Membership interest in accordance with
Section 7.6. In the event of such a withdrawal, the Company records
shall be amended to reflect the change in ownership interests. No
other Members are permitted to withdraw from the Company.

Section 4.4. Competing Activities. The Members and their officers,
directors, shareholders, partners, managers, agents, employees and
Affiliates are permitted to participate in other business
activities which may be in competition, direct or indirect, with
those of the Company. The Members further acknowledge that they are
under no obligation to present to the Company any business or
investment opportunities, even if the opportunities are of such a
character as to be appropriate for the Company's undertaking. Each
Member hereby waives the right to any claim against any other

EXHIBIT 4 - PAGE 22

Member or Affiliate on account of such competing activities. Provided, however, that the provisions of Section 4.4 do not apply to Members who are Managers of the Company.

Section 4.5. Compensation of Members. No Member or Affiliate shall be entitled to compensation for services rendered to the Company, absent agreement by the Members. However, Members and Affiliates shall be entitled to reimbursement for the actual cost of goods and services provided to the Company, including, without limitation, reimbursement for any professional services required to form the Company.

Section 4.6. Transactions with the Company. The Managers may permit a Member to lend money to and transact business with the Company, subject to any limitations contained in this Agreement or in the Act. To the extent permitted by applicable laws, such a Member shall be treated like any other Person with respect to transactions with the Company.

Section 4.7. Members Are Not Agents. Each of the Members of the Company has agreed to delegate the management of the Company to the Managers and, accordingly, expressly relinquishes any rights he or she might otherwise have to act on behalf of the Company, to incur liability on behalf of the Company or to bind the Company in any way. Unless authorized by the Act, this Agreement or the Members shall not act as agents of the Company.

Section 4.8. Meetings.
(a) There will be no regular or annual meetings of the Members. However, any Manager or Members with an aggregate Percentage Interest of ten percent (10%) or more may call a meeting of the Members at any time. Such meeting shall be held at a place to be agreed upon by the Managers or, if no agreement can be reached, at the Company's principal executive office. The meeting shall be held during normal business hours.
(b) The Managers shall appoint one Member to preside at the meeting and another Member to act as secretary. The secretary shall prepare minutes of the events transpiring at the meeting, which shall be maintained along with the books and records indicated in Section 8.1 at the Company's principal place of business.
(c) If any action on the part of the Members is to be proposed at the Meeting, then written notice of the meeting must be provided to each Member entitled to vote not less than ten (10) days or more than sixty (60) days prior to the meeting. Notice may be given in person, by facsimile, telegraph, or first class mail, or other written communication, charges prepaid, addressed to each Member at

EXHIBIT 4 - PAGE 23

the address listed for that Member. Notice shall be deemed complete upon personal delivery, transmission of the facsimile or telegram, or when deposited in the mail or sent in writing in some other manner. The notice shall contain the date, time, and place of the meeting and a statement of the general nature of the business to be transacted there. Matters which are not contained in the notice may not be addressed at the meeting.

(d) Any Member entitled to call a meeting may request in writing that any Manager provide the aforementioned notice to all Members entitled to vote at the meeting. If the written notice is not given by the Manager within twenty (20) days of the request, the Member may then give notice of the meeting.

(e) An affidavit of the mailing of notice shall be prepared by the Manager, Member, or other employee of the Company that actually causes written notice of the meeting to be transmitted to the Members. The affidavit shall be maintained at the Company's principal place of business, along with the books and records listed in Section 8.1.

Section 4.9. Actions at Meetings.

(a) No action may be taken at a meeting that was not proposed in the notice of the meeting, unless there is unanimous consent among all Members entitled to vote.

(b) No action may be taken at a meeting unless a quorum of Members is present, either in person or by proxy. A quorum of Members shall consist of Members holding a majority of the Percentage Interest in the Company. Once a quorum has been established at a duly held meeting, business may be regularly transacted at that meeting without adjournment, notwithstanding that the quorum is no longer present, so long as Members holding a majority of the Percentage Interest in the Company approve any action taken.

(c) A Member may participate in any meeting by conference telephone or other similar means of communication, as long as all of the participating Members are able to hear each other. A Member participating in accordance with the preceding sentence shall be deemed present at the meeting.

(d) Any meeting may be adjourned upon the vote of the majority of the Membership Interests represented at the meeting. A quorum of Members need not be present to conduct the vote. If a duly held meeting is adjourned to another time and place, no notice of the time and place of the adjourned meeting is required, if there is an announcement at the time of the adjournment of when and where the meeting is to be resumed and it is resumed within forty-five (45) days of adjournment. Notice in accordance with the provisions of Section 4.8(c) is required if a new record date for the meeting is

EXHIBIT 4 - PAGE 24

subsequently set or if the adjournment is for a period in excess of forty-five (45) days from the date of the original meeting, in which case the Managers shall set a new record date. Any business which could have been transacted at the original meeting may be transacted at the adjourned meeting.

(e) Actions taken at any meeting of the Members, regardless of where it is held or whether it is noticed and conducted in accordance with the foregoing rules, have the same force and validity as actions taken at a duly noticed and held meeting, if there is a quorum present in person or by proxy, and if, either before or after the meeting, each Member who was entitled to vote at the meeting but who was not present in person or by proxy, signs a written waiver of notice, consent to the holding of the meeting, or approval of the minutes of the meeting. A written waiver of notice need not contain a statement of the purpose of the meeting or the business to be transacted, except if it is to be given in support of an action taken at a meeting which was not stated in the notice. All such written waivers, consents, or approvals shall become part of the records of the Company and shall be maintained at the Company's principal place of business along with the books and records listed in Section 8.1.

(f) Any Member who attends a meeting shall be deemed to have waived his or her right to object to the notice of the meeting, unless the Member expresses such an objection at the commencement of the meeting. Attendance at a meeting shall not constitute a waiver of the right to object to the transaction of any business which was not disclosed in the notice of the meeting, so long as the objection is asserted at the meeting.

(g) Members who are entitled to vote at a meeting may do so in person or by authorizing another Person or Persons to act as proxy. The proxy must be in writing, executed by the Member authorizing it, and it must be filed with the Managers or secretary, if any, of the Company. A proxy will be deemed executed if the Member's name is placed on the proxy, whether manually, typed, electronically transmitted or otherwise, by the Member or his or her attorney in fact. If the proxy does not state on its face that it is irrevocable, it shall continue in full force and effect unless either (1) the Member who issued the proxy revokes it prior to the vote pursuant to the proxy by (A) delivering written notice to the Company that the proxy is revoked, (B) issuing a subsequent proxy, or (C) attending the meeting and voting in person; or (2) the Company is notified of the death or incapacity of the Member who authorized the proxy, before the vote pursuant to the proxy is counted. Notwithstanding the foregoing, no proxy shall remain in effect for more than eleven (11) months, unless the face of the proxy indicates a longer term. The revocability of any proxy which

EXHIBIT 4 - PAGE 25

states on its face that it is irrevocable will be determined in accordance with Corporations Code § 705(e), (f).

Section 4.10. Actions Without Meetings. Any action that may be taken at a meeting of the Members may be taken without a meeting and without prior notice, if written consents to the action are submitted to the Company within sixty (60) days of the record date for the taking of the action, executed by Members holding a sufficient number of votes to authorize the taking of the action at a meeting at which all Members entitled to vote thereon are present and vote. All such consents shall be submitted to the Managers or the secretary, if any, and shall be maintained as a part of the Company's records. Any Member who signs such a written consent, or the Member's proxy holders, may revoke the consent by submitting a written revocation to the Managers or secretary which is received prior to the filing with the Company of a sufficient number of written consents to authorize the taking of the action. Unless written solicitations of consent have been circulated to all Members entitled to vote: (1) notice of any action taken pursuant to submission of written consents shall immediately be given to any Member who did not submit a written consent; and (2) if the action to be taken is the dissolution or merger of the Company, such action shall not be consummated until at least ten (10) days after notice is received by each Member who has not consented in writing to the action.

Section 4.11. Record Date. To enable the Company to determine the Members entitled to receive notice of any meeting, to vote, to receive distributions, to exercise any rights with regard to distributions, or to exercise any other lawful right granted by this Agreement, the Articles, or the Act, the Managers or Members representing in excess of ten percent (10%) of the Percentage Interests in the Company may fix, in advance, a record date that is not more than sixty (60) or less than ten (10) days prior to the date of such meeting or more than sixty (60) days prior to any other action. If no record date is fixed, the record date shall be determined in accordance with Corporations Code § 17104(k).

Section 4.12. Voting Rights. Except as expressly provided in the Articles or in this Agreement, Members shall have no voting, approval, or consent rights. Members shall have the right to approve or disapprove matters as stated in the Articles and in this Agreement, including, without limitation, the following actions:

    (a) The following actions shall require the unanimous vote, approval, or consent of all Members who are neither the subjects of a dissolution event nor the transferors of a Membership Interest:

EXHIBIT 4 - PAGE 26

     (1) approval of the purchase by the Company or its nominee of the Membership Interest of a transferor Member in accordance with Section 7.3;

     (2) approval of the sale, transfer, exchange, assignment, or other disposition of a Member's interest in the Company, and admission of the transferee as a Member pursuant to Section 7.1;

     (3) a decision to make any amendment to the Articles or to this Agreement, in accordance with Section 11.13; and

     (4) a decision to compromise the obligation of any Member to make a Capital Contribution or return money or property distributed in violation of the Act.

(b) Except as set forth in Section 5.4, all other matters requiring the vote, approval, or consent of the Members may be authorized upon the vote, approval, or consent of those Members holding a majority of the Percentage Interests in the Company.

**ARTICLE**

**V.**

**MANAGEMENT**

Section 5.1. Exclusive Management. The Company shall be managed by the Managers. The Managers shall have exclusive authority, discretion, power, and control to manage the property, business and affairs of the Company, and to make all decisions and perform all services incident to the management thereof, except as otherwise provided in this Agreement or the Act.

Section 5.2. Time Commitments. The Managers shall devote the time, effort, and skill that they reasonably believe is necessary to conduct the affairs of the Company and to attend to all matters concomitant to the business of the Company. The Managers are not required to devote all of their time or efforts to the operation of the Company.

Section 5.3. Management Powers. Subject to the express limitations contained in Section 5.4 and elsewhere in this Agreement or in the Articles, the Managers shall have all powers necessary to carry out the purposes of and to manage the business, property, and affairs of the Company, including, without limitation, the powers enumerated in Corporations Code § 17003, including the power to:

     (a) acquire, purchase, alter, renovate, improve, demolish, rebuild, replace, and hold real property and any other property or assets or to acquire options to purchase such property or assets, wherever located, that the Managers determine to be in the furtherance of the Company's business or in the best interests of the Company;

EXHIBIT 4 - PAGE 27

(b) make contracts and guarantees, incur liabilities, act as surety, borrow money, issue evidences of indebtedness in connection therewith, refinance, increase the amount of, modify, amend, or change the terms of, and extend the time for payment of any indebtedness or obligation of the Company; and secure such indebtedness with a lien on Company assets, such as a mortgage, deed of trust, pledge, or security interest;

(c) sell, lease, exchange, transfer, convey, mortgage, pledge, and otherwise dispose of all or any part of the Company's property and assets, or any interest therein;

(d) lend money to the Company and otherwise assist its members and employees;

(e) purchase, take, receive, subscribe for, or otherwise acquire, own, hold, vote, use, employ, sell, mortgage, loan, pledge, or otherwise dispose of and otherwise use and deal in and with stock or other interests in and obligations of any person, or direct or indirect obligations of the United States or of any government, state, territory, governmental district, or municipality, or of any instrumentality of any of them;

(f) be a promoter, stockholder, partner, member, manager, associate, or agent of any person;

(g) indemnify or hold harmless any person or guarantee the payment of money or the performance of any contract or obligation of any person;

(h) sue on, defend, or compromise any claim or liability in favor of or against the Company or submit any such claim to arbitration or other alternative means of dispute resolution or confess a judgment against the Company in connection with any litigation with which the Company is involved; and

(i) retain auditors, legal counsel, and such other professional services as the Company may require and determine the appropriate compensation for the same.

Section 5.4. Limitations on Powers. The Managers shall not be authorized to permit the Company to perform the following acts or to engage in the following transactions without first obtaining the affirmative vote or written consent of Members holding a Majority Interest or such greater Percentage Interest as may be indicated below:

(a) the sale or other disposition of all or a substantial part of the Company's assets, whether occurring as a part of a single transaction or a series of transactions over a 12-month period, except if the same is part of the orderly liquidation and winding up of the Company's affairs upon the duly authorized dissolution of the Company, shall require the affirmative vote or written consent of Members holding at least 100% of the Percentage Interests in the

EXHIBIT 4 - PAGE 28

Company;

(b) the merger of the Company with another limited liability company or limited partnership shall require the affirmative vote or the written consent of Members holding at least [percentage]% of the Percentage Interests in the Company, provided that no Member may be required to become a general partner in the merged entity absent his or her express written consent thereto;

(c) the merger of the Company with a corporation, a general partnership, or other Person shall require the affirmative vote or written consent of all Members;

(d) any alteration of the primary purpose or business of the Company as set forth in Section 2.8 shall require the affirmative vote or written consent of Members holding at least [percentage]% of the Percentage Interests in the Company;

(e) the establishment of different classes of Members;

(f) transactions between the Company and one or more Members or Managers or one or more of any Member's or Manager's Affiliates, or transactions in which one or more Members, Managers, or Affiliates thereof have a material financial interest;

(g) without limiting subsection (f) of this section, the lending of money to any Member, Manager, or Affiliate of either;

(h) any act which would prevent the Company from conducting its duly authorized business;

(i) the confession of a judgment against the Company;

(j) the filing of a petition under Title 11 of the United States Code on behalf of the Company; and

(k) any other act or transaction for which the consent of the Members is required, either in this Agreement or under the Act.

Notwithstanding any other provision of this Agreement, the written consent of all of the Managers is required to permit the Company to incur an indebtedness or obligation greater than $5,000. All checks, drafts, or other instruments requiring the Company to make payment of an amount less than $5,000 may be signed by any Manager, acting alone. Any check, draft, or other instrument requiring the Company to make payment in the amount of $5,000 or more shall require the signatures of all Managers acting together. Any Manager, acting alone, may endorse checks, drafts, or other evidence of indebtedness to the Company, but only for deposit into one of the Company's accounts.

Section 5.5. Meetings. Any Manager may call a meeting of the Managers upon four (4) days' notice by mail or forty-eight (48) hours' notice delivered personally, by facsimile, telephone, or telegraph. The notice need not indicate the purpose for which the meeting is called.

EXHIBIT 4 - PAGE 29

(a) Notice of a meeting need not be given to any Manager who executes a waiver of notice or a consent to the holding of the meeting, whether before or after the meeting, or who attends the meeting without objecting to the lack of notice prior to the commencement thereof or who approves the minutes of the meeting. All such waivers, consents, or approvals shall be filed with the Company and be made a part of the minutes of the meeting, but they need not indicate the purpose for which the meeting was called.

(b) A majority of the Managers present at the meeting, whether or not they constitute a quorum, may adjourn any meeting to another time and place. If the adjournment is for a period greater than twenty-four (24) hours, notice of the adjourned time and place shall be given prior to the time of the adjourned meeting to any Manager who was not present when the meeting was adjourned.

(c) Meetings of the Managers may be held at any place specified in the notice of the meeting, whether within or without the State of California. If the notice does not designate a meeting place, then the meeting shall be held at any place agreed upon by the Managers or at the principal executive office of the Company.

(d) A Manager may participate in any meeting by conference telephone or other similar means of communication, as long as all of the participating Managers are able to hear each other. A Manager participating in accordance with the preceding sentence shall be deemed present at the meeting.

(e) A majority of the authorized number of Managers constitutes a quorum of Managers for the transaction of business. Unless the Articles or this Agreement expressly require the approval of all Managers, every act performed or decision made by a majority of the Managers present at a duly held meeting, at which a quorum is present, is the act or decision of the Managers. The Managers may continue to transact business at a meeting at which a quorum was initially present, notwithstanding that one or more Managers depart, as long as any action taken is approved by at least a majority of the required quorum for the meeting.

(f) The decision to have a meeting is solely that of the Managers. The provisions of this Section 5.5 govern the procedures for conducting a meeting, should the managers, in their sole discretion, elect to hold a meeting. Nothing in this Section 5.5 is intended to create a requirement that meetings be held, as the Members expressly intend that meetings of the Managers are not required.

Section 5.6. Actions Without Meetings. Any action required or permitted to be taken by the Managers may be taken without a meeting, if a majority of the Managers individually or collectively consent in writing to the taking of the action, except in such

EXHIBIT 4 - PAGE 30

cases where the Articles or this Agreement require the unanimous consent of the Managers, in which case all Managers must execute written consents. Any action taken by written consent shall have the same force and effect as an action taken by a vote of the Managers.

Section 5.7. Election and Removal of Manager.

(a) The Company shall initially have two Managers. The Company may, from time to time, fix the number of Managers that it shall have, upon the affirmative vote or written consent of a Majority Interest of the Members. However, the Company may not have less than one (1) Manager at any time. Should the Members elect to increase the number of Managers to more than one or to reduce it from more than one to one, the Articles shall be amended to so indicate.

(1) Unless a Manager resigns or is removed, each Manager shall serve until a successor has been elected and qualified to serve.

(2) The Managers shall be elected by the affirmative vote or written consent of a Majority Interest of the Members.

(3) A Manager may, but need not, be a Member. The Managers need not be individuals, residents of the State of California, or citizens of the United States.

(b) A Manager may be removed at any time, with or without cause, upon the affirmative vote of Members holding a Majority Interest at a meeting expressly called for the purpose of such a vote. The removal shall be without prejudice to the rights, if any, of the Manager under any employment contract with the Company. If the Manager is a Member, his or her removal shall not affect any rights he or she has as a Member, nor shall it constitute a withdrawal from Membership.

(c) A Manager may resign at any time by providing written notice to each Member and the Company and remaining Managers. The resignation shall be effective immediately upon receipt of the notice, unless a later time is specified in the notice. Acceptance of the resignation is not required to make it effective, unless the notice provides otherwise. The resignation shall be without prejudice to the rights, if any, of the Company under any contract with the Manager. If the Manager is a Member, his or her resignation shall not affect any rights he or she has as a Member, nor shall it constitute a withdrawal from Membership.

(d) A vacancy shall exist if any Manager is removed, resigns, or dies, if there is an increase in the number of authorized positions or if the Members fail to elect a sufficient number of Managers to fill the authorized positions. If a vacancy occurs, it may be filled by the affirmative vote or written consent of Members

EXHIBIT 4 - PAGE 31

holding a Majority Interest.

Section 5.8. Liability for Performance of Duties; Duty of Care.
 (a) The Managers shall perform their managerial duties in good
faith, in a manner that they reasonably believe to be in the best
interests of the Company and its Members, and with such care,
including reasonable inquiry, as an ordinarily prudent person in
the same position would exercise in similar circumstances. A
Manager who so performs the duties of Manager shall not incur any
liability to the Company by reason of being or having been a
Manager of the Company.
 (b) In performing their duties, the Managers shall be entitled
to rely upon information, reports, opinions, or statements made by
or received from the following Persons or groups, unless the
Managers are in the possession of information regarding the matter
in question sufficient to render such reliance unwarranted and
provided that the Managers act in good faith and after a reasonable
inquiry when the need therefore is indicated by the circumstances:
 (1) Any officer, employee, or other agent of the Company
whom the Managers reasonably believe to be trustworthy and
competent regarding the matters presented;
 (2) Any attorney, independent accountant, or other
professional with regard to matters which the Managers reasonably
believe to be within such person's area of expertise or competence;
or
 (3) Any committee upon which the Manager does not serve,
duly created in accordance with the provisions of this Agreement or
the Articles, as to matters within its designated authority, which
committee the Managers reasonably believe to be competent regarding
the matters within the ambit of its authority.

Section 5.9. Duty of Loyalty. Subject to the provisions of Section
5.10, Managers owe the same duty of loyalty to the Company and the
Members that a partner owes to the partnership and the partners of
the partnership.

Section 5.10. Transactions Between Company and Manager. Any Manager
or Affiliate of a Manager may engage in transactions with the
Company, notwithstanding that such transactions may constitute a
conflict of interest, as long as the transaction is not expressly
prohibited by this Agreement or the Act and both of the following
conditions are met:
 (a) The terms and conditions of the transaction are fair and
reasonable to the Company and are at least as favorable as those
that are generally available from Persons capable of providing the
same or similar services and those between parties operating at

EXHIBIT 4 - PAGE 32

arms length; and

(b) A majority of the Members having no interest in the transaction (other than their interest as Members) vote in favor of consummating the transaction.

Section 5.11. Compensation. Except as specified in this Agreement, no Manager or Affiliate of a Manager is entitled to compensation for services performed for or goods provided to the Company. The Managers and their Affiliates shall receive the following payments:

(a) The Company shall pay the Managers a monthly fee for services rendered in connection with the management of the Company if agreed by a unanimous vote of the Members. The fee may be changed from time to time by the affirmative vote or written consent of the majority of the Members who are not Managers. The fact that a Manager is also a Member shall have no effect on his or her entitlement to the aforementioned monthly fee.

(b) In the event that a Manager or Affiliate renders services or provides goods to the Company which he or she would not be required to provide without charge as a Manager, the Company shall pay the Manager or Affiliate for those services or goods, but only to the extent that the payment would not exceed that which would be charged by an independent, capable third party willing to render those services or to provide those goods.

(c) The Company shall reimburse the Managers for the actual costs of goods used by or on behalf of the Company. [A/Any] Manager who incurs expenses for professional services required in connection with the formation of the Company and preparation of appropriate documentation shall be reimbursed for such expenses.

(d) The Company shall not provide reimbursement for the following expenses, except where permitted by this Agreement:

(1) overhead expenses of the Managers, including but not limited to rent and general office expenses;

(2) salaries, compensation, fringe benefits, and other payments to employees, officers, and directors of [a/the] Manager or Affiliates; and

(3) the cost of providing any goods or rendering any services for which a Manager or Affiliate is entitled to compensation under this Agreement.

Section 5.12. Limitation on Exposing Members to Personal Liability. Neither the Company nor the Managers nor any Member may take any action which will have the effect of exposing any Member of the Company to personal liability for the obligations of the Company, without first obtaining the consent of the affected Member.

Section 5.13. Limitations on Manager's Liability. No Person who is

EXHIBIT 4 - PAGE 33

a Manager shall be personally liable under any judgment of a court, or in any other manner, for any debt, obligation, or liability of the Company, whether that liability or obligation arises in contract, tort, or otherwise, solely by reason of being a Manager of the Company.

Section 5.14. Membership Interests of Manager. A Manager who holds a Membership Interest shall be entitled to all of the rights and privileges of a Member who is not a Manager, including without limitation the economic, voting, information, and inspection rights, unless otherwise provided in this Agreement.

**ARTICLE
VI.
ALLOCATION OF PROFIT AND LOSS**

Section 6.1. Compliance with the Code and Regulations. The Company intends to comply with the Code and all applicable Regulations, including without limitation the minimum gain chargeback requirements, and intends that the provisions of this Article be interpreted consistently with that intent.

Section 6.2. Net Profits. Except as specifically provided elsewhere in this Agreement, Distributions of Net Profit shall be made to Members in proportion to their Percentage Interest in the Company.

Section 6.3. Net Losses. Except as specifically provided elsewhere in this Agreement, Net Losses shall be allocated to the Members in proportion to their Percentage Interest in the Company. However, the foregoing will not apply to the extent that it would result in a Negative Capital Account balance for any Member equal to the Company Minimum Gain which would be realized by that Member in the event of a foreclosure of the Company's assets. Any Net Loss which is not allocated in accordance with the foregoing provision shall be allocated to other Members who are unaffected by that provision. When subsequent allocations of profit and loss are calculated, the losses reallocated pursuant to this provision shall be taken into account such that the net amount of the allocation shall be as close as possible to that which would have been allocated to each Member if the reallocation pursuant to this section had not taken place.

Section 6.4. Regulatory Allocations. Notwithstanding the provisions of Section 6.3, the following applies:
    (a) Should there be a net decrease in Company Minimum Gain in any taxable year, the Managers shall specially allocate to each

EXHIBIT 4 - PAGE 34

Member items of income and gain for that year (and, if necessary, for subsequent years) as required by the Regulations governing "minimum gain chargeback" requirements, section 1.704-2(f) [26 C.F.R. § 1.704-2(f)] prior to making any other allocations.

(b) Should there be a net decrease in Company Minimum Gain based on a Member Nonrecourse Debt in any taxable year, the Managers shall first determine the extent of each Member's share of the Company Minimum Gain attributable to Member Nonrecourse Debt in accordance with Regulations section 1.704-2(i)(5) [26 C.F.R. § 1.704-2(i)(5)]. The Managers shall then specially allocate items of income and gain for that year (and, if necessary, for subsequent years) in accordance with Regulations section 1.704-2(i)(4) [26 C.F.R. § 1.704-2(i)(4)] to each Member who has a share of the Company Nonrecourse Debt Minimum Gain.

(c) The Managers shall allocate nonrecourse deductions for any taxable year to each Member in proportion to his or her Percentage Interest.

(d) The Managers shall allocate Member Nonrecourse Deductions for any taxable year to the Member who bears the risk of loss with respect to the nonrecourse debt to which the Member Nonrecourse Deduction is attributable, as provided in Regulations section 1.704-2(i) [26 C.F.R. § 1.704-2(i)].

(e) If a Member unexpectedly receives any allocation of loss or deduction, or item thereof, or distributions which result in the Member's having a Negative Capital Account balance at the end of the taxable year greater than the Member's share of Company Minimum Gain, the Company shall specially allocate items of income and gain to that Member in a manner designed to eliminate the excess Negative Capital Account balance as rapidly as possible. Any allocations made in accordance with this provision shall be taken into consideration in determining subsequent allocations under Article VI, so that, to the extent possible, the total amount allocated in this and subsequent allocations equals that which would have been allocated had there been no unexpected adjustments, allocations, and distributions and no allocation pursuant to Section 6.4(e).

(f) In accordance with Code section 704(c) [26 U.S.C.A. § 704(c)] and the Regulations promulgated pursuant thereto, and notwithstanding any other provision in this Article, income, gain, loss, and deductions with respect to any property contributed to the Company shall, solely for tax purposes, be allocated among Members taking into account any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value on the date of contribution. Allocations pursuant to this subsection are made solely for federal, state, and local taxes and shall not be taken into

EXHIBIT 4 - PAGE 35

consideration in determining a Member's Capital Account or share of Net Profits or Net Losses or any other items subject to Distribution under this Agreement.

Section 6.5. Distributions. The Managers may elect, by unanimous vote, to make a Distribution of assets at any time that would not be prohibited under the Act or under this Agreement. Such a Distribution shall be made in proportion to the unreturned capital contributions of each Member until all contributions have been paid, and thereafter in proportion to each Member's Percentage Interest in the Company. All such distributions shall be made to those Persons who, according to the books and records of the Company, were the holders of record of Membership Interests on the date of the distribution. Subject to Section 6.6, neither the Company nor [any/the] Manager shall be liable for the making of any distributions in accordance with the provisions of this section.

Section 6.6. Limitations on Distributions.

(a) The Managers shall not make any distribution if, after giving effect to the distribution:

(1) the Company would not be able to pay its debts as they become due in the usual course of business; or

(2) the Company's total assets would be less than the sum of its total liabilities plus, unless this Agreement provides otherwise, the amount that would be needed, if the Company were to be dissolved at the time of distribution, to satisfy the preferential rights of other Members upon dissolution that are superior to the rights of the Member receiving the distribution.

(b) The Managers may base a determination that a distribution is not prohibited under this section on any of the following:

(1) financial statements prepared on the basis of accounting practices and principles that are reasonable under the circumstances;

(2) a fair valuation; or

(3) any other method that is reasonable under the circumstances.

(c) Except as provided in Corporations Code § 17254(e), the effect of a distribution under this section is measured as of the date the distribution is authorized if the payment occurs within 120 days after the date of authorization, or the date payment is made if it occurs more than 120 days after the date of authorization.

(d) A Member or Manager who votes for a distribution in violation of this Agreement or the Act is personally liable to the Company for the amount of the distribution that exceeds what could have been distributed without violating this Agreement or the Act,

EXHIBIT 4 - PAGE 36

if it is established that the Member or Manager did not act in compliance with this section or Section 6.5 or Section 9.3.

Section 6.7. Return of Distributions. Members shall return to the Company any distributions received which are in violation of this Agreement or the Act. Such distributions shall be returned to the account or accounts of the Company from which they were taken in order to make the distribution. If a distribution is made in compliance with the Act and this Agreement, a Member is under no obligation to return it to the Company or to pay the amount of the distribution for the account of the Company or to any creditor of the Company.

Section 6.8. Members Bound by These Provisions. The Members understand and acknowledge the tax ramifications of the provisions of this Article of the Agreement and agree to be bound by these provisions in reporting items of income and loss relating to the Company on their federal and state income tax returns.

## ARTICLE
## VII.
### TRANSFERS AND TERMINATIONS OF MEMBERSHIP INTERESTS

Section 7.1. Restriction on Transferability of Membership Interests. A Member may not transfer, assign, encumber, or convey all or any part of his or her Membership interest in the Company, except as provided herein. In entering into this Agreement, each of the Members acknowledges the reasonableness of this restriction, which is intended to further the purposes of the Company and the relationships among the Members.

Section 7.2. Permitted Transfers. In order to be permitted, a transfer or assignment of all or any part of a Membership interest must have the approval of all of the Members of the Company. Each Member, in his or her sole discretion, may proffer or withhold approval. In addition, the following conditions must be met:

(a) the transferee must provide a written agreement, satisfactory to the Members, to be bound by all of the provisions of this Agreement;

(b) the transferee must provide the Company with his or her taxpayer identification number and initial tax basis in the transferred interest;

(c) the transferee must pay the reasonable expenses incurred in connection with his or her admission to Membership;

(d) the transfer must be in compliance with all federal and state securities laws;

EXHIBIT 4 - PAGE 37

(e) the transfer must not result in the termination of the Company pursuant to Code section 708 [26 U.S.C.A. § 708];

(f) the transfer must not render the Company subject to the Investment Company Act of 1940, as amended as set forth in 15 U.S.C.A. §§ 80a-1; and

(g) the transferor must comply with the provisions of Section 7.3.

Section 7.3. Company's Right to Purchase Transferor's Interest. Any Member who wishes to transfer all or any part of his or her interest in the Company shall immediately provide the Company with written notice of his or her intention. The notice shall fully describe the nature of the interest to be transferred. Thereafter, the Company, or its nominee, shall have the option to purchase the transferor's interest at a price equal to the amount that the transferor would receive if the Company were liquidated as of the date of the proposed transfer and an amount equal to the agreed or appraised value of the Company was available for distribution to the Members, in accordance with Section 9.3.

(a) The option provided to the Company shall be irrevocable and shall remain open for thirty (30) days from the date that notice is given, except that if notice is given by regular mail, the option shall remain open for thirty-five (35) days from the date that notice is given to the Company.

(b) At any time while the option remains open, the Company (or its nominee) may elect to exercise the option and purchase the transferor's interest in the Company. The transferor Member shall not vote on the question of whether the Company should exercise its option.

(c) If the Company chooses to exercise its option to purchase the transferor's interest, it shall provide written notice to the transferor within the option period. The notice shall specify a closing date for the purchase, which shall occur within thirty (30) days of the expiration of the option period. On the closing date, the transferor shall be paid in cash the purchase price and shall deliver an instrument of title, free of any encumbrances and containing warranties of title, conveying his or her interest in the Company.

(d) If the Company declines to exercise its option to purchase the transferor Member's interest, the transferor Member may then transfer his or her interest in accordance with Section 7.2. Any transfer not in compliance with the provisions of Section 7.2 shall be null and void and have no force or effect.

Section 7.4. Occurrence of Dissolution Event. Upon the death, withdrawal, resignation, retirement, expulsion, insanity,

EXHIBIT 4 - PAGE 38

bankruptcy, or dissolution of any Member (a Dissolution Event), the Company shall be dissolved, unless all of the Remaining Members elect unanimously within ninety (90) days thereafter to continue the operation of the business. In the event that the Remaining Members so agree, the Company and the Remaining Members shall have the right to purchase the interest of the Member whose actions caused the occurrence of the Dissolution Event. The interest shall be sold in the manner described in Section 7.6.

Section 7.5. Withdrawal from Membership. Notwithstanding Section 7.4, in the event that a Member withdraws in accordance with Section 4.3, and such withdrawal does not result in the dissolution of the Company, the Company and the Remaining Members shall have the right to purchase the interest of the withdrawing Member in the manner described in Section 7.6.

Section 7.6. Purchase of Interest of Departing Member. The purchase price of a Departing Member's interest shall be determined in accordance with the procedure provided in Section 7.3.

(a) Once a value has been determined, each Remaining Member shall be entitled to purchase that portion of the Departing Member's interest that corresponds to his or her percentage ownership of the Percentage Interests of those Members electing to purchase a portion of the Departing Member's interest in the Company.

(b) Each Remaining Member desiring to purchase a share of the Departing Member's interest shall have thirty (30) days to provide written notice to the Company of his or her intention to do so. The failure to provide notice shall be deemed a rejection of the opportunity to purchase the departing Member's interest.

(c) If any Member elects not to purchase all of the Departing Member's interest to which he or she is entitled, the other Members may purchase that portion of the Departing Member's interest. Any interest which is not purchased by the Remaining Members may be purchased by the Company.

(d) The Managers shall assign a closing date within sixty (60) days after the Members' election to purchase is completed. At that time, the Departing Member shall deliver to the Managers and the Remaining Members an instrument of title, free of any encumbrances and containing warranties of title, duly conveying his or her interest in the Company and, in return, he or she shall be paid the purchase price for his or her interest in cash. The Departing Member, the Managers and the Remaining Members shall perform all acts reasonably necessary to consummate the transaction in accordance with this Agreement.

EXHIBIT 4 - PAGE 39

Section 7.7. No Release of Liability. Any Member or Departing Member whose interest in the Company is sold pursuant to Article VII is not relieved thereby of any liability he or she may owe the Company.

## ARTICLE VIII.
### BOOKS, RECORDS, AND REPORTING

Section 8.1. Books and Records. The Managers shall maintain at the Company's principal place of business the following books and records:

(a) a current list of the full name and last known business or residence address of each Member and Manager set forth in alphabetical order, together with the Capital Contribution, Capital Account, and Membership Interest of each Member;

(b) a copy of the Articles and all amendments thereto, together with executed copies of any powers of attorney pursuant to which the Articles or any amendments thereto were executed;

(c) copies of the Company's federal, state, and local income tax or information returns and reports, if any, for the six (6) most recent taxable years;

(d) a copy of this Agreement and any amendments hereto, together with executed copies of any powers of attorney pursuant to which this Agreement or any amendments hereto were executed;

(e) copies of the Company's financial statements, if any, for the six (6) most recent fiscal years;

(f) the books and records of the Company as they relate to its internal affairs for at least the current and past four (4) fiscal years; and

(g) true and correct copies of all relevant documents and records indicating the amount, cost and value of all of the property and assets of the Company.

Section 8.2. Accounting Methods. The books and records of the Company shall be maintained in accordance with the accounting methods utilized for federal income tax purposes.

Section 8.3. Reports. The Managers shall cause to be prepared and filed in a timely manner all reports and documents required by any governmental agency. The Managers shall cause to be prepared at least annually all information concerning the Company's operations that is required by the Members for the preparation of their federal and state tax returns. The Managers shall send to each Member within ninety (90) days of the conclusion of the taxable year:

EXHIBIT 4 - PAGE 40

(a) all information concerning the Company's operations necessary to the preparation of the Member's individual federal and state income tax or information returns;

(b) a copy of the Company's federal, state, and local income tax or information returns for the taxable year, if the Company has thirty-five (35) or fewer Members; and

(c) an annual report containing a balance sheet as of the end of the fiscal year as well as an income statement and statement of changes in financial position, accompanied by the report thereon, if any, of the independent accountant engaged by the Company, or, if there is no report, a signed certificate from the Managers that the financial statements were prepared from the unaudited books and records of the Company, if the Company has more than thirty-five (35) Members.

Section 8.4. Inspection Rights. For purposes reasonably related to their interests in the Company, all Members shall have the right to inspect and copy the books and records of the Company during normal business hours, upon reasonable request. The Managers shall provide Members with copies of all Company records and documents to which Members are entitled under Corporations Code § 17106(a).

Section 8.5. Bank Accounts. The Managers shall maintain all of the funds of the Company in a bank account or accounts in the name of the Company, at a depository institution or institutions to be determined by the majority of the Managers. The Managers shall not permit the funds of the Company to be commingled in any manner with the funds or accounts of any other Person. The Managers shall have the powers enumerated in Section 5.4 with respect to endorsing, signing, and negotiating checks, drafts, or other evidence of indebtedness to the Company or obligating the Company to pay money to a third party.

**ARTICLE
IX.
DISSOLUTION, LIQUIDATION, AND WINDING UP**

Section 9.1. Conditions Under Which Dissolution Shall Occur. The Company shall dissolve and its affairs shall be wound up upon the happening of the first to occur of the following:

(a) at the time specified in the Articles;

(b) upon the happening of a Dissolution Event, and the failure of the Remaining Members to elect to continue, in accordance with Section 7.4;

(c) upon the vote of all of the Members to dissolve;

(d) upon the entry of a decree of judicial dissolution

EXHIBIT 4 - PAGE 41

pursuant to California Corporations Code § 17351;

(e) upon the happening of any event specified in the Articles as causing or requiring dissolution; or

(f) upon the sale of all or substantially all of the Company's assets.

Section 9.2. Winding Up and Dissolution. If the Company is dissolved, the Managers shall wind up its affairs, including the selling of all of the Company's assets and the provision of written notification to all of the Company's creditors of the commencement of dissolution proceedings.

Section 9.3. Order of Payment. After determining that all known debts and liabilities of the Company in the process of winding up have been paid or provided for, including, without limitation, debts and liabilities to Members or Managers who are creditors of the Company, the Managers shall distribute the remaining assets among the Members in accordance with their Positive Capital Account balances, after taking into consideration the profit and loss allocations made pursuant to Section 6.4. Members shall not be required to restore Negative Capital Account Balances.

Section 9.4. Members' Receipt of Payment. Except as otherwise provided in this Agreement or by the Act, the Members are entitled to payment of their Capital Account balances only from the Company and are not entitled to recover their Positive Capital Account balance or share of Net Profits from any individual Member or Manager, except as provided in Article X.

Section 9.5. Certificates to Be Filed. Upon the dissolution of the Company, the Managers shall file a Certificate of Dissolution with the Secretary of State. After the winding up of the Company's affairs has been completed, the Managers shall file a Certificate of Cancellation of the Articles of Organization with the Secretary of State.

**ARTICLE
X.**

**INDEMNIFICATION OF AGENTS**

The Company shall indemnify any Member or Manager and may indemnify any Person to the fullest extent permitted by law on the date such indemnification is requested for any judgments, settlements, penalties, fines, or expenses of any kind incurred as a result of that Person's performance in the capacity of Member, Manager, officer, employee, or agent of the Company, as long as the Member, Manager, or Person did not behave in violation of Sections 5.8 and

EXHIBIT 4 - PAGE 42

5.9.

## ARTICLE
## XI.
## MISCELLANEOUS PROVISIONS

Section 11.1. Assurances. Each Member shall execute all documents and certificates and perform all acts deemed appropriate by the Managers and the Company or required by this Agreement or the Act in connection with the formation and operation of the Company and the acquisition, holding, or operation of any property by the Company.

Section 11.2. Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of the agreement among the Members with respect to the matters discussed herein and therein and they supersede all prior written or oral statements among the Members, including any prior statement, warranty, or representation.

Section 11.3. Section Headings. The section headings which appear throughout this Agreement are provided for convenience only and are not intended to define or limit the scope of this Agreement or the intent or subject matter of its provisions.

Section 11.4. Binding Effect. Subject to the provisions of this Agreement relating to the transferability of Membership interests, this Agreement is binding upon and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors, and assigns.

Section 11.5. Interpretation. All pronouns and common nouns shall be deemed to refer to the masculine, feminine, neuter, singular, and plural, as the context may require. In the event that any claim is made by any Member relating to the drafting and interpretation of this Agreement, no presumption, inference, or burden of proof or persuasion shall be created or implied solely by virtue of the fact that this Agreement was drafted by or at the behest of a particular Member or his or her counsel.

Section 11.6. Company Counsel. Company counsel may also be counsel to any Member, Manager, or Affiliate of a Member or Manager, if a majority of the Members who are not individually represented by such counsel agree. The Members may execute on behalf of the Members and the Company any written consents to such representation as may be required by the California Rules of Professional Conduct or the rules governing professional conduct in other jurisdictions.

EXHIBIT 4 - PAGE 43

Randall Johnson of Johnson & Associates has been initially selected to serve as Company counsel. The Members expressly acknowledge that Randall Johnson does not represent any Member, Manager, or Affiliate of a Member or Manager, unless they have approved such representation and an express written agreement regarding such representation has been provided to them. The Members acknowledge and agree that Company counsel owes them no direct duties and that Company counsel's duties shall be owed to the Company and to any Member or Manager or Affiliate of a Member or Manager which he or she represents individually.

Section 11.7. Applicable Law. Each Member agrees that all disputes arising under or in connection with this Agreement and any transactions contemplated by this Agreement shall be governed by the internal law, and not the law of conflicts, of the State of California.

Section 11.8. Jurisdiction and Venue. Each Member agrees to submit to the exclusive jurisdiction of the federal and state courts of the State of California in any action arising out of a dispute under or in connection with this Agreement or any transaction contemplated by this Agreement. Each Member further agrees that personal jurisdiction may be effected upon him or her by service of process by registered or certified mail, and that when service is so made, it shall be as if personal service was effected within the State of California.

Section 11.9. Specific Performance. The Members acknowledge and agree that irreparable injury shall result from a breach of this Agreement and that money damages will not adequately compensate the injured party. Accordingly, in the event of a breach or a threatened breach of this Agreement, any party who may be injured shall be entitled, in addition to any other remedy which may be available, to injunctive relief to prevent or to correct the breach.

Section 11.10. Arbitration. Except as otherwise provided in this Agreement, any dispute arising out of this Agreement shall be submitted to the American Arbitration Association for resolution. The arbitration shall be scheduled to take place in [location selected for arbitration], California, and all of the fees and costs of the arbitration shall be shared equally by the parties. Attorney fees may be awarded to the prevailing party at the discretion of the arbitrator, but the arbitrator shall have no power to alter or amend this Agreement or to award any relief inconsistent with the provisions herein or unavailable in a court

EXHIBIT 4 - PAGE 44

of law.

Section 11.11. Remedies Cumulative. The remedies described in this Agreement are cumulative and shall not eliminate any other remedy to which a Person may be lawfully entitled.

Section 11.12. Notices. Any notice or other writing to be served upon the Company or any Member thereof in connection with this Agreement shall be in writing and shall be deemed completed when delivered to the address specified in the books and records of the Company, if to a Member, and to the resident agent, if to the Company. Any Member shall have the right to change the address at which notices shall be served upon ten (10) days' written notice to the Company and the other Members.

Section 11.13. Amendments. Any amendments, modifications, or alterations to this Agreement or the Articles must be in writing and signed by all of the Members.

Section 11.14. Severability. Each provision of this Agreement is severable from the other provisions. If, for any reason, any provision of this Agreement is declared invalid or contrary to existing law, the inoperability of that provision shall have no effect on the remaining provisions of the Agreement which shall continue in full force and effect.

Section 11.15. Counterparts. This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which shall, when taken together, constitute a single document.

IN WITNESS WHEREOF, all of the Members of Global Premier America, LLC, a California Limited Liability Company, have executed or caused to be executed this Agreement, effective as of the date set forth at the commencement of the document.

_____
Andrew Hanna

EXHIBIT 4 - PAGE 45

EXHIBIT 5

**RECORDING REQUESTED BY:**
Blackhawk Solar LLC
2549 Eastbluff Drive, #720
Newport Beach, CA 92660

When recorded mail to:
Blackhawk Solar LLC
2549 Eastbluff Drive, #720
Newport Beach, CA 92660

Loan # 7000273600

APN # 221-0-063-185

# GRANT DEED IN LIEU OF FORECLOSURE

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

JKO Group, LLC, an affiliate of the Grantee herein was the Beneficiary
The amount of the unpaid debt, together with cost, as of June 30, 2023 was **$30,489,629.27**
The amount paid by the grantee over and above the unpaid debt was **$0.00**
The documentary transfer tax is **$0.00**
Said property is in ( ) Unincorporated area  (X) City of **Oxnard, County of Ventura, State of California**
Tax Parcel Number: **221-0-063-185**

For valuable consideration, receipt of which is hereby acknowledged, **GLOBAL PREMIER REGENCY PALMS OXNARD, LP, a California limited partnership ("Global")**, hereby grants to **BLACKHAWK SOLAR LLC, a Delaware limited liability company**, the following described real property in the city of **OXNARD**, County of **Ventura**, State of **California**, and described as the following:

LOTS 20 TO 27 INCLUSIVE, OF TRACT NO. 1570-1, IN THE CITY OF OXNARD, COUNTY OF VENTURA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 43 PAGES 57, 58 AND 59 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID COUNTY.

EXCEPT ALL OF THE OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERALS IN AND UNDER SAID LAND, WITHOUT HOWEVER, ANY RIGHT OF ENTRY ON THE SURFACE OF SAID PROPERTY OR THE SUBSURFACE THEREOF TO A DEPTH OF 500 FEET MEASURED VERTICALLY FROM SAID SURFACE..

Commonly known as: 1020 Bismark Way, Oxnard, CA 93033.

**This deed is delivered in trust pursuant to the terms and conditions of the Stipulation entered into between Global and JKO Group, LLC and approved by the Bankruptcy Court and attached to the Bankruptcy Court Order entered on _____[Docket no. ___] (the "Order"), in case number 9:22-bk-10626-RC (ECF #___).  This deed may be recorded only after the occurrence of a Payment Default or Uncured Default (as defined in the Stipulation incorporated into the Order) that occurs before payment in full of all debt from the Borrower to JKO.**

Subject to the foregoing paragraph,  this deed is an absolute conveyance, the grantor having sold land to the grantee for a fair and adequate consideration, such consideration, in addition to that above recited, being full satisfaction of all of grantor's obligations secured by the Deed of Trust dated March 23, 2020, executed by GLOBAL PREMIER AMERICA #3, LLC, General Partner of GLOBAL PREMIER REGENCY PALMS OXNARD, LP, as trustor to Fidelity National Title, a California Corporation as trustee, recorded in Official Records in the County Recorder's office of Ventura County, California, as Instrument #20200327-00043822-0, and that certain Modification of Deed of Trust, dated as of November 19, 2020, and recorded in Official Records in the Recorder's Office as Instrument #20201204-00208378-0, and an assignment of deed of trust executed by NANO BANC, a California state-chartered bank, as assignor to JKO GROUP,

2371543.1 - 32572.0001

EXHIBIT 5 - PAGE 1

LLC, a Delaware limited liability company as assignee recorded April 22, 2022 as Document number 2022000049962, Official Records of Ventura County, State of California.

Grantor declares that this conveyance is freely and fairly made, and that there are no agreements, oral or written, or other than this deed between grantor and grantee with respect to said land. The property conveyed shall include all fixtures, improvements and systems thereon and no fixtures, improvements or systems may be removed or modified without the express written consent of Grantee.

GLOBAL PREMIER REGENCY PALMS OXNARD, LP, a California limited partnership

Dated: _____
By: _____
Christine Hanna, Manager of Global Premier America #3, LLC, General Partner of Global Premier Regency Palms Oxnard, LP

*[NOTARIAL ACKNOWLEDGEMENTS FOLLOW ON NEXT PAGE]*

**\*THIS CONVEYANCE CHANGES THE MANNER IN WHICH TITLE IS HELD, GRANTOR(S) AND GRANTEE(S) REMAIN THE SAME AND CONTINUE TO HOLD THE SAME PROPORTIONATE INTEREST, R & T 11911.**

# CERTIFICATE OF ACKNOWLEDGEMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _____

On _____ before me, _____ (insert name and title of the officer), personally appeared Andrew Hanna and Christine Hanna who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacity(ies), and that by their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.


WITNESS my hand and official seal.


Signature _____.                    (Seal)

EXHIBIT 6

Agency Plus Home
Post-BK Plan
As of 7/14/2023

| | TTM Ending Aug 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 |
| Census | 98 | 124 | 124 | 124 | 124 |
| Occupancy % | 77% | 98% | 98% | 98% | 98% |
| **Income** | | | | | |
| Rent Income | 4,821,455 | 6,286,485 | 6,738,226 | 7,222,428 | 7,741,425 |
| Other Charges | - | - | - | - | - |
| **Total Revenue** | **4,821,455** | **6,286,485** | **6,738,226** | **7,222,428** | **7,741,425** |
| | | | | | |
| **G&A Expenses** | | | | | |
| Payroll | (1,969,655) | (2,305,795) | (2,378,857) | (2,466,555) | (2,572,177) |
| Payroll Taxes | (196,965) | (230,580) | (237,886) | (246,656) | (257,218) |
| Contract Labor | (236,842) | (242,763) | (248,832) | (255,053) | (261,429) |
| Benefits | (39,667) | (51,370) | (52,654) | (53,970) | (55,319) |
| General Transportation | (10,171) | (16,532) | (22,234) | (29,902) | (40,214) |
| Telephone | (13,356) | (13,563) | (13,935) | (14,500) | (15,305) |
| Office Expense | (66,515) | (78,601) | (79,537) | (80,496) | (81,479) |
| Advertising | (87,520) | (87,908) | (88,306) | (88,713) | (89,131) |
| Fees for Licensing and Memberships | (4,775) | (4,775) | (4,775) | (4,775) | (4,775) |
| Insurance | (189,574) | (205,469) | (208,924) | (213,071) | (218,066) |
| **Total G&A** | **(2,815,039)** | **(3,237,355)** | **(3,335,939)** | **(3,453,690)** | **(3,595,113)** |
| | | | | | |
| **Care & Service Expenses** | | | | | |
| Food | (269,733) | (349,313) | (358,046) | (366,997) | (376,172) |
| Household Supplies | (42,705) | (52,965) | (54,289) | (55,646) | (57,038) |
| Laundry & Dry Cleaning | - | - | - | - | - |
| Personal Hygiene | - | - | - | - | - |
| Recreational Activities | (29,039) | (23,180) | (23,760) | (24,354) | (24,963) |
| Newspaper, Magazines, Cable TV | (15,940) | (16,513) | (17,538) | (19,095) | (21,313) |
| Medical & First Aid | (18,263) | (27,758) | (28,452) | (29,163) | (29,892) |
| Client Transportation | (15,142) | (15,142) | (15,142) | (15,142) | (15,142) |
| **Total Care & Services** | **(390,821)** | **(484,872)** | **(497,227)** | **(510,397)** | **(524,519)** |
| | | | | | |
| **Physical Plant** | | | | | |
| Rent, Lease, Mortgage & HOA Fees | - | - | - | - | - |
| Gas | (50,307) | (71,917) | (73,715) | (75,558) | (77,447) |
| Electricity | (146,253) | (205,478) | (210,615) | (215,881) | (221,278) |
| Water | (42,195) | (59,341) | (60,824) | (62,345) | (63,904) |
| Garbage | (5,061) | - | - | - | - |
| Repair & Maintenance (Building) | (68,931) | (70,654) | (72,420) | (74,231) | (76,087) |
| Repair & Maintenance (FF&E) | (42,405) | (91,297) | (93,580) | (95,919) | (98,317) |
| **Total Physical Plant** | **(355,151)** | **(498,688)** | **(511,155)** | **(523,934)** | **(537,032)** |
| | | | | | |
| **Total Opex** | **(3,561,011)** | **(4,220,915)** | **(4,344,320)** | **(4,488,022)** | **(4,656,665)** |
| | | | | | |
| **EBITDAR / NOI** | **1,260,444** | **2,065,570** | **2,393,905** | **2,734,407** | **3,084,760** |

| | TTM Ending Aug 31, | | | | |
|---|---|---|---|---|---|
| | 2024 | 2025 | 2026 | 2027 | 2028 |
| **Cash BOP** | **1,218,000** | **1,317,215** | **2,218,759** | **1,706,448** | **1,053,478** |
| NOI | 1,260,444 | 2,065,570 | 2,393,905 | 2,734,407 | 3,084,760 |
| Pmts to JKO | (1,068,000) | (26,918,040) | - | - | - |
| PACE Loan Pmts | - | - | (588,000) | (1,176,000) | (1,176,000) |
| Property Tax Pmts | (93,229) | (96,026) | (98,906) | (101,874) | (52,465) |
| Mechanic's Liens Pmts | - | - | (109,807) | - | - |
| Pre-Petition Unsecured Creditor Pmts | - | - | (300,000) | (300,000) | (300,000) |
| New Financing to Replace JKO | - | 25,850,040 | (1,809,503) | (1,809,503) | (2,192,432) |
| **Cash EOP** | **1,317,215** | **2,218,759** | **1,706,448** | **1,053,478** | **417,341** |

EXHIBIT 6 - PAGE 1

Post-BK Plan
As of 7/14/2023

| | Actual | Actual | Actual | Forecast | Forecast |
|---|---|---|---|---|---|
| | 4/30/2023 | 5/31/2023 | 6/30/2023 | 7/31/2023 | 8/31/2023 |
| Census | 60 | 60 | 64 | 68 | 72 |
| Occupancy % | 47% | 47% | 50% | 54% | 57% |
| **Income** | | | | | |
| Rent Income | 223,691 | 227,513 | 239,471 | 270,110 | 285,534 |
| Other Charges | - | - | - | - | - |
| **Total Revenue** | **223,691** | **227,513** | **239,471** | **270,110** | **285,534** |
| | | | | | |
| **G&A Expenses** | | | | | |
| Payroll | (116,532) | (117,556) | (119,717) | (135,991) | (139,504) |
| Payroll Taxes | (13,810) | (12,370) | (11,791) | (13,599) | (13,950) |
| Contract Labor | (17,000) | (26,407) | (26,379) | (19,533) | (19,533) |
| Benefits | (11,571) | (13,763) | (11,511) | (2,267) | (2,400) |
| General Transportation | (579) | (150) | (225) | (567) | (600) |
| Telephone | (711) | (829) | (877) | (1,108) | (1,108) |
| Office Expense | (5,892) | (4,790) | (5,574) | (4,441) | (4,584) |
| Advertising | (4,298) | (2,000) | (5,415) | (7,280) | (7,280) |
| Fees for Licensing and Memberships | (150) | - | - | (398) | (398) |
| Insurance | (14,226) | (12,263) | (13,575) | (14,467) | (14,633) |
| **Total G&A** | **(184,770)** | **(190,128)** | **(195,065)** | **(199,651)** | **(203,991)** |
| | | | | | |
| **Care & Service Expenses** | | | | | |
| Food | (13,576) | (14,497) | (15,580) | (15,413) | (16,320) |
| Household Supplies | (2,062) | (921) | (2,387) | (2,536) | (2,686) |
| Laundry & Dry Cleaning | - | - | - | - | - |
| Personal Hygiene | - | - | - | - | - |
| Recreational Activities | (902) | (1,205) | (2,120) | (2,253) | (2,385) |
| Newspaper, Magazines, Cable TV | (1,328) | (1,396) | (1,348) | (1,300) | (1,300) |
| Medical & First Aid | (1,081) | (566) | (823) | (875) | (926) |
| Client Transportation | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) |
| **Total Care & Services** | **(20,211)** | **(19,846)** | **(23,521)** | **(23,639)** | **(24,879)** |
| | | | | | |
| **Physical Plant** | | | | | |
| Rent, Lease, Mortgage & HOA Fees | - | - | - | - | - |
| Gas | (2,800) | (2,800) | (1,167) | (2,960) | (3,040) |
| Electricity | (8,000) | (6,119) | (7,929) | (8,560) | (8,840) |
| Water | (2,310) | (2,334) | (2,763) | (2,470) | (2,550) |
| Garbage | - | - | - | (723) | (723) |
| Repair & Maintenance (Building) | (5,832) | (1,763) | (1,307) | (5,685) | (5,685) |
| Repair & Maintenance (FF&E) | (3,555) | (75) | (165) | (1,200) | (1,200) |
| **Total Physical Plant** | **(22,497)** | **(13,092)** | **(13,331)** | **(21,598)** | **(22,038)** |
| | | | | | |
| **Total Opex** | **(227,478)** | **(223,065)** | **(231,917)** | **(244,888)** | **(250,908)** |
| | | | | | |
| **EBITDAR / NOI** | **(3,787)** | **4,448** | **7,554** | **25,222** | **34,626** |

| | Actual | Actual | Actual | Forecast | Forecast |
|---|---|---|---|---|---|
| | 4/30/2023 | 5/31/2023 | 6/30/2023 | 7/31/2023 | 8/31/2023 |
| **Cash BOP** | | | | | |
| NOI | (3,787) | 4,448 | 7,554 | 25,222 | 34,626 |
| Pmts to JKO | | | | | |
| PACE Loan Pmts | | | | | |
| Property Tax Pmts | | | | | |
| Mechanic's Liens Pmts | | | | | |
| Pre-Petition Unsecured Creditor Pmts | | | | | |
| New Financing to Replace JKO | | | | | |
| **Cash EOP** | | | | 1,218,000 | |

EXHIBIT 6 - PAGE 2

**Regency Palms Oxnard**
Post-BK Plan
As of 7/14/2023

| | 2024 Forecast 9/30/2023 | 2024 Forecast 10/31/2023 | 2024 Forecast 11/30/2023 | 2024 Forecast 12/31/2023 | 2024 Forecast 1/31/2024 | 2024 Forecast 2/29/2024 | 2024 Forecast 3/31/2024 | 2024 Forecast 4/30/2024 | 2024 Forecast 5/31/2024 | 2024 Forecast 6/30/2024 | 2024 Forecast 7/31/2024 | 2024 Forecast 8/31/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Census | 76 | 80 | 84 | 88 | 92 | 96 | 100 | 104 | 108 | 112 | 116 | 120 |
| Occupancy % | 60% | 63% | 66% | 69% | 72% | 76% | 79% | 82% | 85% | 88% | 91% | 94% |
| **Income** | | | | | | | | | | | | |
| Rent Income | 300,957 | 321,918 | 337,611 | 353,305 | 375,456 | 391,424 | 407,392 | 430,769 | 447,017 | 463,265 | 487,904 | 504,436 |
| Other Charges | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Revenue** | 300,957 | 321,918 | 337,611 | 353,305 | 375,456 | 391,424 | 407,392 | 430,769 | 447,017 | 463,265 | 487,904 | 504,436 |
| **G&A Expenses** | | | | | | | | | | | | |
| Payroll | (143,018) | (146,531) | (150,045) | (153,558) | (157,071) | (160,585) | (164,098) | (171,665) | (175,267) | (179,004) | (182,606) | (186,207) |
| Payroll Taxes | (14,302) | (14,653) | (15,004) | (15,356) | (15,707) | (16,058) | (16,410) | (17,167) | (17,527) | (17,900) | (18,261) | (18,621) |
| Contract Labor | (19,533) | (19,533) | (19,533) | (19,533) | (19,533) | (19,533) | (19,533) | (20,022) | (20,022) | (20,022) | (20,022) | (20,022) |
| Benefits | (2,533) | (2,667) | (2,800) | (2,933) | (3,067) | (3,200) | (3,333) | (3,553) | (3,690) | (3,827) | (3,963) | (4,100) |
| General Transportation | (633) | (667) | (700) | (733) | (767) | (800) | (833) | (888) | (946) | (1,005) | (1,067) | (1,131) |
| Telephone | (1,108) | (1,108) | (1,108) | (1,108) | (1,108) | (1,108) | (1,108) | (1,120) | (1,120) | (1,120) | (1,120) | (1,120) |
| Office Expense | (4,727) | (4,870) | (5,013) | (5,156) | (5,299) | (5,442) | (5,585) | (5,796) | (5,940) | (6,084) | (6,229) | (6,373) |
| Advertising | (7,280) | (7,280) | (7,280) | (7,280) | (7,280) | (7,280) | (7,280) | (7,312) | (7,312) | (7,312) | (7,312) | (7,312) |
| Fees for Licensing and Memberships | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) |
| Insurance | (14,799) | (14,965) | (15,131) | (15,298) | (15,464) | (15,630) | (15,796) | (16,154) | (16,324) | (16,501) | (16,671) | (16,841) |
| **Total G&A** | (208,332) | (212,672) | (217,013) | (221,353) | (225,694) | (230,034) | (234,375) | (244,074) | (248,544) | (253,173) | (257,648) | (262,125) |
| **Care & Service Expenses** | | | | | | | | | | | | |
| Food | (17,227) | (18,133) | (19,040) | (19,947) | (20,853) | (21,760) | (22,667) | (24,163) | (25,092) | (26,021) | (26,951) | (27,880) |
| Household Supplies | (2,835) | (2,984) | (3,133) | (3,282) | (3,432) | (3,581) | (3,730) | (3,664) | (3,805) | (3,946) | (4,086) | (4,227) |
| Laundry & Dry Cleaning | - | - | - | - | - | - | - | - | - | - | - | - |
| Personal Hygiene | - | - | - | - | - | - | - | - | - | - | - | - |
| Recreational Activities | (2,518) | (2,650) | (2,783) | (2,915) | (3,048) | (3,180) | (3,313) | (1,603) | (1,665) | (1,727) | (1,788) | (1,850) |
| Newspaper, Magazines, Cable TV | (1,300) | (1,300) | (1,300) | (1,300) | (1,300) | (1,300) | (1,300) | (1,361) | (1,431) | (1,382) | (1,333) | (1,333) |
| Medical & First Aid | (978) | (1,029) | (1,081) | (1,132) | (1,183) | (1,235) | (1,286) | (1,920) | (1,994) | (2,068) | (2,142) | (2,215) |
| Client Transportation | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) |
| **Total Care & Services** | (26,118) | (27,358) | (28,598) | (29,838) | (31,078) | (32,318) | (33,557) | (33,973) | (35,249) | (36,405) | (37,561) | (38,767) |
| **Physical Plant** | | | | | | | | | | | | |
| Rent, Lease, Mortgage & HOA Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| Gas | (3,120) | (3,200) | (3,280) | (3,360) | (3,440) | (3,520) | (3,600) | (4,975) | (5,166) | (5,357) | (5,549) | (5,740) |
| Electricity | (9,120) | (9,400) | (9,680) | (9,960) | (10,240) | (10,520) | (10,800) | (14,213) | (14,760) | (15,307) | (15,853) | (16,400) |
| Water | (2,630) | (2,710) | (2,790) | (2,870) | (2,950) | (3,030) | (3,110) | (4,105) | (4,263) | (4,420) | (4,578) | (4,736) |
| Garbage | (723) | (723) | (723) | (723) | (723) | (723) | (723) | | | | | |
| Repair & Maintenance (Building) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,685) | (5,827) | (5,827) | (5,827) | (5,827) | (5,827) |
| Repair & Maintenance (FF&E) | (1,200) | (1,200) | (1,200) | (1,200) | (1,200) | (1,200) | (1,200) | (6,558) | (6,801) | (7,044) | (7,287) | (7,287) |
| **Total Physical Plant** | (22,478) | (22,918) | (23,358) | (23,798) | (24,238) | (24,678) | (25,118) | (35,435) | (36,574) | (37,713) | (38,851) | (39,990) |
| **Total Opex** | (256,928) | (262,949) | (268,969) | (274,989) | (281,010) | (287,030) | (293,051) | (313,483) | (320,367) | (327,291) | (334,061) | (340,883) |
| **EBITDAR / NOI** | 44,029 | 58,969 | 68,642 | 78,315 | 94,446 | 104,394 | 114,342 | 117,287 | 126,650 | 135,973 | 153,843 | 163,553 |

| | Forecast 9/30/2023 | Forecast 10/31/2023 | Forecast 11/30/2023 | Forecast 12/31/2023 | Forecast 1/31/2024 | Forecast 2/29/2024 | Forecast 3/31/2024 | Forecast 4/30/2024 | Forecast 5/31/2024 | Forecast 6/30/2024 | Forecast 7/31/2024 | Forecast 8/31/2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash BOP** | 1,218,000 | 1,173,029 | 1,142,998 | 1,076,026 | 1,065,341 | 1,070,787 | 1,086,181 | 1,111,523 | 1,093,195 | 1,130,846 | 1,177,819 | 1,242,662 |
| NOI | 44,029 | 58,969 | 68,642 | 78,315 | 94,446 | 104,394 | 114,342 | 117,287 | 126,650 | 135,973 | 153,843 | 163,553 |
| Pmts to JKO | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) |
| PACE Loan Pmts | | | | | | | | | | | | |
| Property Tax Pmts | | | (46,614) | | | | | (46,614) | | | | |
| Mechanic's Liens Pmts | | | | | | | | | | | | |
| Pre-Petition Unsecured Creditor Pmts | | | | | | | | | | | | |
| New Financing to Replace JKO | | | | | | | | | | | | |
| **Cash EOP** | 1,173,029 | 1,142,998 | 1,076,026 | 1,065,341 | 1,070,787 | 1,086,181 | 1,111,523 | 1,093,195 | 1,130,846 | 1,177,819 | 1,242,662 | 1,317,215 |

**Regency Palms Oxnard**
Post-BK Plan
As of 7/14/2023

| | 2025 Forecast 9/30/2024 | 2025 Forecast 10/31/2024 | 2025 Forecast 11/30/2024 | 2025 Forecast 12/31/2024 | 2025 Forecast 1/31/2025 | 2025 Forecast 2/28/2025 | 2025 Forecast 3/31/2025 | 2025 Forecast 4/30/2025 | 2025 Forecast 5/31/2025 | 2025 Forecast 6/30/2025 | 2025 Forecast 7/31/2025 | 2025 Forecast 8/31/2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Census | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 |
| Occupancy % | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% |
| **Income** | | | | | | | | | | | | |
| Rent Income | 504,436 | 513,263 | 513,263 | 513,263 | 522,246 | 522,246 | 522,246 | 531,385 | 531,385 | 531,385 | 540,684 | 540,684 |
| Other Charges | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Revenue** | 504,436 | 513,263 | 513,263 | 513,263 | 522,246 | 522,246 | 522,246 | 531,385 | 531,385 | 531,385 | 540,684 | 540,684 |
| **G&A Expenses** | | | | | | | | | | | | |
| Payroll | (189,808) | (189,808) | (189,808) | (189,808) | (189,808) | (189,808) | (189,808) | (195,428) | (195,428) | (195,428) | (195,428) | (195,428) |
| Payroll Taxes | (18,981) | (18,981) | (18,981) | (18,981) | (18,981) | (18,981) | (18,981) | (19,543) | (19,543) | (19,543) | (19,543) | (19,543) |
| Contract Labor | (20,022) | (20,022) | (20,022) | (20,022) | (20,022) | (20,022) | (20,022) | (20,522) | (20,522) | (20,522) | (20,522) | (20,522) |
| Benefits | (4,237) | (4,237) | (4,237) | (4,237) | (4,237) | (4,237) | (4,237) | (4,343) | (4,343) | (4,343) | (4,343) | (4,343) |
| General Transportation | (1,198) | (1,228) | (1,259) | (1,290) | (1,323) | (1,356) | (1,390) | (1,424) | (1,460) | (1,497) | (1,534) | (1,572) |
| Telephone | (1,120) | (1,120) | (1,120) | (1,120) | (1,120) | (1,120) | (1,120) | (1,145) | (1,145) | (1,145) | (1,145) | (1,145) |
| Office Expense | (6,518) | (6,518) | (6,518) | (6,518) | (6,518) | (6,518) | (6,518) | (6,595) | (6,595) | (6,595) | (6,595) | (6,595) |
| Advertising | (7,312) | (7,312) | (7,312) | (7,312) | (7,312) | (7,312) | (7,312) | (7,345) | (7,345) | (7,345) | (7,345) | (7,345) |
| Fees for Licensing and Memberships | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) |
| Insurance | (17,012) | (17,012) | (17,012) | (17,012) | (17,012) | (17,012) | (17,012) | (17,277) | (17,277) | (17,277) | (17,277) | (17,277) |
| **Total G&A** | **(266,605)** | **(266,635)** | **(266,666)** | **(266,697)** | **(266,730)** | **(266,763)** | **(266,797)** | **(274,020)** | **(274,055)** | **(274,092)** | **(274,129)** | **(274,167)** |
| **Care & Service Expenses** | | | | | | | | | | | | |
| Food | (28,809) | (28,809) | (28,809) | (28,809) | (28,809) | (28,809) | (28,809) | (29,530) | (29,530) | (29,530) | (29,530) | (29,530) |
| Household Supplies | (4,368) | (4,368) | (4,368) | (4,368) | (4,368) | (4,368) | (4,368) | (4,477) | (4,477) | (4,477) | (4,477) | (4,477) |
| Laundry & Dry Cleaning | - | - | - | - | - | - | - | - | - | - | - | - |
| Personal Hygiene | - | - | - | - | - | - | - | - | - | - | - | - |
| Recreational Activities | (1,912) | (1,912) | (1,912) | (1,912) | (1,912) | (1,912) | (1,912) | (1,960) | (1,960) | (1,960) | (1,960) | (1,960) |
| Newspaper, Magazines, Cable TV | (1,333) | (1,333) | (1,333) | (1,333) | (1,333) | (1,333) | (1,333) | (1,430) | (1,504) | (1,452) | (1,400) | (1,400) |
| Medical & First Aid | (2,289) | (2,289) | (2,289) | (2,289) | (2,289) | (2,289) | (2,289) | (2,347) | (2,347) | (2,347) | (2,347) | (2,347) |
| Client Transportation | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) |
| **Total Care & Services** | **(39,973)** | **(39,973)** | **(39,973)** | **(39,973)** | **(39,973)** | **(39,973)** | **(39,973)** | **(41,005)** | **(41,079)** | **(41,027)** | **(40,975)** | **(40,975)** |
| **Physical Plant** | | | | | | | | | | | | |
| Rent, Lease, Mortgage & HOA Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| Gas | (5,931) | (5,931) | (5,931) | (5,931) | (5,931) | (5,931) | (5,931) | (6,080) | (6,080) | (6,080) | (6,080) | (6,080) |
| Electricity | (16,947) | (16,947) | (16,947) | (16,947) | (16,947) | (16,947) | (16,947) | (17,370) | (17,370) | (17,370) | (17,370) | (17,370) |
| Water | (4,894) | (4,894) | (4,894) | (4,894) | (4,894) | (4,894) | (4,894) | (5,016) | (5,016) | (5,016) | (5,016) | (5,016) |
| Garbage | - | - | - | - | - | - | - | - | - | - | - | - |
| Repair & Maintenance (Building) | (5,827) | (5,827) | (5,827) | (5,827) | (5,827) | (5,827) | (5,827) | (5,973) | (5,973) | (5,973) | (5,973) | (5,973) |
| Repair & Maintenance (FF&E) | (7,530) | (7,530) | (7,530) | (7,530) | (7,530) | (7,530) | (7,530) | (7,718) | (7,718) | (7,718) | (7,718) | (7,718) |
| **Total Physical Plant** | **(41,129)** | **(41,129)** | **(41,129)** | **(41,129)** | **(41,129)** | **(41,129)** | **(41,129)** | **(42,157)** | **(42,157)** | **(42,157)** | **(42,157)** | **(42,157)** |
| **Total Opex** | **(347,707)** | **(347,737)** | **(347,768)** | **(347,799)** | **(347,831)** | **(347,865)** | **(347,898)** | **(357,182)** | **(357,291)** | **(357,276)** | **(357,261)** | **(357,299)** |
| **EBITDAR / NOI** | **156,729** | **165,526** | **165,496** | **165,464** | **174,414** | **174,381** | **174,347** | **174,203** | **174,094** | **174,109** | **183,423** | **183,385** |

| | Forecast 9/30/2024 | Forecast 10/31/2024 | Forecast 11/30/2024 | Forecast 12/31/2024 | Forecast 1/31/2025 | Forecast 2/28/2025 | Forecast 3/31/2025 | Forecast 4/30/2025 | Forecast 5/31/2025 | Forecast 6/30/2025 | Forecast 7/31/2025 | Forecast 8/31/2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash BOP** | **1,317,215** | **1,384,943** | **1,461,470** | **1,489,953** | **1,566,417** | **1,651,831** | **1,737,212** | **1,822,559** | **1,859,749** | **1,944,843** | **2,029,952** | **2,124,375** |
| NOI | 156,729 | 165,526 | 165,496 | 165,464 | 174,414 | 174,381 | 174,347 | 174,203 | 174,094 | 174,109 | 183,423 | 183,385 |
| Pmts to JKO | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | (89,000) | ######### |
| PACE Loan Pmts | | | | | | | | | | | | |
| Property Tax Pmts | | | (48,013) | | | | | (48,013) | | | | |
| Mechanic's Liens Pmts | | | | | | | | | | | | |
| Pre-Petition Unsecured Creditor Pmts | | | | | | | | | | | | |
| New Financing to Replace JKO | | | | | | | | | | | | 25,850,040 |
| **Cash EOP** | **1,384,943** | **1,461,470** | **1,489,953** | **1,566,417** | **1,651,831** | **1,737,212** | **1,822,559** | **1,859,749** | **1,944,843** | **2,029,95_** | **2,124,37_** | **248,759** |

EXHIBIT 3 PAGE 2

**Regency Palms Oxnard**
Post-BK Plan
As of 7/14/2023

| | 2026 Forecast 9/30/2025 | 2026 Forecast 10/31/2025 | 2026 Forecast 11/30/2025 | 2026 Forecast 12/31/2025 | 2026 Forecast 1/31/2026 | 2026 Forecast 2/28/2026 | 2026 Forecast 3/31/2026 | 2026 Forecast 4/30/2026 | 2026 Forecast 5/31/2026 | 2026 Forecast 6/30/2026 | 2026 Forecast 7/31/2026 | 2026 Forecast 8/31/2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Census | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 |
| Occupancy % | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% |
| **Income** | | | | | | | | | | | | |
| Rent Income | 540,684 | 550,146 | 550,146 | 550,146 | 559,774 | 559,774 | 559,774 | 569,570 | 569,570 | 569,570 | 579,537 | 579,537 |
| Other Charges | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Revenue** | **540,684** | **550,146** | **550,146** | **550,146** | **559,774** | **559,774** | **559,774** | **569,570** | **569,570** | **569,570** | **579,537** | **579,537** |
| **G&A Expenses** | | | | | | | | | | | | |
| Payroll | (195,428) | (195,428) | (195,428) | (195,428) | (195,428) | (195,428) | (195,428) | (202,173) | (202,173) | (202,173) | (202,173) | (202,173) |
| Payroll Taxes | (19,543) | (19,543) | (19,543) | (19,543) | (19,543) | (19,543) | (19,543) | (20,217) | (20,217) | (20,217) | (20,217) | (20,217) |
| Contract Labor | (20,522) | (20,522) | (20,522) | (20,522) | (20,522) | (20,522) | (20,522) | (21,035) | (21,035) | (21,035) | (21,035) | (21,035) |
| Benefits | (4,343) | (4,343) | (4,343) | (4,343) | (4,343) | (4,343) | (4,343) | (4,451) | (4,451) | (4,451) | (4,451) | (4,451) |
| General Transportation | (1,612) | (1,652) | (1,693) | (1,736) | (1,779) | (1,823) | (1,869) | (1,916) | (1,964) | (2,013) | (2,063) | (2,115) |
| Telephone | (1,145) | (1,145) | (1,145) | (1,145) | (1,145) | (1,145) | (1,145) | (1,184) | (1,184) | (1,184) | (1,184) | (1,184) |
| Office Expense | (6,595) | (6,595) | (6,595) | (6,595) | (6,595) | (6,595) | (6,595) | (6,674) | (6,674) | (6,674) | (6,674) | (6,674) |
| Advertising | (7,345) | (7,345) | (7,345) | (7,345) | (7,345) | (7,345) | (7,345) | (7,378) | (7,378) | (7,378) | (7,378) | (7,378) |
| Fees for Licensing and Memberships | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) |
| Insurance | (17,277) | (17,277) | (17,277) | (17,277) | (17,277) | (17,277) | (17,277) | (17,596) | (17,596) | (17,596) | (17,596) | (17,596) |
| **Total G&A** | **(274,207)** | **(274,247)** | **(274,288)** | **(274,331)** | **(274,374)** | **(274,419)** | **(274,464)** | **(283,024)** | **(283,072)** | **(283,121)** | **(283,171)** | **(283,223)** |
| **Care & Service Expenses** | | | | | | | | | | | | |
| Food | (29,530) | (29,530) | (29,530) | (29,530) | (29,530) | (29,530) | (29,530) | (30,268) | (30,268) | (30,268) | (30,268) | (30,268) |
| Household Supplies | (4,477) | (4,477) | (4,477) | (4,477) | (4,477) | (4,477) | (4,477) | (4,589) | (4,589) | (4,589) | (4,589) | (4,589) |
| Laundry & Dry Cleaning | - | - | - | - | - | - | - | - | - | - | - | - |
| Personal Hygiene | - | - | - | - | - | - | - | - | - | - | - | - |
| Recreational Activities | (1,960) | (1,960) | (1,960) | (1,960) | (1,960) | (1,960) | (1,960) | (2,009) | (2,009) | (2,009) | (2,009) | (2,009) |
| Newspaper, Magazines, Cable TV | (1,400) | (1,400) | (1,400) | (1,400) | (1,400) | (1,400) | (1,400) | (1,540) | (1,619) | (1,564) | (1,508) | (1,508) |
| Medical & First Aid | (2,347) | (2,347) | (2,347) | (2,347) | (2,347) | (2,347) | (2,347) | (2,405) | (2,405) | (2,405) | (2,405) | (2,405) |
| Client Transportation | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) |
| **Total Care & Services** | **(40,975)** | **(40,975)** | **(40,975)** | **(40,975)** | **(40,975)** | **(40,975)** | **(40,975)** | **(42,073)** | **(42,152)** | **(42,096)** | **(42,040)** | **(42,040)** |
| **Physical Plant** | | | | | | | | | | | | |
| Rent, Lease, Mortgage & HOA Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| Gas | (6,080) | (6,080) | (6,080) | (6,080) | (6,080) | (6,080) | (6,080) | (6,232) | (6,232) | (6,232) | (6,232) | (6,232) |
| Electricity | (17,370) | (17,370) | (17,370) | (17,370) | (17,370) | (17,370) | (17,370) | (17,805) | (17,805) | (17,805) | (17,805) | (17,805) |
| Water | (5,016) | (5,016) | (5,016) | (5,016) | (5,016) | (5,016) | (5,016) | (5,142) | (5,142) | (5,142) | (5,142) | (5,142) |
| Garbage | - | - | - | - | - | - | - | - | - | - | - | - |
| Repair & Maintenance (Building) | (5,973) | (5,973) | (5,973) | (5,973) | (5,973) | (5,973) | (5,973) | (6,122) | (6,122) | (6,122) | (6,122) | (6,122) |
| Repair & Maintenance (FF&E) | (7,718) | (7,718) | (7,718) | (7,718) | (7,718) | (7,718) | (7,718) | (7,911) | (7,911) | (7,911) | (7,911) | (7,911) |
| **Total Physical Plant** | **(42,157)** | **(42,157)** | **(42,157)** | **(42,157)** | **(42,157)** | **(42,157)** | **(42,157)** | **(43,211)** | **(43,211)** | **(43,211)** | **(43,211)** | **(43,211)** |
| **Total Opex** | **(357,339)** | **(357,379)** | **(357,420)** | **(357,463)** | **(357,506)** | **(357,551)** | **(357,596)** | **(368,308)** | **(368,435)** | **(368,428)** | **(368,422)** | **(368,474)** |
| **EBITDAR / NOI** | **183,345** | **192,767** | **192,726** | **192,683** | **202,268** | **202,223** | **202,177** | **201,262** | **201,135** | **201,142** | **211,115** | **211,063** |

| | Forecast 9/30/2025 | Forecast 10/31/2025 | Forecast 11/30/2025 | Forecast 12/31/2025 | Forecast 1/31/2026 | Forecast 2/28/2026 | Forecast 3/31/2026 | Forecast 4/30/2026 | Forecast 5/31/2026 | Forecast 6/30/2026 | Forecast 7/31/2026 | Forecast 8/31/2026 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash BOP** | 2,218,759 | 2,116,505 | 2,133,481 | 2,100,961 | 2,117,853 | 2,144,328 | 2,170,759 | 1,609,145 | 1,585,161 | 1,610,505 | 1,635,854 | 1,671,177 |
| NOI | 183,345 | 192,767 | 192,726 | 192,683 | 202,268 | 202,223 | 202,177 | 201,262 | 201,135 | 201,142 | 211,115 | 211,063 |
| Pmts to JKO | | | | | | | | | | | | |
| PACE Loan Pmts | | | | | | | (588,000) | | | | | |
| Property Tax Pmts | | | (49,453) | | | | | (49,453) | | | | |
| Mechanic's Liens Pmts | (109,807) | | | | | | | | | | | |
| Pre-Petition Unsecured Creditor Pmts | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| New Financing to Replace JKO | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) |
| **Cash EOP** | **2,116,505** | **2,133,481** | **2,100,961** | **2,117,853** | **2,144,328** | **2,170,759** | **1,609,145** | **1,585,161** | **1,610,505** | **1,635,854** | **1,671,177** | **1,706,448** |

EXHIBIT 1, PAGE 154

**Regency Palms Oxnard**
Post-BK Plan
As of 7/14/2023

| | Forecast 9/30/2026 | Forecast 10/31/2026 | Forecast 11/30/2026 | Forecast 12/31/2026 | Forecast 1/31/2027 | Forecast 2/28/2027 | Forecast 3/31/2027 | Forecast 4/30/2027 | Forecast 5/31/2027 | Forecast 6/30/2027 | Forecast 7/31/2027 | Forecast 8/31/2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Census | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 |
| Occupancy % | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% |
| **Income** | | | | | | | | | | | | |
| Rent Income | 579,537 | 589,679 | 589,679 | 589,679 | 599,998 | 599,998 | 599,998 | 610,498 | 610,498 | 610,498 | 621,182 | 621,182 |
| Other Charges | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Revenue** | 579,537 | 589,679 | 589,679 | 589,679 | 599,998 | 599,998 | 599,998 | 610,498 | 610,498 | 610,498 | 621,182 | 621,182 |
| **G&A Expenses** | | | | | | | | | | | | |
| Payroll | (202,173) | (202,173) | (202,173) | (202,173) | (202,173) | (202,173) | (202,173) | (210,269) | (210,269) | (210,269) | (210,269) | (210,269) |
| Payroll Taxes | (20,217) | (20,217) | (20,217) | (20,217) | (20,217) | (20,217) | (20,217) | (21,027) | (21,027) | (21,027) | (21,027) | (21,027) |
| Contract Labor | (21,035) | (21,035) | (21,035) | (21,035) | (21,035) | (21,035) | (21,035) | (21,561) | (21,561) | (21,561) | (21,561) | (21,561) |
| Benefits | (4,451) | (4,451) | (4,451) | (4,451) | (4,451) | (4,451) | (4,451) | (4,562) | (4,562) | (4,562) | (4,562) | (4,562) |
| General Transportation | (2,167) | (2,222) | (2,277) | (2,334) | (2,392) | (2,452) | (2,514) | (2,576) | (2,641) | (2,707) | (2,775) | (2,844) |
| Telephone | (1,184) | (1,184) | (1,184) | (1,184) | (1,184) | (1,184) | (1,184) | (1,242) | (1,242) | (1,242) | (1,242) | (1,242) |
| Office Expense | (6,674) | (6,674) | (6,674) | (6,674) | (6,674) | (6,674) | (6,674) | (6,755) | (6,755) | (6,755) | (6,755) | (6,755) |
| Advertising | (7,378) | (7,378) | (7,378) | (7,378) | (7,378) | (7,378) | (7,378) | (7,413) | (7,413) | (7,413) | (7,413) | (7,413) |
| Fees for Licensing and Memberships | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) |
| Insurance | (17,596) | (17,596) | (17,596) | (17,596) | (17,596) | (17,596) | (17,596) | (17,979) | (17,979) | (17,979) | (17,979) | (17,979) |
| **Total G&A** | (283,275) | (283,330) | (283,385) | (283,442) | (283,500) | (283,560) | (283,622) | (293,783) | (293,848) | (293,914) | (293,981) | (294,051) |
| **Care & Service Expenses** | | | | | | | | | | | | |
| Food | (30,268) | (30,268) | (30,268) | (30,268) | (30,268) | (30,268) | (30,268) | (31,025) | (31,025) | (31,025) | (31,025) | (31,025) |
| Household Supplies | (4,589) | (4,589) | (4,589) | (4,589) | (4,589) | (4,589) | (4,589) | (4,704) | (4,704) | (4,704) | (4,704) | (4,704) |
| Laundry & Dry Cleaning | - | - | - | - | - | - | - | - | - | - | - | - |
| Personal Hygiene | - | - | - | - | - | - | - | - | - | - | - | - |
| Recreational Activities | (2,009) | (2,009) | (2,009) | (2,009) | (2,009) | (2,009) | (2,009) | (2,059) | (2,059) | (2,059) | (2,059) | (2,059) |
| Newspaper, Magazines, Cable TV | (1,508) | (1,508) | (1,508) | (1,508) | (1,508) | (1,508) | (1,508) | (1,700) | (1,787) | (1,726) | (1,664) | (1,664) |
| Medical & First Aid | (2,405) | (2,405) | (2,405) | (2,405) | (2,405) | (2,405) | (2,405) | (2,465) | (2,465) | (2,465) | (2,465) | (2,465) |
| Client Transportation | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) |
| **Total Care & Services** | (42,040) | (42,040) | (42,040) | (42,040) | (42,040) | (42,040) | (42,040) | (43,215) | (43,302) | (43,240) | (43,179) | (43,179) |
| **Physical Plant** | | | | | | | | | | | | |
| Rent, Lease, Mortgage & HOA Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| Gas | (6,232) | (6,232) | (6,232) | (6,232) | (6,232) | (6,232) | (6,232) | (6,387) | (6,387) | (6,387) | (6,387) | (6,387) |
| Electricity | (17,805) | (17,805) | (17,805) | (17,805) | (17,805) | (17,805) | (17,805) | (18,250) | (18,250) | (18,250) | (18,250) | (18,250) |
| Water | (5,142) | (5,142) | (5,142) | (5,142) | (5,142) | (5,142) | (5,142) | (5,270) | (5,270) | (5,270) | (5,270) | (5,270) |
| Garbage | - | - | - | - | - | - | - | - | - | - | - | - |
| Repair & Maintenance (Building) | (6,122) | (6,122) | (6,122) | (6,122) | (6,122) | (6,122) | (6,122) | (6,275) | (6,275) | (6,275) | (6,275) | (6,275) |
| Repair & Maintenance (FF&E) | (7,911) | (7,911) | (7,911) | (7,911) | (7,911) | (7,911) | (7,911) | (8,109) | (8,109) | (8,109) | (8,109) | (8,109) |
| **Total Physical Plant** | (43,211) | (43,211) | (43,211) | (43,211) | (43,211) | (43,211) | (43,211) | (44,291) | (44,291) | (44,291) | (44,291) | (44,291) |
| **Total Opex** | (368,527) | (368,581) | (368,637) | (368,693) | (368,752) | (368,812) | (368,873) | (381,289) | (381,441) | (381,445) | (381,451) | (381,521) |
| **EBITDAR / NOI** | 211,010 | 221,098 | 221,042 | 220,985 | 231,247 | 231,187 | 231,125 | 229,209 | 229,058 | 229,053 | 239,731 | 239,661 |

| | Forecast 9/30/2026 | Forecast 10/31/2026 | Forecast 11/30/2026 | Forecast 12/31/2026 | Forecast 1/31/2027 | Forecast 2/28/2027 | Forecast 3/31/2027 | Forecast 4/30/2027 | Forecast 5/31/2027 | Forecast 6/30/2027 | Forecast 7/31/2027 | Forecast 8/31/2027 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash BOP** | 1,706,448 | 1,153,667 | 1,198,973 | 1,193,286 | 1,238,480 | 1,293,935 | 1,349,329 | 816,663 | 819,143 | 872,409 | 925,670 | 989,609 |
| NOI | 211,010 | 221,098 | 221,042 | 220,985 | 231,247 | 231,187 | 231,125 | 229,209 | 229,058 | 229,053 | 239,731 | 239,661 |
| Pmts to JKO | | | | | | | | | | | | |
| PACE Loan Pmts | (588,000) | | | | | | (588,000) | | | | | |
| Property Tax Pmts | | | (50,937) | | | | | (50,937) | | | | |
| Mechanic's Liens Pmts | | | | | | | | | | | | |
| Pre-Petition Unsecured Creditor Pmts | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | |
| New Financing to Replace JKO | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | (150,792) | |
| **Cash EOP** | 1,153,667 | 1,198,973 | 1,193,286 | 1,238,480 | 1,293,935 | 1,349,329 | 816,663 | 819,143 | 872,409 | 925,670 | 989,609 | 1,063,478 |

EXHIBIT 6, PAGE 063

**Regency Palms Oxnard**
Post-BK Plan
As of 7/14/2023

| | 2028 Forecast 9/30/2027 | 2028 Forecast 10/31/2027 | 2028 Forecast 11/30/2027 | 2028 Forecast 12/31/2027 | 2028 Forecast 1/31/2028 | 2028 Forecast 2/29/2028 | 2028 Forecast 3/31/2028 | 2028 Forecast 4/30/2028 | 2028 Forecast 5/31/2028 | 2028 Forecast 6/30/2028 | 2028 Forecast 7/31/2028 | 2028 Forecast 8/31/2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Census | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 | 124 |
| Occupancy % | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% | 98% |
| **Income** | | | | | | | | | | | | |
| Rent Income | 621,182 | 632,053 | 632,053 | 632,053 | 643,114 | 643,114 | 643,114 | 654,368 | 654,368 | 654,368 | 665,820 | 665,820 |
| Other Charges | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Revenue** | **621,182** | **632,053** | **632,053** | **632,053** | **643,114** | **643,114** | **643,114** | **654,368** | **654,368** | **654,368** | **665,820** | **665,820** |
| **G&A Expenses** | | | | | | | | | | | | |
| Payroll | (210,269) | (210,269) | (210,269) | (210,269) | (210,269) | (210,269) | (210,269) | (220,059) | (220,059) | (220,059) | (220,059) | (220,059) |
| Payroll Taxes | (21,027) | (21,027) | (21,027) | (21,027) | (21,027) | (21,027) | (21,027) | (22,006) | (22,006) | (22,006) | (22,006) | (22,006) |
| Contract Labor | (21,561) | (21,561) | (21,561) | (21,561) | (21,561) | (21,561) | (21,561) | (22,100) | (22,100) | (22,100) | (22,100) | (22,100) |
| Benefits | (4,562) | (4,562) | (4,562) | (4,562) | (4,562) | (4,562) | (4,562) | (4,676) | (4,676) | (4,676) | (4,676) | (4,676) |
| General Transportation | (2,915) | (2,988) | (3,063) | (3,139) | (3,218) | (3,298) | (3,381) | (3,465) | (3,552) | (3,640) | (3,731) | (3,825) |
| Telephone | (1,242) | (1,242) | (1,242) | (1,242) | (1,242) | (1,242) | (1,242) | (1,322) | (1,322) | (1,322) | (1,322) | (1,322) |
| Office Expense | (6,755) | (6,755) | (6,755) | (6,755) | (6,755) | (6,755) | (6,755) | (6,838) | (6,838) | (6,838) | (6,838) | (6,838) |
| Advertising | (7,413) | (7,413) | (7,413) | (7,413) | (7,413) | (7,413) | (7,413) | (7,448) | (7,448) | (7,448) | (7,448) | (7,448) |
| Fees for Licensing and Memberships | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) | (398) |
| Insurance | (17,979) | (17,979) | (17,979) | (17,979) | (17,979) | (17,979) | (17,979) | (18,442) | (18,442) | (18,442) | (18,442) | (18,442) |
| **Total G&A** | **(294,122)** | **(294,195)** | **(294,269)** | **(294,346)** | **(294,424)** | **(294,505)** | **(294,587)** | **(306,755)** | **(306,842)** | **(306,931)** | **(307,022)** | **(307,115)** |
| **Care & Service Expenses** | | | | | | | | | | | | |
| Food | (31,025) | (31,025) | (31,025) | (31,025) | (31,025) | (31,025) | (31,025) | (31,800) | (31,800) | (31,800) | (31,800) | (31,800) |
| Household Supplies | (4,704) | (4,704) | (4,704) | (4,704) | (4,704) | (4,704) | (4,704) | (4,822) | (4,822) | (4,822) | (4,822) | (4,822) |
| Laundry & Dry Cleaning | - | - | - | - | - | - | - | - | - | - | - | - |
| Personal Hygiene | - | - | - | - | - | - | - | - | - | - | - | - |
| Recreational Activities | (2,059) | (2,059) | (2,059) | (2,059) | (2,059) | (2,059) | (2,059) | (2,110) | (2,110) | (2,110) | (2,110) | (2,110) |
| Newspaper, Magazines, Cable TV | (1,664) | (1,664) | (1,664) | (1,664) | (1,664) | (1,664) | (1,664) | (1,924) | (2,022) | (1,953) | (1,883) | (1,883) |
| Medical & First Aid | (2,465) | (2,465) | (2,465) | (2,465) | (2,465) | (2,465) | (2,465) | (2,527) | (2,527) | (2,527) | (2,527) | (2,527) |
| Client Transportation | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) | (1,262) |
| **Total Care & Services** | **(43,179)** | **(43,179)** | **(43,179)** | **(43,179)** | **(43,179)** | **(43,179)** | **(43,179)** | **(44,445)** | **(44,543)** | **(44,474)** | **(44,404)** | **(44,404)** |
| **Physical Plant** | | | | | | | | | | | | |
| Rent, Lease, Mortgage & HOA Fees | - | - | - | - | - | - | - | - | - | - | - | - |
| Gas | (6,387) | (6,387) | (6,387) | (6,387) | (6,387) | (6,387) | (6,387) | (6,547) | (6,547) | (6,547) | (6,547) | (6,547) |
| Electricity | (18,250) | (18,250) | (18,250) | (18,250) | (18,250) | (18,250) | (18,250) | (18,706) | (18,706) | (18,706) | (18,706) | (18,706) |
| Water | (5,270) | (5,270) | (5,270) | (5,270) | (5,270) | (5,270) | (5,270) | (5,402) | (5,402) | (5,402) | (5,402) | (5,402) |
| Garbage | - | - | - | - | - | - | - | - | - | - | - | - |
| Repair & Maintenance (Building) | (6,275) | (6,275) | (6,275) | (6,275) | (6,275) | (6,275) | (6,275) | (6,432) | (6,432) | (6,432) | (6,432) | (6,432) |
| Repair & Maintenance (FF&E) | (8,109) | (8,109) | (8,109) | (8,109) | (8,109) | (8,109) | (8,109) | (8,311) | (8,311) | (8,311) | (8,311) | (8,311) |
| **Total Physical Plant** | **(44,291)** | **(44,291)** | **(44,291)** | **(44,291)** | **(44,291)** | **(44,291)** | **(44,291)** | **(45,399)** | **(45,399)** | **(45,399)** | **(45,399)** | **(45,399)** |
| **Total Opex** | **(381,592)** | **(381,665)** | **(381,739)** | **(381,816)** | **(381,894)** | **(381,975)** | **(382,057)** | **(396,599)** | **(396,784)** | **(396,803)** | **(396,824)** | **(396,917)** |
| **EBITDAR / NOI** | **239,590** | **250,388** | **250,313** | **250,237** | **261,219** | **261,139** | **261,056** | **257,770** | **257,584** | **257,565** | **268,995** | **268,902** |

| | Forecast 9/30/2027 | Forecast 10/31/2027 | Forecast 11/30/2027 | Forecast 12/31/2027 | Forecast 1/31/2028 | Forecast 2/29/2028 | Forecast 3/31/2028 | Forecast 4/30/2028 | Forecast 5/31/2028 | Forecast 6/30/2028 | Forecast 7/31/2028 | Forecast 8/31/2028 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Cash BOP** | **1,053,478** | **497,366** | **540,051** | **530,197** | **572,731** | **626,248** | **679,684** | **145,038** | **195,105** | **244,986** | **294,849** | **356,142** |
| NOI | 239,590 | 250,388 | 250,313 | 250,237 | 261,219 | 261,139 | 261,056 | 257,770 | 257,584 | 257,565 | 268,995 | 268,902 |
| Pmts to JKO | | | | | | | | | | | | |
| PACE Loan Pmts | (588,000) | | | | | | (588,000) | | | | | |
| Property Tax Pmts | | | (52,465) | | | | | | | | | |
| Mechanic's Liens Pmts | | | | | | | | | | | | |
| Pre-Petition Unsecured Creditor Pmts | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | |
| New Financing to Replace JKO | (182,703) | (182,703) | (182,703) | (182,703) | (182,703) | (182,703) | (182,703) | (182,703) | (182,703) | (182,703) | (182,703) | (182,703) |
| **Cash EOP** | **497,366** | **540,051** | **530,197** | **572,731** | **626,248** | **679,684** | **145,038** | **195,105** | **244,986** | **294,849** | **356,142** | **442,341** |

**Regency Palms Oxnard**
Post-BK Plan
As of 7/14/2023

1. Occupancy projected to grow at a rate of 4 residents per month until RPO is 98% full at 124 occupants.

2. Expenses grow at 3% per year due to inflation; rental rates projected to grow at 4% above inflation due to market demand in Oxnard

3. Labor expenses divided into fixed and variable categories by position (e.g., Executive Director is fixed; resident care positions are variable)

4. Payments to senior lender (JKO) as specified in the Global Stipulation Agreement

5. Senior loan replaced in Month 24 by a replacement credit facility, projected at 10 year term, 25 year amort, 7% interest, interest only Years 1-2

6. Mechanics liens paid off in Month 25, including $87k to Top Tier Painting (disputed) and $23k to Art Mex Artistic Design

7. Payments to prepetition unsecured creditors commence in Month 25 at $25,000 per month

8. PACE loan of $12.8 million scheduled to close no later than 8/31/2023

9. Disbursement of PACE loan governed by Global Stipulation Agreement between RPO and JKO, including  $2.6m in capitalized interest and expenses to PACE lender, $4.8m in accrued and default interest to JKO, $0.4m in fees to JKO, $3.0m in principal paydown, $0.75m in professional fees, $0.1m in property taxes, $0.15m in working capital

EXHIBIT 6 - PAGE 8

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled: **DEBTOR'S NOTICE OF MOTION AND MOTION FOR ORDER: (1) APPROVING COMPROMISE OF CONTROVERSY WITH JKO GROUP, INC. AND (2) DISMISSING CHAPTER 11 CASE; MEMORANDUM OF POINTS AND AUTHORITIES; AND SUPPORTING DECLARATION OF CHRISTINE HANNA IN SUPPORT THEREOF** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On <u>July 14, 2023</u>, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

**Michael J Conway -** MConway@gblawllp.com, msingleman@gblawllp.com; rsoll@gblawllp.com
**James R Felton -** jfelton@gblawllp.com, pstruntz@gblawllp.com; msingleman@gblawllp.com
**Brian David Fittipaldi -** brian.fittipaldi@usdoj.gov
**Garrick A Hollander -** ghollander@wghlawyers.com, jmartinez@wghlawyers.com;
svillegas@wghlawyers.com
**Mike D Neue -** m.neue@geracillp.com, a.lewis@geracillp.com
**Jeremy H Rothstein -** jrothstein@gblawllp.com, msingleman@gblawllp.com; rsoll@gblawllp.com
**Matthew J Stockl -** mstockl@wghlawyers.com, jmartinez@wghlawyers.com;
svillegas@wghlawyers.com
**United States Trustee (ND) -** ustpregion16.nd.ecf@usdoj.gov

**2.  SERVED BY UNITED STATES MAIL**:  On **<u>July 14, 2023,</u>** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed. **SEE ATTACHED**

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on _____. I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 14, 2023 | Jeannie Martinez | /s/ Jeannie Martinez |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

265080