1  GARRICK A. HOLLANDER – State Bar No. 166316
   ghollander@wghlawyers.com
2  **WINTHROP GOLUBOW HOLLANDER, LLP**
   1301 Dove Street, Suite 500
3  Newport Beach, CA 92660
   Telephone: (949) 720-4100
4  Facsimile: (949) 720-4111

5  General Insolvency Counsel for
   Debtor and Debtor-in-Possession

6

7              **UNITED STATES BANKRUPTCY COURT**

8              **CENTRAL DISTRICT OF CALIFORNIA**

9                    **NORTHERN DIVISION**

10

11

12  In re:                                    Case No. ~~96~~23-bk-10517-RC

13  GLOBAL PREMIER REGENCY PALMS
    COLTON, LP, a California limited          Chapter 11 Proceeding
14  partnership,
                                              **DEBTOR'S AMENDED[1] DISCLOSURE**
15            Debtor and                      **STATEMENT IN SUPPORT OF DEBTOR'S**
              Debtor-in-Possession            **FIRST AMENDED CHAPTER 11 PLAN OF**
16                                            **REORGANIZATION**

17

18                                            DATE:    July 24, 2024
                                              TIME:    1:00 p.m.
19                                            PLACE:   Courtroom 201
                                                       1415 State Street
20                                                     Santa Barbara, CA 93101

21

22

23

24

25

26

27

28  [1] This Amended disclosure statement only includes Exhibit 3, which has been amended to include gross amounts of transfers.  All other exhibits can be found in the original disclosure statement filed with the Court [Docket no. 298].

# **TABLE OF CONTENTS**

| | | **PAGE** |
|---|---|---|
| I. | INTRODUCTION | 2 |
| | A. Purpose of Disclosure Statement | 2 |
| | B. The Plan | 2 |
| | C. Voting, Objections to Plan and Confirmation | 2 |
| | D. Disclaimers | 3 |
| II. | DEFINITIONS AND RULES OF INTERPRETATION | 6 |
| III. | BACKGROUND OF THE DEBTOR | 6 |
| | A. Description of the Debtor | 6 |
| | B. Events Participating Chapter 11 Filing | 7 |
| | C. The Compromise Between the Debtor and iBorrow | 8 |
| | D. DIP/Exit Financing | 9 |
| | E. Debtor's Assets | 10 |
| | F. Debtor's Liabilities | 10 |
| | 1. Secured Claims | 10 |
| | 2. Administrative, Priority and General Unsecured Claims | 12 |
| IV. | THE DEBTORS' CHAPTER 11 PROCEEDING | 13 |
| | A. Commencement of Case | 13 |
| | B. Income and Payment of Expenses and Debts During Bankruptcy | 13 |
| | C. Employment of Professionals | 13 |
| | D. Analysis of Preferential, Fraudulent and Unauthorized Transfers | 13 |
| | E. Projected Objections to Claims Filed Against the Estate | 14 |
| V. | FINANCIAL INFORMATION | 14 |
| | A. Historical Financial Information for the Debtor | 14 |
| | B. Financial Information Provided During the Case | 14 |
| | C. Financial Projections for the Debtor's Plan of Reorganization | 15 |
| VI. | DESCRIPTION OF PLAN OF REORGANIZATION | 16 |
| | A. Summary of the Plan | 16 |
| | B. Proposed Treatment of Claims | 16 |
| | 1. Creditors Asserting Secured Claims | 16 |
| | a. Class 1.1-1.2. | 16 |
| | (1) Allowance of Secured Claim | 17 |
| | (2) Treatment of Allowed Secured Claims | 17 |
| | b. Classes 2.1-2.8: Disallowed Claims of Invalid Mechanics Lien | 17 |
| | (1) Disallowance of Secured Claim | 18 |
| | (2) Treatment of Claim | 18 |
| | c. Class 3 - Allowed Secured Claim of Governmental Units | 18 |

# TABLE OF CONTENTS

### (Continued)

| | PAGE |
|---|---|

2.  Unsecured Creditors ........................................................................ 19
    a.  Class 4 – Unsecured Non-Tax Priority Claims ................................. 19
    b.  Class 5 - Allowed Claim of RCB ...................................................... 19
    c.  Class 6 - Allowed General Unsecured Claims ................................. 20
    d.  Class 7 - Allowed Interests ............................................................... 20

C.    Executory and Assumed Contracts and Leases ............................... 20

VII.    FUNDING OF THE PLAN ..................................................................... 21

A.    Debtor's Business Operations ............................................................ 21
B.    Equity Financing ................................................................................ 21
C.    DIP Financing .................................................................................... 21
D.    Sale and/or Refinancing of Assets .................................................... 22
E.    Causes of Actions .............................................................................. 22

VIII.    TAX CONSEQUENCES OF THE PLAN ............................................... 22

A.    Introduction ........................................................................................ 22
B.    Federal Income Tax Consequences to the Debtors ........................... 23
C.    Tax Consequences to Creditors ......................................................... 25

IX.    LIQUIDATION ANALYSIS ................................................................... 25

A.    Class 1.1-1.2 ...................................................................................... 28
B.    Class 2.1-2.8 ...................................................................................... 28
C.    Class 3 ................................................................................................ 28
D.    Class 4 ................................................................................................ 28
E.    Class 5 ................................................................................................ 28
F.    Class 6 ................................................................................................ 28
G.    Class 7 ................................................................................................ 28

X.    VOTING ................................................................................................. 29

A.    Who May Vote .................................................................................... 29
B.    How to Vote ........................................................................................ 29
C.    Effect of Vote ..................................................................................... 29

XI.    CONCLUSION ....................................................................................... 29

A.    Rules of Construction ........................................................................ 31
B.    Schedules ............................................................................................ 31

# TABLE OF AUTHORITIES

## CASES

11 U.S.C. § 102 .................................................................................................................... 31

11 U.S.C. § 363 ...................................................................................................................... 9

11 U.S.C. § 544(b) ............................................................................................................... 13

11 U.S.C. § 547 .................................................................................................................... 13

11 U.S.C. § 548 .................................................................................................................... 13

11 U.S.C. § 549 .................................................................................................................... 13

11 U.S.C. § 552(a) ............................................................................................................... 12

11 U.S.C § 552(A) ............................................................................................................... 12

11 U.S.C. § 1107 .................................................................................................................. 13

11 U.S.C. § 1108 .................................................................................................................. 13

11 U.S.C. § 1129 .................................................................................................................... 3

11 U.S.C. § 1129(a)(7) ........................................................................................................ 25

11 U.S.C. § 1129(a)(11) ...................................................................................................... 15

11 U.S.C. § 1129(b) ............................................................................................................. 29

11 U.S.C. § 1141 ............................................................................................................ 3, 25

CAL CIVIL CODE 3144 ................................................................................................ 11, 18

# I.

## INTRODUCTION

### A.    Purpose of Disclosure Statement.

The purpose of a disclosure statement is to provide information to enable a creditor to make an informed judgment about a plan of reorganization and to enable such creditor to determine whether it is in its best interest to vote for (accept) or against (reject) such plan. The Bankruptcy Court has already approved the Debtor's Disclosure Statement [Docket no. 298~~170~~] in this ~~e~~Case. The Debtor now seeks approval of its Plan. This Disclosure Statement is in support of the Debtor's Plan.

### B.    The Plan.

~~Included on the thumb drive containing this Disclosure Statement is a copy of the Debtor's Plan~~ [FOR PURPOSES OF APPROVAL OF THIS DISCLOSURE STATEMENT, ATTACHED AS **EXHIBIT 6** IS A COPY OF THE PLAN.  THIS PARENTHETICAL WILL NOT BE INCLUDED IN THE ACTUAL DISCLOSURE STATEMENT SERVED ON PARTIES AS THEY WILL BE RECEIVING A COPY OF THE PLAN AS PART OF THE MAILING]. The Plan provides for payments to Creditors through a reorganization, which may provide for refinancing and/or debt and equity recapitalization. Under the Plan, General Unsecured Creditors are expected to receive their Pro Rata share of the Plan Fund based on each of their respective Allowed Claims. The reorganization of the Debtor will generate a greater distribution than what would be realized in a Chapter 7 liquidation.

The Debtor attests that the information stated in this Disclosure Statement and the Plan is accurate to the best of its knowledge. All Creditors should refer to Articles III-V of the Plan for the precise treatment of their claims. This Disclosure Statement is explanatory only; the language used in the Plan is binding. **Your rights may be affected.  You should read the Plan and Disclosure Statement carefully and discuss them with your attorney, if you have one.**

### C.    Voting, Objections to Plan and Confirmation.

To vote to accept or reject the Debtor's Plan, a Creditor must indicate its acceptance or rejection thereof on the ballot which accompanies this Disclosure Statement and return it to

1  Winthrop Golubow Hollander, LLP ("WGH"), such that the ballot is actually received by WGH

2  on or before September 4, 2024——————— at 5:00 p.m. (the "Ballot Deadline").  Each Class of

3  Creditors allowed to vote on the Plan will be deemed to have accepted the Plan if the Plan is

4  accepted by valid ballots cast by Creditors in that Class holding at least two-thirds (2/3) in dollar

5  amount and more than one half (1/2) in number of the Allowed Claims of Creditors in that Class

6  actually voting on the Plan.  **ONLY PROPERLY EXECUTED BALLOTS TIMELY**

7  **RECEIVED BY COUNSEL FOR THE DEBTOR WILL BE COUNTED AS HAVING**

8  **VOTED ON THE PLAN.**

9        Since mail delays may occur, and because time is of the essence, it is important that ballots

10  be mailed well in advance of the Ballot Deadline.  Any ballots received after the Ballot Deadline

11  will <u>not</u> be included in any calculation to determine whether the Debtor's Creditors have accepted

12  or rejected the Plan.

13        Any party-in-interest may object to confirmation of the Plan.  The Bankruptcy Court has

14  fixed ———————August 28, 2024 as the deadline for filing an objection to the Plan and for

15  serving a copy of the objection on the Debtor's attorneys, WGH, at the address set forth above

16  (Attn: Garrick A. Hollander, Esq.); and upon the United States Trustee, located at 1415 State

17  Street, Suite 148 Santa Barbara, CA 93101 (Attn:  Brian Fittipaldi, Esq.).

18        At the Confirmation Hearing, the Bankruptcy Court will determine, pursuant to § 1129 of

19  the Bankruptcy Code, whether the Plan has been accepted by the necessary Classes of Claims

20  created under the Plan, and, if not, whether the Bankruptcy Court should, nevertheless, confirm

21  the Plan.  If at such hearing the Bankruptcy Court should determine that the Plan meets all the

22  requirements for confirmation prescribed by the Bankruptcy Code, the Bankruptcy Court will

23  enter a Confirmation Order.  Pursuant to §  1141 of the Bankruptcy Code, the effect of the

24  Confirmation Order will be to make the provisions of the Plan binding upon the Debtor and each

25  of its Creditors, regardless whether the Creditor voted to accept the Plan.

26        **D.        <u>Disclaimers</u>.**

27        **THIS IS A SOLICITATION BY THE DEBTOR.  ALL REPRESENTATIONS**

28  **MADE ARE THOSE OF THE DEBTOR AND NOT OF ITS ATTORNEYS OR OTHER**

PROFESSIONALS.  NO REPRESENTATIONS CONCERNING THE DEBTOR, INCLUDING, BUT NOT LIMITED TO, REPRESENTATIONS AS TO THE DEBTOR'S FUTURE BUSINESS OPERATIONS, CASH FLOW PROJECTIONS, THE VALUE OF ITS PROPERTY, THE AMOUNT OF CLAIMS AGAINST THE ESTATE, OR ANY TAX EFFECT OF THE TRANSACTIONS PROPOSED UNDER THE PLAN, ARE AUTHORIZED BY THE DEBTOR, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN THAT ARE IN ADDITION TO OR DIFFERENT FROM THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY PARTY-IN-INTEREST.  ANY SUCH ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO THE DEBTOR'S ATTORNEYS WHO, IN TURN, WILL DELIVER THE INFORMATION TO THE BANKRUPTCY COURT FOR SUCH ACTION AS THE BANKRUPTCY COURT MAY DEEM TO BE APPROPRIATE.

THE DISCUSSION IN THIS DISCLOSURE STATEMENT REGARDING THE DEBTOR MAY CONTAIN "FORWARD LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. SUCH STATEMENTS CONSIST OF ANY STATEMENT OTHER THAN A RECITATION OF HISTORICAL FACT AND CAN BE IDENTIFIED BY THE USE OF FORWARD LOOKING TERMINOLOGY SUCH AS "MAY," "EXPECT," "ANTICIPATE," "ESTIMATE," OR "CONTINUE," OR THE NEGATIVE THEREOF OR OTHER VARIATIONS THEREON OR COMPARABLE TERMINOLOGY.  THE READER IS CAUTIONED THAT ALL FORWARD LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD LOOKING STATEMENTS.  THE LIQUIDATION ANALYSES, DISTRIBUTION PROJECTIONS, PROJECTIONS OF FINANCIAL PERFORMANCE AND OTHER

INFORMATION CONTAINED HEREIN ARE ESTIMATES ONLY, AND THE TIMING, AMOUNT AND VALUE OF ACTUAL DISTRIBUTIONS TO CREDITORS MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED.  THEREFORE, ANY ANALYSES, ESTIMATES, OR PROJECTIONS MAY OR MAY NOT PROVE TO BE ACCURATE.

UNLESS SPECIFICALLY SET FORTH HEREIN TO THE CONTRARY, THE INFORMATION CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT.  RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON BOOKKEEPING PERFORMED INTERNALLY BY THE DEBTOR.  THE DEBTOR BELIEVES THAT EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT FINANCIAL INFORMATION AS ACCURATE AS IS REASONABLY PRACTICABLE GIVEN THE NATURE AND HISTORY OF THE DEBTOR'S BUSINESS AND THE CONDITION OF THE DEBTOR'S BOOKS AND RECORDS.  HOWEVER, THE RECORDS KEPT BY THE DEBTOR ARE NEITHER WARRANTED NOR REPRESENTED TO BE FREE OF INACCURACY. NEITHER THE DEBTOR NOR THE DEBTOR'S COUNSEL VERIFIED INDEPENDENTLY THE INFORMATION CONTAINED HEREIN, OR MAKE ANY REPRESENTATIONS OR WARRANTIES WITH RESPECT TO THE ACCURACY THEREOF.

THE DEBTOR AND ITS PROFESSIONALS HAVE MADE A DILIGENT EFFORT TO IDENTIFY IN THIS DISCLOSURE STATEMENT ALL LITIGATION CLAIMS, INCLUDING CLAIMS FOR RELIEF, COUNTERCLAIMS, AND OBJECTIONS TO CLAIMS.  HOWEVER, NO RELIANCE SHOULD BE PLACED ON THE FACT THAT A PARTICULAR LITIGATION CLAIM IS OR IS NOT IDENTIFIED IN THIS DISCLOSURE STATEMENT.  THE DEBTOR OR OTHER PARTIES-IN-INTEREST MAY SEEK TO INVESTIGATE, FILE AND PROSECUTE CAUSES OF ACTION WHETHER OR NOT SUCH CLAIMS ARE IDENTIFIED IN THIS DISCLOSURE STATEMENT.

1    **ALL PARTIES ENTITLED TO VOTE ON THE PLAN ARE URGED TO**

2    **CAREFULLY REVIEW THE PLAN AND THIS DISCLOSURE STATEMENT PRIOR TO**

3    **VOTING ON THE PLAN.  THE CONTENTS OF THIS DISCLOSURE STATEMENT**

4    **SHOULD NOT BE CONSTRUED IN ANY MANNER TO BE LEGAL, BUSINESS OR**

5    **TAX ADVICE.  EACH CREDITOR AND OTHER PARTY-IN-INTEREST SHOULD**

6    **CONSULT WITH ITS OWN LEGAL COUNSEL, BUSINESS ADVISOR, CONSULTANT**

7    **OR ACCOUNTANT PRIOR TO VOTING ON THE PLAN IN ORDER TO ENSURE A**

8    **COMPLETE UNDERSTANDING OF THE TERMS OF THE PLAN.  THIS DISCLOSURE**

9    **STATEMENT IS INTENDED FOR THE SOLE USE OF THE CREDITORS OF THE**

10   **DEBTOR TO ENABLE THEM TO MAKE AN INFORMED DECISION REGARDING**

11   **THE PLAN.**

12   **THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE**

13   **STATEMENT INDICATES ONLY THAT THE DISCLOSURE STATEMENT CONTAINS**

14   **ADEQUATE INFORMATION FOR THE PURPOSE OF SOLICITATION BY THE**

15   **DEBTOR OF ACCEPTANCES TO THE PLAN, ASSUMING THE ACCURACY OF THE**

16   **CONTENTS OF THIS DISCLOSURE STATEMENT.  THE BANKRUPTCY COURT HAS**

17   **NOT YET DETERMINED SUCH ACCURACY, BUT MAY DO SO AT THE HEARING**

18   **REGARDING CONFIRMATION OF THE PLAN.**

19   **II.**

20   **DEFINITIONS AND RULES OF INTERPRETATION**

21   See Appendix appended to the Planhereto.

22   **III.**

23   **BACKGROUND OF THE DEBTOR**

24   A.   **Description of the Debtor**

25   The Debtor was formed in 2014 to purchase land and develop and operate an assisted

26   living/memory care facility 839 Fairway Drive, Colton, California.  The Debtor was initially

27   funded by foreign investors, who invested in the Debtor pursuant to a program of the United

28   States government to allow foreign investors to make investments in the United States in order to

1   obtain residency status.  This program is designed to stimulate the U.S. economy through job

2   creation and capital investment.  The Debtor's successful completion and operation of this project

3   will preserve jobs, protect the investment of these foreign investors, and ensure their continued

4   residency in the United States.

5       In late 2019, the Debtor began its development of the Property, which is currently

6   approximately 60-65% complete.  The Debtor estimates that it will need approximately $8.5

7   million for construction costs, and an additional estimated $2.5 million for professional fees and

8   expenses, property operations and maintenance, furniture, fixtures and equipment, financing fees

9   and costs to complete the Property, and approximately 2-3 million of working capital to stabilize

10  the Property.  Once the development of the Property is complete, the Debtor will promptly

11  commence the operation of its planned assisted living facility, providing housing and a full

12  spectrum of care and services to fragile seniors in need of a moderate level of medical assistance,

13  including specialized memory care for seniors who suffer from Alzheimer's Disease and other

14  forms of dementia.  Details for all expenses to complete development of and stabilize the Property

15  are provided in the Plan projections attached as **Exhibit 1**.

16      **B.    Events Precipitating Chapter 11 Filing**

17      Similar to many other companies, in 2020, the Debtor experienced significant financial

18  and operational challenges as a result of the COVID-19 pandemic.  In the course of building its

19  Facility, the Debtor was materially impacted by the outbreak of COVID-19, and the subsequent

20  shutdown and imposition of restrictions, caused construction delays and cost overruns at the

21  Facility.

22      Under the circumstances, the Debtor needed more time to complete the Facility; so, in

23  2021, the Debtor exercised its option to extend the maturity date of the loan though September 3,

24  2022, and paid the requisite fee to iBorrow to extend the maturity date from September 2021 to

25  September 2022.

26      On June 22, 2022, before the passing of the extended maturity date, iBorrow issued a

27  notice of default (based on an alleged maturity default), and stopped all further draws by the

28  Debtor, thereby preventing the Debtor from paying its creditors and causing a complete halt on its

development.  The Debtor contended that iBorrow had no legal basis to issue a notice of default

and improperly terminated funding.  iBorrow disputed this contention.

Based on the termination of funding, the Debtor was unable to pay its vendors.  The

Debtor tried for many months to negotiate a resolution with iBorrow, but unfortunately, the parties

were unable to reach agreement.  iBorrow scheduled a foreclosure sale, which was continued

multiple times.  Ultimately, on June 22, 2023, the Debtor filed a voluntary petition for relief under

Chapter 11 of the Bankruptcy Code in order to stave off iBorrow's scheduled foreclosure of the

Property.

### C.    The Compromise Between the Debtor and iBorrow

In or about September 2019, the Debtor obtained a construction loan from iBorrow, which

was evidenced by, among other things, a Promissory Note Secured by Deed of Trust, dated

September 3, 2019.  Pursuant to the loan with iBorrow, the Debtor drew and used $9.9 million for

construction of the Facility. Based on the accrual of interests and fees, iBorrow asserted that it held

a senior secured claim in the amount of $18.8 million against the Property.  The Debtor asserted

iBorrow's claim was $13.3 million as of the petition date.

The Debtor and iBorrow had been vigorously litigating disputes over iBorrow's claims

throughout the Case, during which time they continuously sought resolution of their disputes.

After extensive litigation and negotiations, the Debtor and iBorrow resolved their disputes over the

rights to, and claims arising from, the iBorrow loan.  This resolution was memorialized in

Settlement and Release Agreement (the "Compromise"), which was approved by the Court.

Pursuant to the terms of the Compromise, the Debtor was required to, among other things,

file a motion to sell the Property, the hearing for which was required to be held by no later than

March 21, 2024, with a closing date of no later than April 5, 2024.  The parties agreed that

iBorrow would have an allowed claim in the amount of $11 million for credit bidding purposes,

with iBorrow being the stalking horse bidder for the purchase of the property, with a credit bid of

$11 million, and the Debtor would have a right to buy out iBorrow's claim/position in the case for

$9,450,000 so long as payment was received by iBorrow on or before April 5, 2024, in which case

iBorrow's claim was be discharged entirely.

1    On February 22, 2024, the Debtor filed its *Motion For Order: (1) Authorizing Debtor To*

2  *Sell Real Property Of The Estate Free And Clear Of Liens, Claims, And Interests Pursuant To 11*

3  *U.S.C. § 363* ("Sale Motion").  After reaching out to dozens of prospective purchasers and

4  investors for the sale of the Property, the highest and in fact only offer received by the Debtor was

5  the $11 million credit bid by iBorrow pursuant to the Compromise. Nobody was willing to make

6  an offer based on the condition and status of the development of the Property. On March 19, 2024,

7  the Court granted the Sale Motion, authorizing the sale of the Property to iBorrow, subject to the

8  Debtor's buyout right.

9    **D.    DIP/Exit Financing**

10    The Debtor successfully found the DIP Lender, who agreed to provide DIP Financing on a

11  senior secured basis, priming all liens held by any party, to payoff iBorrow's pursuant to the

12  agreed upon discount provided in the Compromise, and to fund the completion of the development

13  of the Property, the administration of the Case, and the capital necessary to secure stabilization of

14  the Property.  To that end, on March 20, 2024, the Debtor filed the DIP Financing Motion.

15  Pursuant to the Court's order shortening time, on March 26, 2024, the Court held a hearing on the

16  DIP Financing Motion, at which time the Court authorized the Debtor, on an interim basis, to

17  borrow $9,702,104 to pay off iBorrow and pay for certain closing costs.

18    On April 4, 2024, the Debtor used that portion of the DIP Financing that was approved on

19  an interim basis to pay iBorrow $9,450,000, thereby retaining ownership of the Property, and

20  eliminating iBorrow's claim in its entirety.

21    The Court scheduled a final hearing on the DIP Financing Motion for April 23, 2024, at

22  which time the Court authorized the Debtor, on a final basis, to borrow up to $23,390,785

23  (including the interim advance already made).  The remaining funds will be used to complete the

24  development of the Property.  It is estimated that, as of the Effective Date, the DIP Lender will

25  have advanced, and thus hold, an Allowed Secured Claim of approximately $19 million pursuant

26  to the DIP Financing Order.

27

28

### E. Debtor's Assets

The Debtor's primary asset is the Property. For more details on the Debtor's assets, see the Debtor's bankruptcy schedules [Docket No. 26]. Based on an appraisal dated March 1, 2024, the Property is estimated to have an "as-is – go-dark" value of $13,500,000; an "as-is – going concern" value of $22,800,000 for the date February 27, 2024; prospective value at completion of $31,200,000 for the date January 1, 2025; and prospective stabilization value of $34,700,000 for the date August 1, 2026. A true and correct copy of the appraisal of the Property is attached hereto as **Exhibit 2** and incorporated herein by this reference.

As mentioned above, recently, the Debtor sought to sell the Property. After reaching out to dozens of prospective purchasers and investors for the sale of the Property, the highest and in fact only offer received was the $11 million credit bid by iBorrow. Nobody was willing to make an offer based on the condition and status of the development of the Property.

The Debtor anticipates it will take approximately seven to nine months to complete construction of the Property, at which time the Property is estimated to be worth approximately $31,200,000.

### F. Debtor's Liabilities

The following is a summary description of the claims asserted against the estate.

### 1. Secured Claims

Pursuant to the DIP Financing Order, the DIP Lender holds a senior secured claim against all assets of the Debtor's estate. Pursuant to the DIP Financing, the Debtor has paid the County of San Bernardino on account of the property tax lien it previously held.

The following parties have recorded mechanics liens against the Property, all of which are junior to the DIP Lender's Secured Claim pursuant to the DIP Financing Order, and based on the contingent nature of the scheduled claims and the proofs of claims filed in the Case, assert the following claims:

| Mechanics Lien Claimant | Claim |
|---|---|
| Alta Finish & Stair Inc. | $0 |
| Apple Valley Insulation | 116,696 |
| Christianbelle Electric Inc. | 0 |

| Mechanics Lien Claimant | Claim |
|---|---:|
| Fiber Care Baths, Inc. | 0 |
| Global Plumbing and Fire Supply | 0 |
| Constant Fire Protection | 55,721 |
| SC Design, Inc./Pacific Western Millworks | 42,703 |
| TriMark Orange County | 0 |
| Walker Windows/SC Design, Inc. | 0 |
| L2 Specialties | 0 |
| Kone | 0 |
| **Total** | $215,121 |

Apple Valley Insulation and Constant Fire Protection are the only parties that timely filed a lawsuit against the Debtor within ninety (90) days of the recording of their liens, and thus, as a matter of law, are the only parties who could hold a valid mechanics lien against the Debtor's Property.[2]  The Debtor, Apple Valley and Constant Fire disputed the amount of their secured claims, but have reached resolution of their dispute, whereby the Debtor agreed to pay, and apple Valley and Constant Fire agreed to accept $45,000 and $25,000 respectively for payment in full on account of their Claim against the Debtor.

All but two of the alleged mechanic lien claimants failed to file a proof of claim, and thus are not creditors of the estate. All of these parties were scheduled as having contingent claims.  On December 20, 2023, the Debtor served upon all creditors a copy of a proof of claim and bar date notice.  The deadline for filing proofs of claims was February 5, 2024.  As of the date of this Disclosure Statement, which is after the passage of the bar date, none of these parties (except for Apple Valley Insulation and Pacific Western Millworks) filed a proof of claim.  Accordingly, as a matter of law, these parties do not even have a claim against the Debtor's estate.  However, Pacific Western Millworks's alleged lien lapsed by operation of Cal Civil Code 3144.

RCB asserts that it holds a secured claim against the estate based on an agreement granting a security interest in the Debtor's right, title, and/or interest in and/or to Accounts, General Intangibles, and Instruments, specifically, and including without limitation any funds received by, or credited to the account of, Assignor in connection with the approval and release of EB-5 funds relating to Assignor's EB-5 program.

---

[2] Cal Civil Code § 3144 (liens are automatically null and void if claimant fails to commence an action to foreclose the lien within ninety days of recording of lien).

1     The Debtor disputes that RCB has a lien against any assets because the Debtor did not own,

2  as of the petition date, any of the assets sought to be collateralized, and section 552(a) prevents

3  liens from attaching or being perfected on after-acquired property.  The Debtor acknowledges that

4  the Debtor granted pre-petition a lien against accounts and general intangibles.  The Debtor

5  however, does not generate any revenue and as a result, as of the petition date, had no accounts

6  receivable, nor did it have any general intangibles or instruments.  Moreover, the Debtor does not

7  own any interest in EB-5 funds (as they are owned by the EB-5 investors) as of the petition date.

8  The Debtor merely holds such funds in trust for the benefit of EB-5 investors, who may withdraw

9  such funds at any time without the consent of the Debtor.  Section 552(a) provides that "property

10  acquired by the estate or by the debtor after the commencement of the case is **not subject to any**

11  **lien resulting from any security agreement** entered into by the debtor before the commencement

12  of the case."  11 U.S.C. § 552(a) (emphasis added).  As a result, no lien can attach to the EB-5

13  funds after the petition date, and thus RCB has no lien against property of the estate.

14          2.    Administrative, Priority and General Unsecured Claims

15     The following is a summary of administrative claims asserted against the date as of the date

16  of the filing of this Disclosure Statement, which will be paid from the DIP Financing.

17
| Firm | Nature of Service | Claim[3] |
|---|---|---|
| WGH | General Insolvency Counsel | $1,400,000 |
| Wilshire Pacific Capital Advisors | Financial Advisor | $30,000 |
| The Smart CPAs | Accounting | 15,750 |

20     The Debtor is not aware of any priority unsecured claims asserted against the estate.  The

21  Debtor estimates that there are approximately $4.6 million of General Unsecured Claims asserted

22  in the Debtor's Case $237,000 of which are claims asserted by insiders or affiliates of the Debtor.

23

24

25

26

27
[3] Claim represents total services rendered by each of the respective firms through May 31, 2024. This does not include
all fees to be incurred in the case.  All fees and expenses incurred by the firms are subject to Bankruptcy Court
approval.

28

## IV.

## THE DEBTOR'S CHAPTER 11 PROCEEDING

### A.    Commencement of Case

On June 22, 2023, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtor has managed its financial affairs as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107 and 1008.

### B.    Income and Payment of Expenses and Debts During Bankruptcy

Based on the Debtor's lack of funds, the Debtor has not been able to resume development during most of the Case.  Based on a small equity infusion made post-petition, the The only expenses Debtor was able to pay paid during this case were for insurance, which was funded with equity infused post-petition.  The Debtor has accrued post-petition obligations to its security guard company and professionals employed in this eCase, but recently, has used DIP Financing to pay other post-petition expenses that had accrued during the Case.

### C.    Employment of Professionals

The Court has entered orders authorizing the employment of the following professionals in the Cases:

| Professional | Type of Professional | Date Order Entered |
|---|---|---|
| WGH | Debtor's General Insolvency Counsel | August 16, 2023 |
| Wilshire Pacific Capital | Debtor's Financial Advisor | November 27, 2023 |
| The Smart CPAs | Debtor's Accountants | March 28, 2024 |

### D.    Analysis of Preferential, Fraudulent and Unauthorized Transfers

The Debtor has completed its analysis of the Debtor's books and records to determine whether any payments made prior to the Petition Date constitute preferential transfers avoidable pursuant to § 547 of the Bankruptcy Code, or whether any transfers made by the Debtor are avoidable as fraudulent transfers under §§ 544(b) or 548 of the Bankruptcy Code, or avoidable pursuant to § 549 of the Bankruptcy Code.  Based on the Debtor's preliminary review and analysis, the Debtor has prepared a Schedule of Potential Causes of Action against third parties who have been preliminarily identified as recipients of potential preferential, fraudulent, and

1    unauthorized post-petition transfers or other monies that the Debtor may be entitled to recover.

2    *See* **Exhibit 3**.  The amounts identified on this schedule represent the total amount of transfers

3    made to each of the respective parties that the Debtor is aware of at this time.  The Debtor has not

4    fully analyzed the potential defenses that may exist or be asserted, or the collectability of any

5    judgment should one be entered against a party.  It is conceivable that after a review, analysis and

6    consideration of all defenses that may exist, the Debtor may determine with respect to any

7    particular action that there is no claim, the claim is less, and/or it is not in the best interests of the

8    estate to pursue such action.  The Debtor does not believe that any Creditor should rely on any

9    recovery on the prosecution of Avoidance Actions.  That being said, any recovery received, net of

10   attorney's fees and costs, would increase the recovery to General Unsecured Creditors.  It is worth

11   noting that based on the 100% Plan, there would not be any legal or practical basis to bring any

12   such action.

13           **E.**      **Projected Objections to Claims Filed Against the Estate**

14           Based on the Debtor's books and records, Schedules and proofs of claims filed, attached as

15   **Exhibit 4** is a schedule of projected Claims in the Debtor's Case.

16                                          **V.**

17                            **FINANCIAL INFORMATION**

18           **A.**      **Historical Financial Information for the Debtor**

19           The Debtor is not an operating business.  Rather, the Debtor has spent years developing

20   real property to be used and operated as an assisted living facility.  The Appraisal attached as

21   **Exhibit 2** and the $11,000,000 credit bid purchase price being the highest offer represents the most

22   detailed information about the current value of the Property.

23           **B.**      **Financial Information Provided During the Case**

24           The Debtor has filed Schedules in the Case.  The Schedules provide financial information

25   regarding the assets and liabilities of the Estate as of the Petition Date.  The Schedules are

26   available for inspection, during normal business hours, at the Clerk's Office of the Bankruptcy

27   Court, located at 1415 State Street, Santa Barbara, CA 93101.  In addition to the Schedules, the

28   Debtor has prepared throughout the Monthly Operating Reports in accordance with the

1  requirements of the United States Trustee.  Copies of the Monthly Operating Reports are available

2  for inspection on the docket and during normal business hours, at the Clerk's Office of the

3  Bankruptcy Court, located at 1415 State Street, Santa Barbara, CA 93101.

4         **C.**      **Financial Projections for the Debtor's Plan of Reorganization**

5        The Debtor has prepared Projections, which includes cash flow projections for the

6  Property, along with assumptions on which such projections are based.  The Projections are

7  intended to assess the future cash flow available to the Debtor for making the Distributions

8  required by the Plan, and thus provide support for the feasibility of the Plan, pursuant to

9  § 1129(a)(11) of the Bankruptcy Code.  The Projections are attached hereto as **Exhibit 1**.  The

10  Projections present the entire financial template for the Debtor's reorganization effort.  The

11  Projections assume that the Debtor will complete its development, and thereafter, operate and

12  manage the facility.  As the Projections indicate, the Debtor projects that the net cash flow from

13  the operations generated from the Property, financing proceeds and, if necessary, net sales

14  proceeds, will be sufficient to pay all Allowed Claims in accordance with the treatment of such

15  Allowed Claims as described herein.

16        The Projections set forth the Debtor's estimate of the anticipated cash flow of the

17  Reorganized Debtor for the term of the Plan, which is based on the anticipated cash flow from the

18  operations of the planned assisted living facility.  Projections of the anticipated cash flow of the

19  Reorganized Debtor are based on estimated revenue and expenses for the operation of the

20  assisted living facility.  The Projections also contain a description of material assumptions

21  underlying the Projections.  The Projections are based, in large part, upon the historical earnings

22  and expenses of similar assisted living facilities owned and operated by affiliates of the Debtor.

23        Although the Debtor has devoted considerable effort to the development of the

24  Projections and believes that the Projections represent fairly the projected future cash flow of the

25  Debtor, care should be taken in analyzing the Projections as no guarantee exists that the

26  Projections can be met by the Debtor.

27        THE FINANCIAL PROJECTIONS SET FORTH IN THIS DISCLOSURE STATEMENT

28  REPRESENT AN ESTIMATE OF FUTURE PERFORMANCE BASED UPON CERTAIN

1   ASSUMPTIONS SET FORTH IN THE FINANCIAL PROJECTIONS.  THESE FUTURE

2   EVENTS MAY OR MAY NOT OCCUR, AND THE FINANCIAL PROJECTIONS MAY NOT

3   BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL

4   RESULTS THAT WILL OCCUR.  BECAUSE OF THE UNCERTAINTIES INHERENT IN

5   PREDICTIONS OF FUTURE EVENTS AND EVENTS OUTSIDE OF THE DEBTOR'S

6   CONTROL, THE DEBTOR'S ACTUAL CASH FLOW MAY BE DIFFERENT FROM THAT

7   PREDICTED, AND SUCH DIFFERENCE MAY BE MATERIAL AND ADVERSE TO THE

8   INTERESTS OF CREDITORS.

9                                        **VI.**

10                    **DESCRIPTION OF PLAN OF REORGANIZATION**

11        A.        **Summary of the Plan**.

12        The following is a brief summary of the Plan and is qualified in its entirety by the full text

13   of the Plan.  The terms of the Plan are comprehensive and will be controlling on the Creditors and

14   the Debtors in the event that the Plan is confirmed.  **Therefore, all Creditors are urged to read**

15   **the Plan carefully in its entirety rather than relying on this summary.**

16        The Plan provides that General Unsecured Creditors will receive their Pro Rata share of the

17   Plan Fund based on each of their respective Allowed Claims.  The Projections attached hereto as

18   **Exhibit 1** represent the Debtor's best estimate of distributions under the proposed reorganization

19   at this time.   one hundred percent (100%) on account of their Allowed General Unsecured Claim

20   from income generated from the business operations over five years and/or the refinancing or sale

21   of the Assets.  For details about Plan treatment, see Article V of the Plan; for details about

22   implementation of the Plan, see Article VI of the Plan.

23        B.        **Proposed Treatment of Claims.**

24             1.        Creditors Asserting Secured Claims.  For full treatment, see Section 5.1-5.3

25        of the Plan.  The following is a summary of the proposed treatment of Claims of Secured

26        creditors:

27                  a.        Class 1.1-1.2:  Members of this Class consist of any Allowed

28                  Secured Claim held by a Mechanics Lien Creditor.  Creditor's rights are

impaired under the Plan, and thus members of this Class are entitled to vote.

       (1)     <u>Allowance of Secured Claim</u>.  The members of Classes 1.1-1.2 shall be allowed a Secured Claim in the amount of their non-contingent liquidated Claim as of the Petition Date to the extent of the value of such Creditor's Claim against the Estate's interest in such property, which shall be based on the Fair Market Value of the property (or such other value as agreed to between the Debtor and any member of Classes 1.1-1.2), securing such Creditor's Claim in these Classes.  If the members of these Classes object to the Debtor's asserted value of the property securing the Creditor's Claim or otherwise asserts a value of the property lower than that which is asserted by the Debtor, then, the Debtor may elect, in its sole discretion, to fix the amount of such objecting Creditor's Allowed Secured Claim based on the lower of the objection value(s).

       (2)     <u>Treatment of Allowed Secured Claims</u>.  Except to the extent that a member of these Classes agrees to a less favorable treatment, each member of these Classes shall receive a cash payment in the amount of its Allowed Secured Claim as of the Petition Date, equal to the Fair Market Value of such Creditor's interest in the Estate's interest in such property, as may be modified pursuant to Section 5.1.1.  Notwithstanding the foregoing, the Debtor has agreed to pay, and the members of Classes 1.1-1.2 have agreed to accept in full satisfaction of their Claims, cash payments in the amounts of $25,000 and $45,000, respectively.  Payment shall be made on or before the later of (i) the first Business Day of the first full month following the Effective Date, or (ii) the tenth (10th) Business Day after such Secured Claim becomes an Allowed Secured Claim.

       b.     <u>Classes 2.1-2.8:  Disallowed Claims of Invalid Mechanics Lien Parties</u>.  Classes 2.1-2.8 consists of parties who do not hold claims against the

estate, but who recorded liens against the Debtor's Property without commencing litigation within ninety days of the recording.  Classes 2.1-2.8 are unimpaired by the Plan.

(1)    Disallowance of Secured Claim.  The members of Classes 2.1-2.8 have no claim nor valid lien against the Debtor's estate.  They have no claim because the asserted claim did not arise from any obligation contracted for by the Debtor, the claim was scheduled by the Debtor as contingent, and the member of this Class failed to file a proof of claim.  Moreover, members of these classes have no valid lien because their lien was automatically void under California law (Cal Civil Code § 3144) based on their failure to timely commence a lawsuit against the Debtor within ninety days of the recording of their lien.

(2)    Treatment of Claim.  The members of this Class shall receive nothing from the Debtor.  Since the members of this Class have no valid lien, yet are clouding the Debtor's title, they must release their lien within five (5) days of the Effective Date.

c.    Class 3 - Allowed Secured Claim of Governmental Units.  Creditor's rights are impaired by the Plan, and thus members of this Class are entitled to vote. Each member of this Class shall receive cash payments until their Allowed Claim is Paid in Full.

Any Allowed Secured Claim of Governmental Units against the Estate will receive payments from the Estate pursuant to the same timing and subject to the same interest, if any, as set forth in § 4.2 of the Plan. Members of this Class shall retain their Lien until their Allowed Secured Claim against the respective Estate is Paid in Full.  A failure by the Reorganized Debtor to make a payment when due to a holder of an Allowed Secured Tax Claim of a Governmental Unit pursuant to the terms of the Plan shall constitute an Event of Default.  If the Reorganized Debtor fails to cure such Event of Default within thirty (30) days after receipt of

1    written notice of default, then such taxing authority may seek to assert an uncured

2    Event of Default to seek to enforce the balance due on its claim, plus interest

3    accrued, if any, under state law, against the Reorganized Debtor in accordance

4    with applicable state law remedies. See § 5.3 of the Plan.

5        2.    Unsecured Creditors:  For full treatment, see Sections 5.4-5.6 of the Plan.

6    The following is a summary of the proposed treatment of Claims of Unsecured creditors:

7        a.    Class 4 – Unsecured Non-Tax Priority Claims.  Creditor's rights

8    are unimpaired by the Plan, and thus members of this Class are not entitled to

9    vote.  This Creditor shall receive Cash in the full amount of the Allowed

10   Unsecured Non-Tax Priority Claim on the later of (i) the Effective Date, and

11   (ii) the tenth (10th) Business Day after such Non-Tax Priority Claim becomes an

12   Allowed Unsecured Non-Tax Priority Claim.

13       b.    Class 5 - Allowed Claim of RCB.  Creditor's rights are impaired by

14   the Plan, and thus the member of this Class is entitled to vote. The Member of this

15   Class shall be allowed a General Unsecured Claim of $2,883,000.

16     The member of this Class shall receive a cash payment in an amount that is the

17   greater of (a) $250,000 or (b) its Pro Rata share of the Plan Fund, which shall be

18   based on the total amount of its Allowed General Claim relative to the total amount

19   of Allowed Claims in Class 5 and Class 6.  Payment shall be made within on or

20   before the first Business Day of the first full month following the Effective Date.  In

21   addition, the member of this Class shall receive a cash payment or payments in an

22   amount equal to fifteen percent (15%) of the Released EB-5 Funds, if any, which

23   shall be paid by the first Business Day of the first full month following the dates

24   that any portion of the EB 5 Funds are released.  Furthermore, RCB shall have a

25   lien against all Released EB-5 Funds,[4] if any, subject to the Debtor's authority to

26   use the Released EB-5 Funds as described herein.  In particular, notwithstanding

27
28   [4] The Debtor believes that no property of the estate constituted collateral of RCB as of the Petition Date.  RCB
     contends that it holds a lien against property of the estate. The treatment proposed in the Plan is in resolution of the
     parties' disputes.

1   this lien, the Debtor shall have full authority, without any further action required by

2   RCB or the Debtor, to use the balance (i.e., 85%) of the Released EB-5 Funds

3   encumbered by RCB's lien, to complete the development and effectuate

4   Stabilization of the Property, including, payment of any and all obligations due and

5   owing to DIP Lender or any other creditor pursuant to the terms of this Plan and as

6   required by the Bankruptcy Code.  RCB shall be entitled to be paid the balance of

7   the Released EB-5 Funds, if any, only after the Property's Stabilization and all

8   obligations due to DIP Lender or any other creditor pursuant to the terms of this

9   Plan, the Bankruptcy Code, and any and all other obligations that may be owed as

10  of the Stabilization of the Property.

11          c.      Class 6 - Allowed General Unsecured Claims .  Creditor's rights

12  are impaired under the Plan, and thus members of this Class are entitled to vote.

13  Except to the extent that a member of this Class agrees to a less favorable

14  treatment, each member of this Class shall receive its GUC Pro Rata share of the

15  Plan Fund based on each member's Allowed General Unsecured Claim relative to

16  all Allowed General Unsecured Claims.  Payment shall be made within later of (i)

17  the first Business Day of the first full month following the Effective Date, or (ii)

18  the tenth (10th) Business Day after such Claim becomes an Allowed Claim. ~~In~~

19  ~~addition, members of this Class shall also receive its Pro Rata share of a fifty~~

20  ~~percent (50%) interest of the Debtor's limited partners' interest in the Debtor.~~

21          d.      Class 7 - Allowed Interests. The Interest holders' rights are impaired

22  by the Plan, and thus entitled to vote.  The holders of Allowed Interests shall retain

23  their Interests in the Debtor, subject to a modification of the rights and powers of

24  the limited and general partners, as reflected in the revised red-lined Limited

25  Partnership Agreement attached as **Exhibit 1** to the Plan and which modifications

26  are incorporated herein by this reference.

27

28

C.      **Executory and Assumed Contracts and Leases**.

The Debtors seek to assume and/or assign a variety of executory contracts, as reflected in Schedule 9.1 to the Plan, and reject executory contracts as reflected in Schedule 9.3. The Debtor is not aware of any other existing executory contracts and unexpired leases, but to the extent they exist, shall be deemed rejected. See Article IX of the Plan.

## VII.

## FUNDING OF THE PLAN

The Plan will be funded from one or more of the following: (a) cash that will be generated from the Reorganized Debtor's operations after the Effective Date; (b) new equity financing in the amount of up to approximately $1,750,000 may be provided by Debtor's EB-5 limited partners from the EB-5 Fund, which funds are currently held in trust for the benefit of the EB-5 limited partners, plus additional equity may be provided by third parties, if necessary; (c) funds from the DIP Financing approved by this Court; (d) any proceeds from the prosecution and/or settlement of Causes of Action, including Avoidance Actions; and (e) proceeds from the sale or refinancing of the Reorganized Debtor's business or real property.

The following is a summary of the potential sources of funding of payments to Creditors:

A.      **Debtor's Business Operations**

The Debtor's obligations due under the Plan are expected to be funded from cash flow generated from the operations of its assisted living facility. The Debtor's Plan Projections attached as **Exhibit 1** reflect the funding of the Debtor's obligations due under the Plan from its business operations.

B.      **Equity Financing**

The Debtor's obligations due under the Plan may be funded from new equity financing of up to approximately $1,710,000 provided from the Debtor's eb-5 limited partners, which funds are currently held in trust for the benefit of these limited partners. It is also conceivable that third party investors may provide additional equity as the Debtor has received interest from other parties.

C.    **DIP Financing**

The Debtor has obtained Bankruptcy Court approval for DIP Financing up to $23.39 million.  The Reorganized Debtor is bound by, and thus, shall comply with all obligations arising from the Court's DIP Financing Order and Credit Agreement attached thereto.  For sake of clarification, the terms of the DIP Financing Order and all of the DIP Lender's rights and remedies granted therein are hereby incorporated into the Plan and thus survive the closure of this Case. Based on the amount of funding made by the DIP Lender as of the date of the filing of this Plan and the estimated advances to be made pursuant to the DIP Financing budget and the order of the Bankruptcy Court approving a line of credit up to $23,390,785 million, it is estimated that, as of the Effective Date, the DIP Lender will have advanced, and thus hold, an Allowed Secured Claim of approximately $19 million, which is secured by liens against all assets of the Estate senior in priority to all Allowed Secured Claims, and subject and subordinate only to the Carve-out.

D.    **Sale and/or Refinancing of Assets**

The Debtor anticipates refinancing, or if necessary, selling the Property to pay Creditors in full.  The ability to refinance and/or sell a property is greatly and indisputably enhanced if the property is completed.

E.    **Causes of Actions**

The Debtor has not completed its evaluation of Causes of Actions, if any, and on that basis, cannot draw any conclusions as to anticipated recovery, likely or otherwise.  That being said, General Unsecured Creditors in the Case shall be entitled to and paid any litigation proceeds realized from the prosecution of Causes of Actions, if any, net of all attorneys' fees and other costs incurred.

**VIII.**

**TAX CONSEQUENCES OF THE PLAN**

A.    **Introduction**

The implementation of the Plan may have federal, state and local tax consequences to the Debtor and the Debtor's Creditors and Interest Holders.  No tax opinion has been sought or will be obtained with respect to any tax consequences of the Plan.  This Disclosure Statement does not

constitute, and is not intended to constitute, either a tax opinion or tax advice to any person, and the summary contained herein is provided for informational purposes only.

The discussion below summarizes only certain of the federal income tax consequences associated with the Plan's implementation.  This discussion does not attempt to comment on all aspects of the federal income tax consequences associated with the Plan, nor does it attempt to consider various facts or limitations applicable to any particular Creditor or Interest Holder which may modify or alter the consequences described herein.  A Creditor or Interest Holder may find that the tax consequences of the Plan to such Creditor or Interest Holder differ materially from the tax consequences discussed below because of such Creditor's or Interest Holder's facts and circumstances.  This discussion does not address state, local or foreign tax consequences or the consequences of any federal tax other than the federal income tax.

The following discussion is based upon the provisions of the Internal Revenue Code, the regulations promulgated thereunder, and existing judicial decisions and administrative rulings.  In light of the rapidly-changing nature of tax law, no assurance can be given that legislative, judicial or administrative changes will not be forthcoming that would affect the accuracy of the discussion below.  Any such changes could be material and could be retroactive with respect to the transactions entered into or completed prior to the enactment or promulgation thereof.  The tax consequences of certain aspects of the Plan are uncertain due to the lack of applicable legal authority and may be subject to judicial or administrative interpretations that differ from the discussion below.

CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.

**B.**      **Federal Income Tax Consequences to the Debtor**.

Consummation of the Plan may reduce substantially the amount of the Debtor's aggregate outstanding indebtedness.  In general, the Internal Revenue Code provides that a taxpayer who realizes a discharge of indebtedness must include the Debt Discharge Amount in its gross income

in the taxable year of discharge to the extent that the Debt Discharge Amount exceeds any consideration given for such discharge.[5]  However, if a taxpayer is in a title 11 case and the discharge of indebtedness occurs pursuant to a plan approved by the bankruptcy court, as in these Cases, then such discharge of indebtedness is specifically excluded from gross income. Accordingly, the Debtor will not be required to include in income any Debt Discharge Amount as a result of the Plan transactions.

Although the Debtor will not have to include the Debt Discharge Amount resulting from the Plan transactions in his gross income, there will be a tax effect.  The Internal Revenue Code requires certain tax attributes of a debtor to be reduced by the Debt Discharge Amount excluded from income.  Tax attributes are reduced in the following order of priority:  net operating losses and net operating loss carryovers; general business credits; minimum tax credits; capital loss carryovers; basis of property of the taxpayer; passive activity loss or credit carryovers; and foreign tax credit carryovers.  Tax attributes are generally reduced by one dollar for each dollar excluded from gross income, except that general tax credits, minimum tax credits and foreign tax credits are reduced by 33.3 cents for each dollar excluded from gross income.

An election can be made to alter the order of priority of attribute reduction by first applying the reduction against depreciable property held by the taxpayer in an amount not to exceed the aggregate adjusted basis of such property.  The Debtor has not yet decided whether to make such election.   The deadline for making such election is the due date (including extensions) of the Debtor's federal income tax return for the taxable year in which such debt is discharged pursuant to the Plan.

Any Claim against the Debtor (except a Claim that would give rise to a deduction if paid) that is discharged by payment to a Creditor of Cash and/or property will result in the creation of a Debt Discharge Amount reducing tax attributes to the extent that the adjusted issue price of the debt discharged (plus accrued interest) exceeds the fair market value of the payment made in cancellation thereof.

---

[5] No income from the discharge of indebtedness is realized to the extent that payment of the liability being discharged would have given rise to a deduction.

1    The Debtor's Debt Discharge Amount may be increased to the extent that General

2    Unsecured Creditors holding unscheduled Claims fail to timely file a Proof of Claim and have

3    their Claims discharged on the Confirmation Date pursuant to Bankruptcy Code § 1141.

4    **C.    <u>Tax Consequences to Creditors</u>.**

5    A Creditor who receives a Distribution on his or her Claim that is less than the Creditor's

6    adjusted basis in such Claim may be entitled to claim a bad debt deduction for this difference.  A

7    bad debt deduction is allowed in the taxable year of the Creditor in which a debt becomes wholly

8    worthless.  The discharge of a Claim pursuant to the Plan establishes that such Claim is wholly

9    worthless as of the date of discharge (assuming the holder of the Claim receives no consideration

10   under the Plan with respect to such Claim).  It is possible, however, that such Claim may have

11   become wholly worthless on an earlier date, depending upon all the facts and circumstances.  The

12   Debtor expresses no opinion regarding the date or dates on which Claims discharged under the

13   Plan became worthless.

14   **IX.**

15   **<u>LIQUIDATION ANALYSIS</u>**

16   Pursuant to § 1129(a)(7) of the Bankruptcy Code, a plan cannot be confirmed unless the

17   bankruptcy court determines that distributions under the plan to all holders of claims and interests

18   who have not accepted the plan, and whose claims and interests are classified in classes that are

19   impaired under the plan, are no less than those which they would receive in a liquidation

20   proceeding under Chapter 7.  This test must be satisfied even if a plan is accepted by each impaired

21   class of claims and interests.   This test, which is often referred to as the "best interests" test,

22   requires the bankruptcy court to find either that (i) <u>all</u> holders of claims and interests in an

23   impaired class of claims or interests have accepted the plan, or (ii) the plan will provide each

24   holder of claims and interests in an impaired class who has not accepted the plan with a recovery

25   of property of a value, as of the effective date of the plan, that is not less than the amount that such

26   holder would receive if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code.

27   To satisfy the "best interest" test, the bankruptcy court must reach a conclusion regarding

28   the probable distribution to the holders in each impaired class of claims and interests if the debtor

was liquidated in a Chapter 7.  The first step in this process is to determine the "liquidation value" that would be generated from a forced sale of the debtor's assets by a Chapter 7 trustee. The second step requires the application of the projected liquidation proceeds in accordance with the various rights of creditors holding liens on the property.  For example, if a claimant holds a lien on corporate equipment but not inventory, the proceeds of the liquidation derived from this asset would have to be applied against this claimant's debt.  If the proceeds were sufficient to retire the claimant's secured claim, then the claimant's claim would be paid in full.  However, if the liquidation proceeds are not sufficient, then that portion of the claim which is not satisfied from the sale proceeds is treated as an unsecured claim and shares pro rata at that distribution level.  This process must then be repeated as to each collateral category to ensure that the claims secured by collateral are paid from their collateral and only from their collateral.

Once all of the claims secured by liens on assets of a debtor's estate are deducted from the projected liquidation proceeds of the sale of the claimant's collateral, then the costs and expenses associated with the liquidation of the estate incurred by the Chapter 7 trustee must be paid.  These costs would include the compensation of the trustee, as well as compensation of counsel and other professionals retained by the trustee, and asset disposition expenses.

After payment of the costs and expenses associated with the Chapter 7 liquidation are paid, all unpaid administrative expenses incurred by the debtor in its Chapter 11 case (such as compensation of attorneys, financial advisors, and restructuring consultants) that are allowed in the Chapter 7 case, and all unpaid claims arising from the operations of the debtor during the pendency of the Chapter 11 case, must be paid.

After the payment of Chapter 11 administrative expenses, the remaining liquidation proceeds would be used to pay priority claims, such as tax and wage claims that are entitled to priority under the Bankruptcy Code. Thereafter the remaining liquidation proceeds would be made available to pay general unsecured claims.  Finally, to the extent that any proceeds remain after paying all allowed claims, they would be distributed to interest holders in accordance with their liquidation priorities.

1    Attached hereto as **Exhibit 5** is a liquidation analysis prepared by the Debtor that estimate

2    the probable liquidation value of the Debtor's assets, and applies the foregoing liquidation

3    methodology to the estimated Claims against the Estate in a Chapter 7 liquidation in an effort to

4    quantify what each Class of Creditors and Interest Holders would receive in a Chapter 7

5    liquidation.  Any liquidation analysis of this nature entails a significant degree of estimation and

6    projection regarding both probable asset value and probable Allowed Claim totals.  For example,

7    in preparing **Exhibit 5**, the Debtor has necessarily quantified what the Debtor believes will be the

8    Allowed Claims after claim objections within each Class, including projected Allowed

9    Administrative Claims, which are included in **Exhibit 5**.  The administrative claims included in

10   **Exhibit 5** are based on fees for professional services, which have not been completed in this Case

11   and are subject to final Court approval.  These and other factors may significantly increase or

12   reduce the Distributions to holders of Allowed Claims.

13   On the valuation side, the Debtor, with the use of the appraisal of the Property, has

14   estimated the liquidation value of its assets.

15   Although there are inherent difficulties in quantifying with exactitude the potential

16   recoveries that Creditors would receive in a Chapter 7 liquidation scenario, the Debtor believes

17   that the comprehensive liquidation analyses attached hereto as **Exhibit 5** provides a fair range of

18   estimated results that would occur in a Chapter 7 liquidation.  As this analysis indicates, a the

19   Debtor's assets are currently encumbered by Liens in favor of secured creditors.  Based upon the

20   foregoing valuation assumptions, and given the amount of the existing secured and unsecured

21   claims against the assets owned by the Debtor, the Debtor believes that, in a Chapter 7 liquidation,

22   Creditors holding General Unsecured Claims would receive 0% on account of their Claims in the

23   Debtor's Case.

24   In contrast, the Debtor believes that substantially more value will be available for Creditors

25   under the terms of the Plan.  More specifically, instead of being paid nothing, the Debtor firmly

26   believes General Unsecured Claims will be paid in full.  Consider the following class by class

27   comparative analysis:

28

### A.    Class 1.1-1.2

The holders of Claims in these Classes are impaired by the Plan.  Under a Chapter 7 liquidation, the members of this Class are projected to receive no distribution.  Accordingly, members of this Class will receive as much as they would in a Chapter 7.


### B.    Classes 2.1-2.8

The holders of Claims in these Classes are unimpaired by the Plan, so they are not entitled to vote.

### C.    Class 3

The holders of Claims in this Class are impaired by the Plan.  Under a Chapter 7 liquidation, the members of this Class is projected to receive no distribution.  Accordingly, members of this Class will receive as much as they would in a Chapter 7.

### D.    Class 4

The holders of Claims in this Class are impaired by the Plan. Under a Chapter 7 liquidation, the members of this Class are projected to receive no distribution.  Accordingly, members of this Class will receive as much as they would in a Chapter 7.

### E.    Class 5

The holder of Claims in this Class is impaired by the Plan. Under a Chapter 7 liquidation, the member of this Class is projected to receive no distribution.  Accordingly, the member of this Class will receive more than it would in a Chapter 7.

### F.    Class 6

The holders of Claims in this Class are impaired by the Plan. Under a Chapter 7 liquidation, the members of this Class is projected to receive no distribution.  Accordingly, the members of this Class will receive more than as they would in a Chapter 7.

### G.    Class 7

The holders of Interests in this Class are impaired by the Plan. Under a Chapter 7 liquidation, Interest Holders in this Class are projected to receive no Distributions.  In contrast, under the Plan, these Interest Holders will retain their interest in the Debtor, and thus receive more

than they would receive in a liquidation.

////

////

# X.

# VOTING

### A. Who May Vote.

Creditors are entitled to vote on confirmation of the Plan unless (i) their class is unimpaired (presumed to accept) or is to receive no distribution (presumed to reject); (ii) an objection has been filed to that creditor's claim, (iii) that creditor's claim is scheduled by the Debtor as contingent, disputed, unliquidated or unknown and the creditor has not filed a proof of claim; or (iv) the claim is unclassified (and thus required by law to be paid in full). A creditor whose claim has either been objected to or been scheduled by the Debtor as contingent, disputed, unliquidated or unknown and the creditor has not filed a proof of claim, and who wishes to vote, must move to have its claim allowed for voting purposes by filing a motion for such relief in time for that motion to be heard at or before the Confirmation Hearing.

### B. How to Vote.

Fill out and return the attached ballot so that it is received by the Debtor's counsel no later than 14 days before the Confirmation Hearing.

### C. Effect of Vote.

The Plan will be confirmed only if (i) it is accepted by each impaired class, or (ii) it is accepted by at least one impaired class (exclusive of insiders) and the Court determines that it is "fair and equitable" (as defined by § 1129(b) of the Bankruptcy Code) to all dissenting classes of creditors. A class of creditors accepts the Plan if it is accepted by a majority in number and two-thirds in dollar amount of creditors who cast timely ballots voting on the Plan.

1

2

3  / / /

4  / / /

5                                **XI.**

6                           **CONCLUSION**

7          The materials provided in this Disclosure Statement are intended to assist Creditors in

8  voting on the Plan.  If the Plan is confirmed, Creditors will be bound by the terms of

9  the Plan.  Therefore, all Creditors are urged to review this material and to make such further

10  inquiries as they deem appropriate, and then cast an informed vote on the Plan.

11

12  Date: ~~June~~ July 24~~10~~, 2024              **GLOBAL PREMIER REGENCY PALMS**
                                               **COLTON, LP, a California limited partnership**

13
                                               **GLOBAL PREMIER AMERICA #4, LLC,**
14                                             **a California limited liability company, its**
                                               **General Partner**
15

16

17  By:_____
18  Name:  Christine Hanna
    Its:      Manager

19

20

21

22

23

24

25

26

27

28

A.     **Rules of Construction**.

For the purpose of the Plan, unless otherwise provided in the Plan, (i) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (ii) each pronoun stated in the masculine, feminine or neuter shall include the masculine, feminine and neuter; (iii) any reference in the Plan to an existing document, exhibit or schedule filed or to be filed means such document or schedule as it may have been or may be amended, modified or supplemented pursuant to the Plan; (iv) any reference to an entity as a holder of a Claim includes that entity's successors and assigns; (v) except as otherwise stated herein, all references in the Plan to section§-s, articles and exhibits are references to §Section-s, Articles and Exhibits of or to the Plan; (vi) the words "herein," "hereunder" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (vii) unless otherwise provided in the Plan, any reference in the Plan to a contract, instrument, release, indenture, agreement, or other document being in a particular form or on particular terms and conditions means that such document shall be substantially and materially in such form or substantially and materially on such terms and conditions; and (viii) the rules of construction set forth in Section §-102 of the Bankruptcy Code shall apply to the extent such rules are not inconsistent with the express terms of the Plan or any other provision in this Appendix.

B.     **Schedules**.

All exhibits to the Plan are incorporated into and are a part of the Plan as if set forth in full herein.

EXHIBIT 3

## Schedule of Potential Avoidance and Other Causes of Action

| Name | Gross Amount of Transfers |
|---|---|
| Christine Hanna | $15,000 |
| Clear Vision Consulting, LLC | 40,000 |
| Global Premier America, LLC | 59,500 |
| Magdy Hanna | 20,000 |
| National Affordable Communities, Inc. | 16,200 |
| Urban Community Builders, LLC | 37,236 |

**Exhibit 3**

### PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1301 Dove Street, Suite 500, Newport Beach, CA 92660

A true and correct copy of the foregoing document entitled: **DEBTOR'S AMENDED DISCLOSURE STATEMENT IN SUPPORT OF DEBTOR'S FIRST AMENDED CHAPTER 11 PLAN OF REORGANIZATION** will be served or was served (a) on the judge in chambers in the form and manner required by LBR 5005-2(d); and (b) in the manner stated below:

**1**.  **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **July 25, 2024**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- **Brian David Fittipaldi**    brian.fittipaldi@usdoj.gov
- **John-Patrick M Fritz**    jpf@lnbyg.com, JPF.LNBYB@ecf.inforuptcy.com
- **Kenneth Hennesay**    khennesay@allenmatkins.com, ncampos@allenmatkins.com
- **Garrick A Hollander**    ghollander@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **Peter W Lianides**    plianides@wghlawyers.com, jmartinez@wghlawyers.com;svillegas@wghlawyers.com
- **David L. Neale**    dln@lnbyg.com
- **Zachary Page**    zach.page@thompsonhine.com, ECFDocket@thompsonhine.com
- **Daniel H Reiss**    dhr@lnbyg.com, dhr@ecf.inforuptcy.com
- **Matthew J Stockl**    matthew.stockl@dinsmore.com, katrice.ortiz@dinsmore.com
- **United States Trustee (ND)**    ustpregion16.nd.ecf@usdoj.gov
- **Johnny White**    JWhite@wrslawyers.com, jlee@wrslawyers.com

**2. SERVED BY UNITED STATES MAIL**: On **____, 2024**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

**3. SERVED BY EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **____, 2024** I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| July 25, 2024 | Silvia Villegas | /s/ Silvia Villegas |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |